# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| DARRYL GUMM | : | CASE NO: C-1-98-838 |
| Petitioner | : | District Judge Walter H. Rice |
| - vs - | : | Magistrate Judge Michael R. Merz |
| BETTY MITCHELL, Warden | : | |
| Respondent | : | |

---

### PETITIONER DARRYL GUMM'S TRAVERSE
### TO THE
### WARDEN'S RETURN OF WRIT

---

Lawrence J. Greger (0002592)
Attorney at Law
1100 Liberty Tower
120 W. Second Street
Dayton, Ohio 45402
(937) 223-3153
lgreger912@aol.com

and

Kathleen McGarry (0038707)
McGarry Law Office
P.O. Box 310
Glorieta, New Mexico 87535
(505) 757-3989
kate@kmcgarrylaw.com

Counsel for Petitioner Darryl Gumm

# TABLE OF CONTENTS

Page No.

STATEMENT OF FACTS AND STATEMENT OF THE CASE ................................. 1

STANDARD OF REVIEW PURSUANT TO 28 U.S.C. §2254 (D) .......................... 10

PROCEDURAL DEFAULT ...................................................................... 15

CONSTITUTIONAL CLAIMS ................................................................. 19

    FIRST CLAIM FOR RELIEF—INVOLUNTARY STATEMENT ......................... 19
        *A.   Introduction*.......................................................................... 19
        A confession, obtained from a person who is mentally retarded, is an involuntary confession when the police overbore the accused's will or the person does not understand the *Miranda* guarantees or the waiver of those rights. .......................... 19
        *B.   Procedural Posture* ...................................................... 19
        *C.   The Claim and Merits Argument*................................... 19
        *D.   State Court Ruling*...................................................... 27
        *E.   Further Factual Development* .................................... 29

    SECOND CLAIM FOR RELIEF---BRADY VIOLATION....................................... 30
        *A.   Introduction*.......................................................................... 30
        The suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material to guilt or punishment. *Brady v. Maryland,* 373 U.S.. 83 (1963); *Kyles v. Whitley*, 514 U.S. 419 (1995).......................................... 30
        *B.   Procedural Posture* ...................................................... 30
        *C   The Claim and Merits Argument*................................... 32
        *D.   State Court Ruling*...................................................... 39

    THIRD CLAIM FOR RELIEF—PRIOR BAD ACTS EVIDENCE ......................... 42
        *A.   Introduction*.......................................................................... 42
        The admission of evidence of prior bad acts of the petitioner in his capital murder trial, which acts bear no relation to the offenses for which he was tried, violated his right to a fundamentally fair trial secured to him by the due process clause and Eighth amendment of the United States Constitution ......................................................... 42
        *B.   Procedural Posture* ...................................................... 42
        *C.   The Claim and Merits Argument*................................... 42
        (1) OTHER ACTS EVIDENCE ELICITED BY THE PROSECUTION FROM STATE'S WITNESSES THACKER AND BAKER ............................................................................. 42

(2) OTHER ACTS EVIDENCE ELICITED BY THE PROSECUTION FROM COURT PSYCHIATRIC CLINIC RECORDS .................................................................. 48

D. *State Court Ruling and Reply to Legal Arguments cited by the Warden* ................. 52

E. *Further Factual Development* ......................................................................... 61

FOURTH CLAIM FOR RELIEF—PROSECUTORIAL MISCONDUCT ............ 62

A. *Introduction* ................................................................................................. 62

A defendant is entitled to a trial which is free from prosecutorial misconduct which renders the proceeding fundamentally unfair. *Donnelly v. DeChristoforo* (1974), 416 U.S. 438. The prosecutor has a special duty and functions as the government's representative, "... whose obligation to govern impartially is as compelling as its obligation to govern at all..." *Berger v. United States* (1935), 295 U.S. 78. .................. 62

B. *Procedural Posture* ........................................................................................ 62

C. *The Claim and Merits Argument* .................................................................... 62

(1) Improper comment regarding the character of the accused and/or prejudicial other act evidence and argument (Claim 3 misconduct) ............................................ 63

(2) Improper comment regarding facts not in evidence, and asking the jury to speculate. ............................................................................................................ 70

D. *State Court Ruling* ........................................................................................ 75

E. *Further Factual Development* ......................................................................... 79

FIFTH CLAIM FOR RELIEF—TRIAL COUNSEL WAS INEFFECTIVE .......... 80

A. *Introduction* ................................................................................................. 80

Mr. Gumm was charged with a capital crime and was on trial for his life. The Sixth Amendment to the United States Constitution, guaranteed him that he would have effective representation by counsel again these charges. He did not receive that constitutional guarantee. ......................................................................................... 80

B. *Procedural Posture* ........................................................................................ 80

C. *The Claim and Merits Argument* .................................................................... 81

D. *State Court Ruling* ........................................................................................ 85

E. *Further Factual Development* ......................................................................... 89

SIXTH CLAIM FOR RELIEF—APPELLATE COUNSEL WAS INEFFECTIVE .................................................................................................................. 90

A. *Introduction* ................................................................................................. 90

B. *Procedural Posture* ........................................................................................ 90

C. *The Claim and Merits Argument* .................................................................... 90

D. *State Court Ruling* ........................................................................................ 93

*There is no evidence in the record in this case that it was a "tactical decision," in fact the evidence shows that there was no tactical decision. During the evidentiary hearing, Herb Freeman, one of Gumm's trial attorneys testified as follows:* .................................................................................................................. 95

*E. Further Factual Development* .......................................................................... 99

SEVENTH CLAIM FOR RELIEF—REMOVAL FROM KENTUCKY .............. 100
    *A. Introduction* ............................................................................................... 100
    Gumm was improperly removed from the State of Kentucky ................................ 100
    *B. Procedural Posture* ..................................................................................... 100
    *C. The Claim and Merits Argument* .............................................................. 100
    *D. State Court Ruling* ..................................................................................... 102
    *E. Further Factual Development* .................................................................... 103

EIGHTH CLAIM FOR RELIEF—GRUESOME PHOTOS ................................. 104
    *A. Introduction* ............................................................................................... 104
    Due process is violated with the introduction of cumulative, gruesome and
    inflammatory photographs of the corpse of the deceased as well as a videotape walk
    through by the defendant being led by the police through the crime scene ............ 104
    *B. Procedural Posture* ..................................................................................... 104
    *C. The Claim and Merits Argument* .............................................................. 104
    *C. State Court Ruling* ..................................................................................... 104
    *E. Further Factual Development* .................................................................... 105

NINTH CLAIM FOR RELIEF—JURY INSTRUCTION ERRORS ................... 106
    *A. Introduction* ............................................................................................... 106
    A capital defendant has a right to receive proper jury instructions in the trial phase of
    his capital case.  The jury instructions regarding police office credibility, non-
    unanimous verdict, causation and purposeful murder, violated Darryl Gumm's rights
    as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments. ............... 106
    *B. Procedural Posture* ..................................................................................... 106
    *C. The Claim and Merits Argument* .............................................................. 106
    Police Office Credibility ........................................................................................ 106
    Non- Unanimous Verdict ........................................................................................ 107
    Gist of the Offense ................................................................................................. 108
    Causation ................................................................................................................ 110
    *D. State Court Ruling* ..................................................................................... 111
    *E. Further Factual Development* .................................................................... 113

**CONCLUSION** ................................................................................................. **114**

**CERTIFICATE OF SERVICE** .......................................................................... **115**

## Statement of Facts and Statement of the Case

Under the Statement of Facts presented by the Warden, the Warden begins: "The Ohio Supreme Court rendered binding factual findings in this case as follows".  The Warden makes this claim without citation to any court decision supporting this claim.  In order to be binding, state court factual findings must be necessary for the decision on a particular claim, must be historical, must be supported by the record, and must not be mixed questions of law and fact.  The statement of facts by the state appellate courts is nothing more than an overall summary of the facts of the case as set forth by the author of the opinion.  Because it is not specific to any issue and because it is not historical and not based on the necessity of finding the facts contained therein, it is not a factual finding under habeas statutes and is therefore not binding on this court.

As set forth in the transcript of proceedings, the following facts were presented in state court.

At approximately 11:00 p.m. on May 11, l992, Aaron Raines was reported missing to the Cincinnati Police Department after an initial search of his neighborhood. (Tr.548). Aaron lived at 713 Neave Street which was located in an area of Cincinnati, Ohio known as "Eighth and State."(Tr.548). When last seen, Aaron was playing in a park near his home, in the daylight hours. (Tr. 547).

Located a short distance from Neave Street, in the 2100 block of West Eighth Street, were two (2) abandoned buildings and next to these buildings is a small park where Aaron was last seen playing. (Tr.560).

In the early morning hours of May 12, l992, Officer Teri Peirano continued the search for Aaron by searching these buildings for clues as to Aaron's whereabouts. (Tr.558).

Officer Peirano searched the first building without success. (Tr. 560-562). She entered the second building and found the body of Aaron Raines on the basement floor of the second building's basement. (Tr.569)

The Cincinnati Police Department's homicide squad began an investigation into the death of Aaron Raines on May 13, l992 (Tr. 676), and knew of Appellant Darryl Gumm as a potential suspect "a few days after the actual homicide occurred." (Tr. 678). Although knowing of Darryl Gumm, they did not focus on Appellant until July of l992, after interviewing, fingerprinting and/or questioning one hundred forty-five individuals. (Tr.677).

On July 24, l992, without a warrant, the Cincinnati Police Department located Appellant Gumm working on a farm in Brooksville, Kentucky, (Tr.63-64), an hour's drive from Cincinnati. (Tr. 692). Gumm, a mentally retarded person, was questioned by the Cincinnati Police personnel in Brooksville, Kentucky about his whereabouts on May 11, 1992, (the date of Aaron Raines' disappearance) (Tr. 65). Appellant was fingerprinted before the Cincinnati officers departed Brooksville, Kentucky. (Tr. 66).

The officers questioned Gumm for forty-five minutes on July 24, l992. (Tr. 694). No tape was made of the questioning or the responses and no rights waiver was obtained. (Tr. 61-76).

Three days later, on July 27, l992, the Cincinnati Police Department personnel once again traveled to Brooksville, Kentucky and made contact with Appellant Gumm. (Tr.66-67). This second contact with Appellant Gumm in the State of Kentucky, which was for the purpose of removing Appellant from that State to the Cincinnati Police Department, occurred without contacting the local sheriff, in contrast to the actions of the Cincinnati Police personnel just three days earlier. (Tr. 694). They again initiated questioning of Appellant Gumm, now knowing that the statements given to them on July 24, l992 were inconsistent with other "reliable" witness statements that they had previously obtained. (Tr.686). On July 27, l992, Appellant was one of two targets in the investigation of the death of Aaron Raines; the remaining target, Michael Bies, was arrested on July 28th or 29th one or two days after the arrest of Appellant Gumm. (Tr. 692).

On July 27, l992, Appellant Gumm was taken from Brooksville, Kentucky to Cincinnati, Ohio. (Tr. 67-68). No governor's warrant was then in existence for the extradition of Appellant Gumm. (Tr. 695). Indeed, no formal charges had even been filed against Gumm as there was insufficient evidence on that date, to charge Appellant Gumm with the offenses for which he ultimately stood trial. (Tr. 679). Appellant Gumm on July 24, l992, and July 27, l992 was confronted by Cincinnati Police personnel, questioned about his involvement in the alleged murder,

-3-

kidnapping and attempted rape of Aaron Raines, all without the assistance of or advice of an attorney. (Tr. 675-703).

Once back in the State of Ohio and in the confines of the Cincinnati Police Department, Appellant Gumm was interrogated wherein he gave oral, written, tape-recorded and ultimately videotaped statements. (Tr.698-703). Essentially, the State of Ohio had no case against the Appellant without these statements, which were obtained over an eight and one-half hour period of interrogation by multiple Cincinnati Police personnel. (Tr. 76-84).

At the time Appellant was brought from Kentucky to Ohio in the back of a police cruiser, he was twenty-six years old, had dropped out of school and had a history of alcohol abuse. Upon testing, Appellant was unable to interpret simple proverbs. He had difficulty with simple calculations. His reading skills were at the four or five-letter word level. He was functioning at substantially below-average intelligence and suffered from a mental defect, specifically: borderline to mild mental retardation. (Tr. 113, 114; 875). In the opinion of Dr. Henry Leland, a witness at trial, Appellant suffered from a "pervasive mental disorder of organic origin". (Tr. 874). Appellant was also totally deaf in his right ear. The statements, given by Appellant on July 27, l992, over an eight and one-half hour period, sealed his fate.

Appellant was indicted on August 5, 1992. His trial counsel accepted representation on the condition imposed by the trial court that the case proceed to trial on November 2, 1992. Because of the lack of time, Appellant's counsel did no

-4-

mitigation investigation of their own.  They did not make a formal request for a continuance even though one was needed because the trial court made clear that the case was proceeding to trial on November 2, 1992.

The matter came before the Common Pleas Court of Hamilton County, Ohio, for Trial on November 2, 1992. (Tr.131).  On November 12, l992, the jury returned its verdict finding Appellant guilty of all charges. (Tr. 1042-1047).

The penalty phase of the trial began on November 13, l992, and the jury unanimously found that the aggravating circumstances of Count I which Appellant had been found guilty of, outweighed the mitigating factors and the jury therefore recommended to the Court that the sentence of death be imposed upon the Appellant. (Tr. 1054-1155).

Appellant's trial was riddled with constitutional misconduct.

On November 25, l992, Judge Ruehlman followed the jury's recommendations and sentenced the Appellant to death with regard to Count I. As to Count II, the Court sentenced Appellant to the term of eight years actual to fifteen years on Count II and ten years actual to twenty-five years on Count III, with all the counts to run consecutively to one another and the Appellant to pay the costs.

On December 2, 1992, the trial court filed its separate opinion following the recommendation of the jury.

Appellant Gumm thereafter filed a timely Notice of Appeal in the First District Court of Appeals on December 23, l992.

Appellant's appellate counsel missed the deadline for the filing of Appellant's appellate brief on his appeal as a matter of right.

The First District Court of Appeals dismissed the Appellant's appeal of right on July 19, l993. The State of Ohio joined in the motion for reinstatement that was ultimately granted by the First District Court of Appeals.

On December 13, 1993, Appellate counsel filed Appellant's Assignments of Error and Brief.  He was represented on appeal to the court of appeals by David J. Boyd and Joseph W. Nienaber.  The First District Court of Appeals rendered its decision affirming the entirety of the lower court action on February 16, l994.

On March 14, l994, Appellant Gumm filed his Notice of Appeal to the Supreme Court of the State of Ohio.  Appellant was represented by David Boyd and H. Fred Hoefle in this court.  On August 30, 1995, the Supreme Court of Ohio affirmed Appellant's conviction and death sentence in all respects.  *State v. Gumm* (l995), 73 Ohio St. 3d 413.  Appellant thereafter filed a Motion for Reconsideration, which was denied by the Ohio Supreme Court on October 18, l995.

On January 8, l996, Appellant Gumm filed his Petition for Writ of Certiorari with the United States Supreme Court.  On February 15, l996, the United States Supreme Court denied Appellant Gumm's Petition for Writ of Certiorari.

Appellant, by and through his attorney David Boyd, filed in the Hamilton County Common Pleas Court, his petition for Post-Conviction Relief and/or his Motion to Vacate the Sentence pursuant to R.C. § 2953.21 et seq. on September 17, l996.

-6-

Judge Ruehlman denied Appellant's Motion for Post-Conviction Relief without a hearing and granted the State's Motion for Summary Judgment on October 15, l996.

Thereafter, Appellant perfected his appeal of the denial of his post-conviction relief petition to the First District Court of Appeals in case B-925608 by filing his notice in the Hamilton County Common Pleas Court on November 12, l996.

The First District Court of Appeals denied Appellant relief and affirmed the denial of his Motion for Post-Conviction Relief on December 5, l997. Appellant sought review of the First District Court of Appeal's affirmance of the Hamilton County Common Pleas Court's denial of his Motion for Post-Conviction Relief and/or to Vacate his sentence by way of a jurisdictional motion to the Ohio Supreme Court, which was denied on April 1, l998.

On September 25, 1998 Petitioner Gumm filed his notice of intent to file a habeas corpus petition (Doc. #2). On November 6, 1998, Petitioner Gumm filed his first petition for writ of habeas corpus. (Doc. #6). The warden filed his return of writ/answer on April 9, 1999. (Doc. # 14). A traverse was filed by petitioner on June 21, 1999. (Doc. # 31)

Petitioner was allowed to conduct some discovery depositions and a limited evidentiary hearing was held on November 20 and 21, 2000. (Doc # 63, 64, 84) After the hearing, Petitioner requested the opportunity to amend his petition. (Doc.# 93)

A second amended Habeas petition was filed on April 20, 2001. (Doc. #105). The warden filed a return of writ on May 9, 2001 (Doc.# 109). An amended traverse was filed by petitioner on June 29, 2001. (Doc.# 117).

Sharon Ovington, one of original habeas counsel withdrew from the case and Kathleen McGarry was appointed in her stead as co-counsel. (Doc.#123)

On December 19, 2002 petitioner filed a motion to stay and abey his Habeas proceeding to return to State court in order to file a claim under *Atkins v. Virginia*, 122 S.Ct. 2242 (2002). (Doc. #124)   The Court granted the motion on January 7, 2003. (Doc. # 126).

Petitioner filed a state post-conviction petition on April 7, 2003 raising his *Atkins* claim and other claims in the state trial court.  Gumm moved that Judge Ruehlman recuse himself from the case and that motion was granted.  Judge Dennis Helmick was appointed to the case.  The Hamilton County Court of Common Pleas allowed petitioner limited discovery, as it related to the *Atkins* claim, and a hearing was held solely on the *Atkins* claim.  The state trial court found that petitioner Gumm was mentally retarded, and therefore not eligible for the death penalty;  the court also denied petitioner's remaining claims.

The First District Court of Appeals affirmed the trial court's decision. *State v. Gumm*, 169 Ohio App.3d 650, 2006-Ohio-6451) (Ohio App. 1 Dist.)  The Ohio Supreme Court denied jurisdiction.  *State v. Gumm*, 114 Ohio St.3d 1410, 867 N.E.2d 844, 2007-Ohio-2632 (Ohio Jun 06, 2007).   On July 23, 2007

petitioner Gumm was resentenced to life without the possibility of parole for 30 years.

While Petitioner's case was pending in State court on his *Atkins* proceedings, on September 15, 2003, Petitioner filed an application to reopen his appeal in the First District Court of Appeals under App. R. 26(B). On January 16, 2004, the Court of Appeals denied his application. *State v. Gumm*, Hamilton App. No. C-920907 (Jan. 16, 2004). The Ohio Supreme Court also denied relief. *State v. Gumm*, 103 Ohio St.3d 162, 2004-Ohio-4755.

On August 13, 2007, this Court vacated the stay of proceedings granted in 2003. (Doc. # 153) On September 13, 2007, Petitioner filed his Third Amended Petition for Writ of Habeas Corpus. (Doc. #157). Petitioner also filed a Motion for an Evidentiary Hearing. (Doc. #158)

On November 1, 2007 the Warden filed the Record, (Doc. #162) and the Return of Writ. (Doc. #163)

The warden also filed a response to the Motion for Evidentiary Hearing (Doc. # 165) and Gumm filed a Reply (Doc. #166). On December 12, 2007, the Court denied without prejudice the Motion for an Evidentiary Hearing. (Doc. # 168).

**Standard Of Review Pursuant To 28 U.S.C. §2254 (D)**

Because Gumm's habeas petition was filed after the Antiterrorism and Effective Death Penalty Act ("AEDPA") became effective on April 24, 1996, the AEDPA appears to provide the standard of review for the state court proceedings. *Harpster vs. Ohio*, 128 F.3d 322, 326 (6th Cir., 1997). 28 U.S.C. §2254 (d) provides, in relevant part:

> (d) An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim:
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in State court proceeding.

The standard of review, however, contained in 28 U.S.C. 2254(d) is not applicable to all habeas petitions filed after April 24, 1996. The standard does not apply unless the state court decision involved an *adjudication* of the constitutional claim on the merits. A state court does not adjudicate the claim on the merits if it 1) found the constitutional claim procedurally defaulted, *Liegakes v. Cook,* 106 F.3d 1381, 1385 (7th Cir. 1997); 2) failed to rule on the issue, *Hooper v. Mullin,* 314 F3d 1162, 1167 (10th Cir. 2002); *Morris v. Burnett*, 319 F3d 1254, 1267 (10th Cir. 2003) 3) addressed the issue but only in terms of state law,

-10-

*Everett v. Beard,* 298 F.3d 500, 509 (3d Cir. 2002); *Gruning v. DiPaulo,* 311 F.3d 69, 71 (12th Cir. 2002); 4) addressed the wrong issue on the merits, *Appel v. Horn* 250 F.3d 203, 211 (3d Cir. 2001); 5) applied the wrong standard in adjudicating the claim, *Mask v. McGinnis,* 233 F.3d 132, 140 (2d Cir. 2000); 6) failed to provide any reasoning for its decision, *Hameen v. Delaware,* 212 F.3d 226, 248 (3d Cir. 2000); 7) failed to cite any federal caselaw in its reasoning, *Romine v. Head,* 253 F.3d 1349, 1365 (11th Cir. 2001); or 8) failed to address all of the pertinent parts of the constitutional analysis, *Miller v. Staub,* 299 F.3d 570, 581-582 (6th Cir. 2002).

If the §2254 standard of review does apply, this Court should initially analyze de novo the merits of the claim and determine whether relief should be granted pursuant to that standard. If the Court determines that under de novo review the petitioner is entitled to relief, then and only then should the Court apply the standard of review contained in § 2254(d). See *Ramdass v. Angelone,* 530 U.S. 156, 165 (2000) (Supreme Court discusses applicability of AEDPA only after thorough discussion of merits); *Weeks v. Angelone,* 528 U.S. 225, 237 (2000) (same).

Thus, while the application of § 2254(d) can be significant, and even dispositive, in habeas cases where it applies, the statute is clear that the standard of review required by § 2254(d) only applies if the particular federal constitutional claim has been "adjudicated on the merits" in the state court proceedings.

-11-

Where the prerequisite of an "adjudication on the merits" in the state court is lacking, and the federal court is permitted to address the merits of the constitutional claim, there is no occasion for the federal court to afford any "deference" to the decision of the state court on the constitutional issue. There is no decision to which to defer. Instead, the pre-AEDPA de novo standard of review is applicable. See, e.g., *Wiggins v. Smith,* 539 U.S. 510, 123 S. Ct. 2527, 2542 (2003)(because the state court did not reach the merits of the prejudice prong of the inquiry for ineffective assistance of counsel under *Strickland v. Washington,* the U.S. Supreme Court's review of the petitioner's claim was "not circumscribed by a state court conclusion," and its review on habeas was thus de novo); *Duckett v Mullin,* 306 F3d 982, 991 n. 1 (10th Cir. 2002); *Morris v. Burnett,* 319 F3d 1254 1254, 1267 (10th Cir. 2003). *Harris v. Stovall,* 212 F.3d 940 (6th Cir. 2000).

Section 2254(d)(1) provides that a federal court may not grant a writ of habeas corpus, with respect to a claim adjudicated on the merits in state court, unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." In *Williams v. Taylor,* 529 U.S. 362 (2000), the Supreme Court addressed the meaning of § 2254(d)(1). Section II of Justice O'Connor's concurring opinion sets forth the majority view as to the meaning of § 2254(d)(1).

The Court explained that a state court decision is "contrary to" the Supreme Court's clearly established precedent "if the state court applies a rule

-12-

that contradicts the governing law set forth in [the Supreme Court's] cases . . . [or] if the state court confronts a set of facts that are materially indistinguishable from a decision of the [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." Id. at 406.

The Court further explained that a state-court decision would fail the "unreasonable application" prong of § 2254(d)(1) if the state court's application of the Supreme Court's precedent was "objectively unreasonable." Id. at 409-10. The Court made clear that an "objectively unreasonable" application of federal law is something more that merely an "erroneous" or "incorrect" application of federal law, id. at 411, but something less than the "all reasonable jurists would agree that the application was unreasonable" standard. Id. at 409-10.

Thus, a district court, in evaluating an application of a legal standard that the Supreme Court has "clearly established" to a factual context substantially different from any the Supreme Court has yet to address, is "unreasonable" under § 2254 (d) (1) if the reviewing court can say with any degree of confidence that the state court decision is erroneous under established Supreme Court precedent. When, on the other hand, the question is so close that the reviewing court can muster no confidence that the outcome it would reach *de novo* is more appropriate than the different outcome the state court reached, then the state court decision is not "an unreasonable application of clearly established" Supreme Court precedent, and relief "shall be denied." As the Second Circuit explains:

-13-

> Some increment of incorrectness is required [to permit habeas relief under the 'unreasonable application' clause.] We caution, however, that the increment need not be great; otherwise, habeas relief would be limited to state court decisions "so far off the mark as to suggest judicial incompetence." *Matteo [v. Superintendent, SCI Albion],* 171 F.3d [877] at 889 [3d Cir. 1999]. We do not believe [the] AEDPA restricted federal habeas corpus to that extent.
>
> *Francis v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000).

Further, the Seventh Circuit agrees with the Second Circuit. The Seventh Circuit recently noted:

> [O]ur review is not so limited as to require a finding of judicial incompetence before we are allowed to overturn a state court's decision. See *Hall [v. Washington],* 106 F.3d [742], 749 ("Congress would not have used the word 'unreasonable' if it really meant that federal courts were to defer in all cases to the state court decisions.")
>
> *Henderson v. Walls,* 296 F.3d 541, 545 (7th Cir. 2002).

A combination of Supreme Court opinions can be a basis for determining that a state court decision is contrary to or an unreasonable application of federal law as determined by the Supreme Court. *Fern v. Gramley,* 99 F.3d 255, 257-60 (7th Cir. 1996). Lower court opinions are a "useful secondary source" for determining the scope of clearly established Supreme Court authority. *Henderson,* 296 F.3d at 549.

-14-

## Procedural Default

Generally, federal courts are barred from reviewing claims that were procedurally defaulted in state court. Certain exceptions exist, however, that allow federal review of otherwise defaulted claims. Petitioner Gumm meets the test of "cause and prejudice" to excuse any procedural default asserted by Respondent, the Warden. Thus, this Court may review all his claims.

The United States Supreme Court established the test for cause and prejudice in *Wainwright v. Sykes,* 433 U.S. 72 (1977). The Sixth Circuit applied those principles in *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986), where the court developed a four-part test to be used when federal courts determine whether to enforce a state procedural bar:

> 1. Is there a state procedural rule applicable to the petitioner's claim and did the petitioner fail to comply with the rule?

> 2. Did the state courts actually enforce the state procedural sanction?

> 3. Is the state procedural rule an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim?

> 4. Was there "cause" for the petitioner to not follow the procedural rule and was he actually prejudiced by the alleged constitutional error?

The *Maupin* test requires the federal court to determine if there is an applicable procedural rule and, then, whether the state chose to enforce it. Id. at 138. Further analysis under *Maupin* is necessary only when there is an applicable

-15-

procedural bar that the state court actually enforced. At that point, the federal court must decide "whether the state procedural forfeiture is an 'adequate and independent' state ground on which the state can rely to foreclose review of a federal constitutional claim . . . . This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims." Id.

Thus, under *Maupin,* there are several contingencies that nonetheless if met do not prevent a federal court from reviewing a claim. If there was an applicable state procedural bar, and if the state court actually enforced the bar, and if it is in fact an adequate, independent, and legitimate state procedural bar, the federal court can still review the claim whenever the petitioner demonstrates "that there was 'cause' for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error." Id.

In determining cause for a procedural default, impediments to raising the claim beyond the petitioner's control, such as ineffective assistance of appellate counsel, overcome the procedural bar. *Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999). There is no set definition of "cause." It is "something external to the petitioner, something that 'cannot fairly be attributed to him.'" *Gravely v. Mills*, 87 F.3d 779, 785 (6th Cir. 1996) (citation omitted). "Cause" can run the gamut from state concealment of evidence, *Amadeo v. Zant*, 486 U.S. 214 (1986), *Strickler v. Greene*, 527 U.S. 263 (1999); to "a showing that the factual or legal basis for a claim was not reasonably available to counsel" at the time the default occurred, *Coleman v.*

-16-

*Thompson*, 501 U.S. at 753; to ineffective assistance of appellate counsel, *Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999); to ineffective assistance of trial counsel, *Gravely*, 87 F.3d at 785.

The *Maupin* court's instruction on how to determine the "prejudice" prong of "cause and prejudice" is also important. The court held that "in analyzing a petitioner's contention of prejudice, the court should assume that the petitioner has stated a meritorious constitutional claim." *Maupin,* 785 F. 2d at 139 (emphasis added). This means the federal court must assume that a claim has merit and decide whether the constitutional error involved meets the test for prejudice articulated in *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993)—that is, whether the error "had substantial and injurious effect or influence in determining the jury's verdict."

The United States Supreme Court has found cause for a procedural default on the basis of ineffective assistance of counsel. *Murray v. Carrier,* 477 U.S. 478 (1986). A federal court may consider a defaulted claim when the default arises from ineffective assistance of counsel, as long as the ineffective assistance claim was first raised in the state courts. *Id.* at 488-89.

The issue whether cause and prejudice exist frequently involves factual questions that should be resolved at an evidentiary hearing. Such questions "include the competence of counsel, whether some state official impeded petitioner's ability or effort to comply with a procedural rule . . . whether petitioner or his attorney was aware of the relevant facts when the alleged

-17-

Case: 1:98-cv-00838-WHR-MRM Doc #: 169 Filed: 01/07/08 Page: 22 of 119 PAGEID #: 295

default occurred . . . and the degree of prejudice . . . ." J. Liebman, R. Hertz, *Federal Habeas Corpus Practice and Procedure,* (3rd ed. 1998). As the Supreme Court has held, "application of the 'cause'-and-'prejudice' standard may turn on factual findings that should be made by a district court." *Jenkins v. Anderson*, 447 U.S. 231, 234-35, n. 1 (1980).

For example, in *Mapes* the Sixth Circuit ordered the district court to conduct an evidentiary hearing on appellate counsel's ineffectiveness as "cause and prejudice" for several procedural defaults. *See also Ratliff v. United States,* 999 F.2d 1023, 1026 (6th Cir. 1993) ("the absence of a hearing on the issue of cause and prejudice makes it more difficult for this reviewing court to determine whether a sufficient showing has been made . . . ."). Federal courts have often recognized the need for evidentiary hearings on the issues of both cause and prejudice. *See, e.g., Barnard v. Collins,* 13 F.3d 871, 878 (5th Cir. 1994); *United States v. Wright,* 43 F.3d 491, 497-500 (10th Cir. 1994); *Porter v. Singletary,* 49 F. 3d 1483, 1489-90 (11th Cir. 1995). Petitioner Gumm requests such an evidentiary hearing on his allegedly defaulted claims.

-18-

# Constitutional Claims

## *FIRST CLAIM FOR RELIEF—INVOLUNTARY STATEMENT*

### A.    Introduction

A confession, obtained from a person who is mentally retarded, is an involuntary confession when the police overbore the accused's will or the person does not understand the *Miranda* guarantees or the waiver of those rights.

### B.    Procedural Posture

The Warden concedes this claim is not procedurally defaulted. (Doc. 163, ROW, p. 25)

### C.    The Claim and Merits Argument

The state trial court found that Darryl Gumm was mentally retarded. This finding merited a re-examination of the voluntariness of Gumm's confession.

"[A] confession cannot be used if it is involuntary." *United States v. Macklin* (6th Cir.1990) 900 F.2d 948, 951, (citing *United States v. Washington* (1977) 431 U.S. 181, 186-87, 97 S.Ct. 1814, 52 L.Ed.2d 238 ). A confession is involuntary only if there is (1) police coercion or overreaching which (2) overbore the accused's will and (3) caused the confession. See *Colorado v. Connelly* (1986) 479 U.S. 157, 165-166, 107 S.Ct. 515; *United States v. Brown* (6th Cir.1995) 66 F.3d 124, 126-27. When a suspect suffers from some mental incapacity, such as intoxication or retardation, and the incapacity is known to interrogating officers,

-19-

a "lesser quantum of coercion" is necessary to call a confession into question. *United States v. Sablotny* (7th Cir.1994) 21 F.3d 747, 751; see also *Nickel v. Hannigan* (10th Cir.1996) 97 F.3d 403, 410.

A suspect's "mental condition is surely relevant to an individual's susceptibility to police coercion." *Colorado v. Connelly*, 479 U.S. at 165. The mentally retarded have, "by definition ... diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Atkins v. Virginia,* 536 U.S. 304, 318, 122 S. Ct. 2242 (2002).

Gumm was brought to Cincinnati, Ohio, on July 27, l992 and interrogation began at approximately 10:42 a.m. that day. A rights waiver form was utilized at that time. At approximately 1:00 p.m., other "background" questions were asked of Gumm, and again another waiver of rights form was presented to Gumm. Yet again, now between 2-3:00 p.m., Gumm was questioned, but in this instance, more than background questions were asked and responded to, including an admission by Gumm that he had been both in the area and in the building, where the decedent's body was found. Although prior statements were taped, and prior rights waiver forms were utilized, the conversation between 2-3:00 p.m. had neither protection. The reason for not taping the 2-3:00 p.m. statement was that "the conversation was going on rather well, we just continued. We did not want to break up the conversation to start putting it on tape at the time." (T.p. 82).

-20-

The 2-3:00 p.m. statement was obtained after the officers in question confronted Gumm as a "liar" (T.p. 82-83) and told him "he'd better tell the truth". (T.p. 83). The reason that the officers considered the conversation as going "rather well" is that the most incriminating statements made by the defendant were obtained during this time period.

Gumm, a mentally retarded, twenty-six year old was then in the fourth round of questioning by the Cincinnati Police: round one occurred on July 24, l992 (without a rights waiver form); round two occurred at 10:42 a.m. on July 27, l992 (with a rights waiver form and taped), round three occurred at 1:00 p.m. on July 27, l992 (with a rights waiver form and taped); and round four occurred between 2-3:00 p.m. on July 27, l992 (without a rights waiver form and without taping as the questioning was going "rather well"). Gumm was evaluated by Dr. Nancy Schmidtgoessling with respect to Gumm's ability to knowingly and intelligently waive his Miranda rights. Dr. Schmidtgoessling concluded:

> Psychological testing shows Mr. Gumm to have obtained a WAIS-R Verbal IQ of 69, Performance IQ of 74, Full Scale IQ of 70. This represents substantially below average intellectual abilities. The test results show that his ability to hold information immediately in mind, to be abstract in his thinking, to use judgment, his vocabulary, and his fund of knowledge are substantially below average. As this is a chronic condition, such substantially below average functioning would have been present during the time period that he gave his statements to police. See, App. Vol. 9, p. 206.[1]

---

[1] "App." Citations are to the record filed by the Warden.

In addition to the report, Dr, Schmidtgoessling testified at the motion to suppress hearing. After her examination of Gumm, she could not reach a conclusion as to whether Gumm understood the waiver of rights. "Well that was the purpose of my whole evaluation yesterday. I don't know if he understood that or not. I just don't know." (Tr. P. 118) When asked if Gumm's intelligence level could affect his ability to understand the meanings contained in the notification form, she answered:

> I do think that that very well could be the case, that people with substantially below average intelligence don't have the vocabulary, they don't have the abstraction, they can't foresee the consequences. (Tr. P. 119)

Police Officer Royce Winters, who specializes in interrogation of suspects, testified at the motion to suppress hearing that he was aware that Gumm did not read or write when he obtained Gumm's waiver and interrogated him. (Tr. P. 96, 95)

It is not unusual for persons who come into contact with mentally retarded persons to not recognize their limitations, although given Gumm's lack of ability to read or write, the interrogators were certainly on notice that Gumm had deficiencies.[2] Dr. David Ott's report, prepared on remand to state court,

---

[2] Years later, during discovery in this Court, Sgt. Robert Disbennet, still refused to acknowledge Gumm's mental retardation. "In my opinion, he's not mildly retarded." (Doc. # 64, Disbennett Deposition, p. 23). There is no record evidence that Sgt. Disbennet has any expertise in mental retardation and willful ignorance does not justify the failure to acknowledge his deficiencies. This is also in direct contradiction to the State Prosecuting Attorney who conceded Gumm's mental retardation in his closing argument.

explained that persons with mental retardation try to "cloak themselves with competence." "This term describes the observed tendency of many individuals with mental retardation to attempt to present themselves as 'normal' (or at least more capable then they actually are) as a means of avoiding the stigma of being identified as mentally retarded." (*Atkins* Hearing Exhibit 17, p. 7[3])  In other words, Gumm would have said he understood so as not to appear "stupid."

How can the waiver of the *Miranda* rights be knowingly and voluntarily made if the person does not understand what he is waiving?  How can the waiver be intelligent when it is made by a mentally retarded individual?  In a recent law review article, the interaction between mentally retarded persons and the *Miranda* warnings were examined.  Morgan Cloud et al., "Words without Meaning: The Constitution, Confessions, and Mentally Retarded Suspects", 69 U. Chi. L. Rev. 495, 511-12 (2002).  The author of this law review article posits that the Supreme Court's *Miranda* decision rested upon the unverified assumptions that suspects who received the now-famous warnings not only would possess information ensuring that subsequent waivers were "knowing and intelligent," but also would possess the tools necessary to resist the pressures inherent in custodial interrogation, thus ensuring that confessions were "voluntary."  The flaws in these assumptions are exposed when they are applied to mentally retarded people.  The authors of this Article tested a sample of mentally retarded

---

[3] The Respondent failed to file the Exhibits used during the course of the Atkins Evidentiary Hearing.  A motion to expand the record will be filed to include these exhibits.

individuals to determine if they could understand the *Miranda* warnings, then compared these results to those obtained for a control group of nondisabled people. The results show that, in contrast to the nondisabled controls, mentally retarded people simply do not understand the warnings. They do not understand the context in which interrogation occurs, the legal consequences of confessing, the meaning of the sentences comprising the warnings, or even the warnings' individual words. For mentally retarded people, the *Miranda* warnings are words without meaning.

> Among the most troubling of *Miranda's* failures is its inability to ensure the constitutional validity of confessions obtained from mentally retarded suspects. ... The set of common psychological characteristics exhibited by mentally retarded people makes them particularly vulnerable to the pressures exerted by custodial interrogation. ... This conclusion is erroneous, at least when extended to mentally retarded people. ... These passages indicate that the Court not only was conscious of the increased vulnerability of mentally retarded people to the pressures of custodial interrogation, but also was aware that their weaknesses might lead them to confess to crimes they did not commit. ... Because cognitive understanding of the content of the warnings is required if the warnings are to fulfill their instrumental functions, a person who is not capable of understanding the warnings logically cannot execute a waiver that is either knowing or intelligent. ... These data suggest that some additional protective mechanisms are needed when mentally retarded people are confronted with custodial interrogation. ... In its broadest form, the rule would be: if custodial interrogation produces a confession from a mentally retarded suspect, the confession is inadmissible in subsequent judicial proceedings. ... *When subjected to the pressures of custodial interrogation, mentally retarded people are more likely than others to confess to crimes they did not commit.*

> Words Without Meaning, supra, emphasis added.

In this case, defense witness Dr. Henry Leland, a Professor of Psychology at the

Ohio State University, and Chief of Psychological Services at the Nisonger Center for Mental Retardation and Developmental Disability examined Gumm and testified that:

> A.    You see, again, it's this matter of synthesis. I asked him -- he said in these reports that he had made different stories because he was scared. And I asked him what he was scared of. And he said, well, because the police had threatened him. And I said, "Well, how did that lead to what you said?" And he said, "They wanted me to talk, so I talked."
>
> Q. Didn't he also say that the reason he didn't say anything was because he was scared of Michael Bies, the person he was with?
>
> A. No, he didn't say that to me. He just said that he was scared of the police, and they wanted him to talk, and so he talked.

"A suspect's 'mental condition is surely relevant to an individual's susceptibility to police coercion.' *Colorado v. Connelly,* 479 U.S. 157, 165, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)." *Hill v. Anderson*, 300 F3d 679, 683 (6th Cir 2002)

The concerns of the law review article are also seen later in Dr. Leland's testimony:

> He demonstrates a mild to borderline level of mental retardation (Tr .p. 875);
>
> His ability to synthesize information is impaired, he could recall the same set of facts consistently as long as there was not intrusion of new facts. New facts could contaminate his original memory, he would get confused over what he had been told, and what he had witnessed (Tr. p. 876-878);

The statements made by the mentally retarded Gumm during his prolonged interrogation were not reliable. (Tr. p. 885, 886, 887) in explaining

-25-

the lack of reliability, Dr. Leland explained:

> Because, after watching the tape and comparing the two programs, I find that Darryl primarily was agreeing with the policemen. As the policemen said things, Darryl would shake his head, meaning yes, and occasionally add things. But the things that he was asked and added had nothing to do with the testimony in this case, State's Exhibit 113

Trial Transcript, p. 886.

> Q. For example, when he took the police officers in that videotape walk-through down into the basement and showed them where that body was, he had the ability on his own to remember where that body was and show them exactly where it laid on the floor?
>
> A. Well, excuse me, sir, but I looked at that tape. They took him in through the walk-through, they took him down to the basement, they brought him over to the area, and then asked him if that's where the body was.
>
> Q. No. They said "show us where the body was"?
>
> A. Show us where the body was, and then they walked on over to the area. Of course, I have no idea where the body was, but they walked over into an area, and he agreed that that is about where it was.

Trial Transcript, p. 898-899.

> Q. And then when he was confronted with a fact that the police knew, evidence that the police had then he admitted to it. Isn't that common? Isn't that normal?
>
> A. But he didn't. He admitted to all – to all kinds of evidence along the line, no, no. no twice -- no time repeating the same thing twice. What he did was agree with the person that was talking to him.

Trial Transcript, p. 903-904.

This helps to explain why Gumm would agree with the examiners,

-26-

particularly when they themselves resorted to lying in order to trick a mentally retarded person.  Tr. 748.

The statements obtained by the Cincinnati Police were in violation of the Gumm's Fifth, Sixth and Fourteenth Amendment rights protected by the United States Constitution.  The trial court, once the *Atkins* determination had been made, should have re-examined the voluntariness of Gumm's confession in light of its finding evidence of mental retardation.  Had he done so, the confession in this case would have been excluded.

**D.     State Court Ruling**

This issue has been raised twice in the state court.  It was first raised on direct appeal.  In response, the Ohio Supreme Court cited to the Report of Dr. Nancy Schmidtgoessling:  Dr. Nancy Schmidtgoessling testified at the motion to suppress hearing that she discovered that Gumm could "actually read fairly decently in terms of the rights forms that we went over together.   He recognized most of those words, seemed to know what they meant as well, not just recognizing."   The Court's decision fails to recognize the rest of Dr. Schmidtgoessling's testimony.

> Q.    Now, let's get specifically to why we're here. On two occasions, Darryl signed a form which was supplied to him by the Cincinnati Police Division, which is entitled a notification of rights. And I think you were supplied with copies of those actual forms.
>
> A.    That's correct.
>
> Q.    This is one of the two and they are both substantially the same. They're the same pre-printed

form. Did you have a copy of that form when you interviewed Darryl yesterday?

A.      Yes. I had copies of both of those.

Q.      Okay. Now, from your interview – and then we'll get into the details -- do you have an opinion as to whether or not Darryl Gumm was able to -- I'm going to ask it in the terms of the Miranda case -- was able to intelligently and knowingly and voluntarily waive his rights that are set out on these forms?

A.      I really don't have an opinion.

Q.      You don't have an opinion --

A.      No.

Q.       -- as to that? Do you think that when he was giving -- or given these rights that he knew what the consequences would be if he waived them?

A.      Well, that was the purpose of my whole evaluation yesterday. I don't know if he understood that or not. I just don't know.

The Supreme Court's decision was an unreasonable determination of facts in light of the evidence presented in the state court proceeding.

The second time this issue was raised in State court is when Gumm's case was remanded to state court as a result of the *Atkins* decision.   Gumm argued that in light of the finding that he was mentally retarded, the issue regarding his confession should be reexamined.   The trial court declined to re-examine the issue and the court of appeals found "no merit to any aspect of the challenges presented." *State v. Gumm*, 169 Ohio App. 3d 650, 2006-Ohio-6451, at ¶30.  The Ohio Supreme Court declined jurisdiction.  *State v. Gumm*, 114 Ohio St3d 1410 (2007).  This Court is free to review this finding.

The decision of the State Courts in this case is contrary to United States

Supreme Court caselaw as set forth in *Connolly* and *Atkins*.

**E.     Further Factual Development**

While Gumm was able to develop the record as it related to his mental retardation in state court, he was not given the opportunity to specifically focus on how his mental retardation affected the "waiver of rights," interrogation and "confession" that was the mainstay of the state's case against him.  Gumm requests the opportunity to pursue that claim here.

### SECOND CLAIM FOR RELIEF---BRADY VIOLATION

**A.     Introduction**

The suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material to guilt or punishment. *Brady v. Maryland,* 373 U.S.. 83 (1963); *Kyles v. Whitley*, 514 U.S. 419 (1995)

**B.     Procedural Posture**

Petitioner Gumm was precluded by Ohio law from conducting discovery when his case was initially filed in state post conviction.[4]  After Gumm concluded his litigation in state court, he filed a federal habeas corpus action in federal district court.  *Gumm v. Mitchell*, S.D. OH Case No. 98-cv-838.  During his federal habeas corpus case, he was allowed to conduct discovery, and had an evidentiary hearing. [5]

During his time in federal court, Gumm obtained records of the Cincinnati Police Department that were in the possession of the State of Ohio and from discovery obtained in his co-defendant's case.  There were voluminous records that the State withheld from Gumm that are exculpatory.  The State's non-disclosure is a violation of *Brady v. Maryland,* (1963) 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-1197.  In spite of the fact that the State had an obligation to turn over

---

[4] The Ohio Supreme Court has made it clear that "there is no requirement of civil discovery in post conviction proceedings." *State ex rel Love v. Cuyahoga Cty. Prosecutor's Office (*1999), 87 Ohio St.3d 158, 159, 718 N.E.2d 426.
[5] Co-defendant Michael Bies' case was also pending in federal court and discovery was granted in his case as well.  *Bies v. Mitchell*, S.D. OH Case No. 00-cv-682.

this material at the time of trial (and frankly the prosecutors have a continuing duty) or thereafter, nothing was turned over. Gumm had no other way of obtaining this material.

In ruling on the non-mental retardation claims, the trial court overruled the claims, finding "this Court hereby overrules these, as well as all remaining issues before this Court on the basis that they are moot or barred because of res judicata and/or collateral estoppels from decisions previously rendered in either direct appeals and/or post conviction appeals." (App. Vol. 11, p. 309).

The Warden now argues that this claim is procedurally defaulted. (Doc. # 163, ROW, p. 30-31) However, on appeal of his *Atkins* post-conviction petition, which included this claim, the court of appeals addressed the merits of this claim, finding it to be without merit. *State v. Gumm*, 169 Ohio App. R. 26(B).3d 650, 2006-Ohio-6451, at ¶30. Essentially, the Warden is arguing that it is acceptable for the State to withhold evidence from the defense, in spite of the fact that the evidence is exculpatory and then argue that habeas relief should be denied because the defendant found the material too late to make use of it.

The court of appeals finding that "the trial court properly declined to entertain his fifth post conviction claim based on R.C. 2953.23(A)(1)(b)" is in conflict with the decision of the trial court. The Warden's assertion that the court of appeals approved of the trial court not hearing the claim because Gumm did not meet the requirements of R.C. 2953.23 is not supported by the record where the trial court made no such finding and failed to cite the statute. The Warden's

argument is further diluted by the fact that the court of appeals addressed the claim on its merits and applied United States Supreme Court case law in denying the claim.

## C     The Claim and Merits Argument

Trial prosecutors have the affirmative duty to timely provide to defense counsel all exculpatory evidence, that is relevant to either guilt or punishment. That constitutional duty applies not only to information in the prosecutor's file, but all information in the possession of other state agencies.  The prosecutor's duty of disclosure extends to inculpatory statements made by other individuals as to the commission of the offense(s) charged in the indictment.  In Gumm's case the prosecutor had actual or constructive possession of numerous police reports that memorialized that three other individuals, a) Roger Cordray, b) Reggie Hetzler and c) Duffy Cody had confessed to the crimes:  (App. Vol. 10, pp. 183-221)

> 1) Roger Cordray, who resided in the vacant building where the victim's body was found.  The police generated at least eight reports which memorialized that Cordray had confessed to the murder. Cordray was seen near the victim when he was last seen alive. Cordray's hands were injured at about the time of the homicide, injuries that would have been consistent with some of the blows administered to the victim. Cordray discarded his shoes shortly after the homicide. Cordray threatened one witness if she went to the police concerning him but the witness still went to the police. One of the persons to whom Cordray confessed took the law into his own hands and physically beat Cordray to a bloody pulp. Ricky Baker came to the rescue of

-32-

Cordray and in the process Baker's jeans became soaked with Cordray's blood. The police recovered Baker's Bloody jeans.

2) The CPD Files also show that Reggie Hetzler stated that he and his brother Steve Pence raped and killed the victim.

3) Duffy Cody, who lived in the same neighborhood as the victim and the vacant building where the victim was found. Cody had a history of fighting and arguing with the children in the neighborhood. Cody approached his neighbor and stated "what would you do if someone killed your kid." The statement was made almost immediately after the victim's body was found and prior to the police announcement that foul play was involved in the victim's death.[6]

The prosecutor's obligation to provide defense counsel with exculpatory evidence extends to the identity and information relating to other individuals who were serious suspects during the course of the investigation. The prosecutors failed to provide information as to other suspects (App. Vol. 10, pp. 361-368). The police focused their investigation on sexual offenders who resided in the immediate geographical area where the body was found. The prosecutors failed to provide to defense counsel any information concerning: a) Garland Inman (App. Vol. 10, pp. 221-260), and b) Claude Justice App. Vol. 10, pp 261-263), who were sexual offenders who lived or had lived in the vicinity and were the focus of the investigation.

Garland Inman, a juvenile that had been previously adjudged a delinquent

---

[6] Files from the Cincinnati police Department were also turned over in federal court and were included as an attachment to the Second Amended Traverse, Doc. 117 and referred to herein as "CPD Files".

for the rape of his three young male cousins. He escaped from the Department of Youth Services and fled to the State of Texas. Relatives provided the investigating officers with information that he had returned to Cincinnati at the time of the homicide. The police focused many of their resources in attempts to locate Garland Inman. Those efforts included obtaining a judicially authorized telephone trap and a search warrant for a residence where he was believed to be hiding as well as the distribution of posters containing his photograph and personal data.

Claude Justice, an adult who was often seen in the company of young males. He had been seen frequently in the vacant building in which the victim's body was found.

The police investigation also focused upon individuals who were seen on the evening of the homicide in or around the building where the victim's body was found. The trial prosecutors failed to provide to defense counsel the identity and information as to the following individuals who fit this criteria: a) Raymond Moore (App. Vol. 10, pp. 264-272), b) Luther Hatton (App. Vol. 10, pp. 273-281), and c) Carl "Junebug" Miller (App. Vol. 10, pp. 282-289). The police, during the course of the investigation also developed information concerning the involvement of: Brothers William and Robert Shelton (App. Vol. 10, pp. 290-316), Jimmy Ball (App. Vol. 10, pp. 290, 311, 333) and an unidentified individual who was with the victim on the night in question at about 11:00 to 11:15 p.m. at which time the victim was involved in an altercation This information was not

-34-

provided to trial counsel.

Raymond Moore, was seen around the building on the night in question and at times lived in the building. Moore himself contacted the police to inform them that his fingerprints would most likely be found in the basement where the body was discovered. He explained the presence of his fingerprints by the fact that he had attempted to locate the boy between the hours of 9:00 to 11:30 on the evening in question. However, the victim's mother did not report the victim missing until 11:30.

Luther Hatton, was reported to be living in the building in question. Hatton was on parole at the time, having previously been incarcerated at Lucasville. He was reportedly seen at the building on the night in question, possibly around 10:00 p.m. Just prior to that time he had left a party unannounced. Either Hatton or his brother were wearing Nike shoes that evening, the brand of shoe that left the print the police lifted in the basement. One of the police reports indicated that Hatton was violent and may have been previously arrested for molesting children.

Carl "Junebug" Miller, was very high on the night in question. His clothes were very filthy as if he had been crawling through a vacant building. He was extremely nervous and told one individual he needed to leave the area immediately. A friend gave him a ride to Covington, Kentucky. Miller did not deny, when asked by Clayton Rose, that he had been in the area of the building with the victim. One individual told the police that he "heard that Carl Junebug

went to Allen house to change shirts because it was bloody." See, CPD Files.

The investigating officers, prior to fingerprinting any juveniles who were suspects, obtained a court order from the Hamilton County Juvenile court authorizing the fingerprinting. See, R.C. § 2151.313. To be entitled to a court order, the investigating officer had to demonstrate a probable cause that the juvenile was involved in the homicide. The Hamilton County Juvenile Court made probable cause determinations that the following individuals may have been involved in the homicide: Jimmy Toulbac, Adam Inman, Dwayne L. Emmons, Terry Linville, Mitchell Noble, Gregory Maynard, Leonard Swinford, Christopher Strader, George Putteet, Shane Gaskins and Harold Reidner, Jr.

The state called the older brother of the victim, Dallas Hayes to testify that the decedent never played in the vacant building where his body was found [Tr. p. 549]. The trial prosecutors failed to provide trial counsel with information that a) a friend of the victim saw the victim, just days prior to the homicide, playing in the vacant building (App. Vol. 10, p. 340), b) Hayes gave the investigating officers conflicting statements as to when he had last seen the decedent alive (App. Vol. 10, pp. 342-344, c) that Hayes failed a polygraph test (Id.), d) that Hayes was a suspect in the homicide. (App. Vol. 10, p. 345-347). As it specifically related to Dallas Hayes, the records disclosed the following: "Finally today [6-3-92] we had Aaron's brother Dallas Hayes come in for a polygraph test…there is not doubt in Royce's [Winters] mind that he was lying on all questions that had to do with Aaron's death." (App. Vol. 10, p. 342-344).

The constitutional obligation of the prosecutor to disclose evidence extends to information and evidence that was inconsistent with the state's theory of the case.  The prosecutor theorized that the victim was killed early in the evening.  The prosecutor failed to disclose police reports that the victim was seen alive late in the evening.  (App. Vol. 10, pp. 290-292, 320, 323, 348, 359).  Specifically, one report stated that Aaron was last scene at 22:30 hours and that he knew his brother was looking for him and he was on his way home.  (App. Vol. 10, pp. 252-254).

Further the prosecutor has an obligation not to present misleading or false evidence.  There was evidence in the police records that the gym shoes belonging to Calvin Sweet matched the gym shoe pattern found on the victim.  (App. Vol. 10, pp. 244-247).  Yet the police led Mr. Gumm to believe it was his gym shoes and never disclosed to the defense that there was an actual match by another suspect.  Mr. Gumm's gym shoes were never recovered.

None of the foregoing material was provided to defense counsel.

This refusal to provide exculpatory evidence requires reversal.  In *Strickler v. Greene*, 119 S.Ct. 1936 (1999), the Supreme Court affirmed the Fourth Circuit's denial of habeas relief in a capital case involving a defaulted *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963) claim.  In its initial discussion, the Supreme Court considered the broad spectrum of government misconduct issues that have come to be considered under the generic rubric of a '*Brady*' claim:

. . . In *Brady* this Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S., at 87, 83 S.Ct. 1194. We have since held that the duty to disclose such evidence is applicable even though there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id., at 682, 105 S.Ct. 3375; see also *Kyles v. Whitley*, 514 U.S. 419, 433-434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor." Id., at 438, 115 S.Ct. 1555. In order to comply with *Brady*, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Kyles*, 514 U.S., at 437, 115 S.Ct. 1555.

In *Kyles v. Whitley, supra,* the Supreme Court made clear that the focal point for *Brady* misconduct was its general effect upon the outcome of the proceeding, understood in terms of a strict 'guilty or not-guilty' verdict:

*Bagley's* touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." *Bagley*, 473 U.S., at 678, 105 S.Ct., at 3381.

*Kyles*, 514 U.S. at 434.

Under these standards, set down by the United States Supreme Court, the material not turned over to the defense in Gumm's case needs to be examined.

There was not an isolated piece of evidence that was not turned over to the defense.  There was not one *Brady* violation, there were many.  *Brady* violations are viewed in a cumulative light.  The effect of nondisclosure must take into account the cumulative effect of the suppressed evidence in light of the other evidence, not merely the probative value of the suppressed evidence standing alone.  *Hutchinson v. Bell*, 303 F.3d 720, 747 (6th Cir. 2002)  Here, the cumulative effect of the non-disclosure requires the granting of the writ.

## D.    State Court Ruling

This claim was raised in state court upon returning to state court to litigate his *Atkins* claim, even though the evidence was uncovered in federal court.  Since Mr. Gumm was returning to State court to litigate *Atkins*, he also provided the State an opportunity to review his *Brady* claim and to exhaust same for habeas purposes.

In its opinion, the court of appeals found:

> {¶39} In support of his fifth claim, Gumm offered Crimestopper reports, lead and tip sheets, and investigation notes and summaries memorializing information received and gathered by the police during their investigation. These records showed what the investigating officers stated at Gumm's trial: that the police had initially had few leads and had cast a very wide net to find the killer. The officers inquired about sex offenders known to live in or frequent the neighborhood surrounding the abandoned building where the victim had been found. They followed tips, often based on rumor and second- and third-hand information, concerning individuals who had made incriminating statements or had exhibited suspicious

behavior, individuals who had been seen in or around the abandoned building or the surrounding neighborhood, and individuals who had been seen with the victim around the time of the murder. They also obtained information that impeached the victim's brother's credibility and contradicted the state's theory concerning when the murder had occurred.

{40} From our review of the record, we conclude that the undisclosed evidence, viewed collectively, was not "material" in that it could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict[s]." [*Kyles v. Whitley*, supra, at 435, 115 S.Ct. 1555] Therefore, the state's failure to disclose the evidence did not deny Gumm his constitutional right to a fair trial. [*Brady v. Maryland*, supra, at 87, 83 S.Ct. 1194] Moreover, the record will not permit the conclusion that, but for the state's failure to disclose the evidence, no reasonable factfinder would have found him guilty of the offenses of which he was convicted.

*Gumm*, 169 Ohio App 3d 650, at ¶39, 40.

The determination that this evidence is not material is an unreasonable application of United States Supreme Court case law. In *Kyles*, the United States Supreme Court found that a showing of "materiality" as required under *Brady* does not require demonstration by preponderance that disclosure of suppressed evidence would have resulted ultimately in defendant's acquittal; rather, the touchstone of materiality is "reasonable probability" of different result. This is not the definition applied in this case, instead the court of appeals required that the material would have resulted in acquittal.

*Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different

-40-

verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." *Bagley,* 473 U.S., at 678, 105 S.Ct., at 3381.

The second aspect of Bagley materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Kyles*, at 434-435

If the correct standard of materiality is applied, the evidence set forth above compels the conclusion that there is a "reasonable probability" of different result.

**E.    Further Factual Development**

Petitioner Gumm is requesting further factual development of this claim and will be filing a Motion for Discovery.

### THIRD CLAIM FOR RELIEF—PRIOR BAD ACTS EVIDENCE[7]

**A.   Introduction**

The admission of evidence of prior bad acts of the petitioner in his capital murder trial, which acts bear no relation to the offenses for which he was tried, violated his right to a fundamentally fair trial secured to him by the due process clause and Eighth amendment of the United States Constitution

**B.   Procedural Posture**

The Warden concedes that this claim is not procedurally defaulted.  (Doc. # 163, ROW, p. 34)

**C.   The Claim and Merits Argument**

(1)  OTHER ACTS EVIDENCE ELICITED BY THE PROSECUTION FROM STATE'S WITNESSES THACKER AND BAKER

The general rule is that evidence of a defendant's other crimes, wrongs or acts is not admissible to demonstrate that the defendant has a propensity for crime or that his character is in conformity with the other acts. *State v. Flonnory* (1972), 31 Ohio St.2d 124; *State v. Thompson* (1981), 66 Ohio St.2d 496. Prosecutor Longano elicited testimony from the state's first witness, Phyllis

---

[7] This claim deals with the admission of the prior bad act evidence by the trial court.  Claim 4 addresses prosecutorial misconduct in using this evidence, however, there is much overlap in these claims and should be considered together as they relate to the Court Clinic File.

Thacker, that Petitioner had "fucked a horse" at some unknown time in his past
as evidenced by the following:

> Q: Mrs. Thacker, I think we were at the point where I
> asked you why you became afraid of Junior and why
> you wanted him out of your house. Was there anything
> specific that evening?
>
> A: Junior's personality changed. He talked crazy talk
> and he---he acted strange to me and he said things that
> made me afraid to be there with him, just me and my
> daughter by myself.
>
> Q: What did he say to you---
>
> A: Well—
>
> Q: -- that made you afraid?
>
> A: Once he told us—we have a horse. Once he told us
> that the horse told him that he was mad at him- - that
> She was mad at him because he was mistreating him,
> and he was crying and he was serious that that horse
> had actually talked to him and told him that. And then
> once - -
>
> Q: Did he tell you why the horse was mad at him?
>
> A: She said he wasn't taking care of him, that he was
> mistreating him and that the horse told him that he
> didn't love him anymore.
>
> Q: Anything more specific than that?
>
> A: Once he told me that him and Charles was working
> on the horse lot and they told us that him and Charles
> told him to do something and he didn't want to do it; he
> was after him about being drunk the night before and
> quarreling at him. And he came to the house and told
> me "One of these days, I'm going to kill that grey-
> headed SB," but he said the word.
>
> Q: Did he tell you one time something he had done with
> the horse?
>
> A: (No response)
>
> Q: Is that difficult for you to tell us?
>
> A: Yes.

Q: You're going to have to.

Mr. Freeman: I'm going to object to the form of the question. He's leading the witness.

The Court: Overruled. Go on. You can tell us. Can you answer?

Q: Can you tell us what Junior told you he did with the horse?

The Court: We're in a court of law, ma'am. You can say exactly what he said.

The Witness: I can't say that. He told us that he did it to the horse and the horse got mad at him.

BY Mr Longano: He did it to the horse?

A: (Indicate yes)

Q: Is that the word he used or did he use a different word?

A: He used the other word.

Q: You can use the other word.

A: I can say the letter to the other word.

Q: Can you spell it?

A: That's still cussing. F – he said he fucked the horse. (Tr.478-480).

While there are other incidences that will be addressed below, the conclusion is inescapable that once the jury heard that Petitioner had "fucked the horse," (from the state's very first witness), Petitioner's chance for a fair trial was gone for good.

Phyllis Thacker was also permitted to testify, despite defense counsel's objection, that when Petitioner drank, "he was hateful" (Tr. 474- 475); that he would then fight and quarrel. She was permitted to testify that she was afraid that Petitioner was going to hurt her or somebody (Tr. 476-478). She testified

-44-

that when he lived with her family in Kentucky earlier in 1992, his personality changed, and she was afraid for herself and her daughter to be with him. (Tr. 476-478). In response to counsel's objections regarding the relevancy of this other act evidence, the prosecutors asserted that "…it's all part of the background leading up to the homicide." (Tr. 477). The Court overruled the objection and allowed the prejudicial and irrelevant testimony to be admitted. (Tr. 478).

The prosecution may not do covertly what is impermissible overtly, and may not lay these prior bad acts before the jury as "background leading up to the homicide," by asking questions of witnesses when there is no good faith basis for asking the questions. The state continued to attack Petitioner's character with prejudicial irrelevancies. The testimony of Charlotte Jean Baker, that the Petitioner lived with her in Kentucky in April and that he was good to her kids but started looking at her strangely was admitted over the defense objection that said testimony was being offered solely as prior bad acts and was irrelevant. The testimony was completely irrelevant and was offered simply for the purpose of prejudicing the jury against Petitioner. (Tr. 497-499).

When Baker did not give the desired response to the state's question as to what Petitioner stated he would do if he could not have sex with a particular person when he came back, the State over the objection of the Petitioner, was allowed to impeach its own witness by asking her to review a statement given to a representative of the Central Psychiatric Clinic. (Tr. 500-504)

The witness was then allowed to testify as to what Petitioner stated he would do when he had sex with the person, which was obviously not responsive to the question. Petitioner submits that in addition to the improper impeachment, the entire line of questioning in this regard was not only irrelevant but also unfairly prejudicial to the Petitioner. (Tr. 500-504)

The State again asked Charlotte Baker whether the Petitioner stated that he was so hard up he would do it to anyone. The Petitioner's objection to the question was overruled. While Ms. Baker responded "no", the jury would certainly remember the question and not the answer and the irrelevance and prejudice of the question is obvious. (Tr. 505-506)

The trial court's admission into evidence of testimony as to the Petitioner's drinking and sexual experiences, which were submitted solely for the purpose of prejudicing the jury, which were clearly irrelevant and which would antagonize and disgust most people, including Petitioner's jurors, was clearly prejudicial error and deprived Petitioner of any chance for a fair trial in violation of his federal constitutional rights.

The evidence adduced as to Petitioner's sexual drive was highly inflammatory, prejudicial and totally irrelevant. The rule against injecting extraneous crimes and other acts into the trial has a profound role in American jurisprudence. The rule is designed to avoid the danger that the jury will punish the defendant for offenses other than those charged, or at least that it will convict when unsure of guilt, because it is convinced that the defendant is a bad man

-46-

deserving of punishment. *Dudley v. Duckworth*, 854 F.2d 967, 972 (7th Cir. 1988) (habeas corpus granted on due process grounds based on admission of other-crimes evidence).

There is no lawful justification in admitting evidence such as described here. The only reason for the admission of intercourse with a horse, drunkenness, fear and sexual perversion would be to show a "pattern" of bad acts; its admission constitutes "an [abuse] of discretion . . . [admitting the evidence] based on the fact that committing one of these [acts] shows a propensity to commit another -- an inference that a jury is forbidden to draw," *State v. Schaim (*1992), 65 Ohio St. 3d 51, 63, 600 N.E.2d 661, 671. [8]

Far more must be shown than the mere fact that Petitioner is excessively active sexually, or even that he had in the past had sexual experiences with members of his own sex, much less a horse. *State v. Curry* (1975), 43 Ohio St. 2d 66, 330 N.E.2d 720, *State v. Eubank* (1979), 60 Ohio St. 2d 183, 398 N.E.2d 567; *State v. Schecter* (1974), 47 Ohio App. 2d 113, 352 N.E.2d 617.

The other bad acts evidence the state offered was grossly prejudicial, and totally irrelevant to the issues at hand. The defense objected at every turn, and was rebuffed by the court, when the state adduced testimony from its witnesses. This evidence denied Gumm a fair trial.

_____

[8] It is worth noting that the trial judge in *Schaim* is the same trial judge who presided over Petitioner's trial and who permitted the same type of tainted other act evidence in both cases. *See also: State v. Barton* (1991), 71 Ohio App.3d 455; *State v. Tolbert* (1990), 70 Ohio App. 3d 372.

(2) OTHER ACTS EVIDENCE ELICITED BY THE PROSECUTION FROM
COURT PSYCHIATRIC CLINIC RECORDS

Petitioner's only witness in the *trial phase* of the case was Dr. Henry
Leland who was asked at the last minute to testify on Petitioner's behalf.
Because of the limitation of time, Dr. Leland only had a short period of time to
interview the Petitioner.  Because of counsel's failure to prepare, Dr. Leland was
limited to a review of the records from the Central Psychiatric Clinic.  He did not
determine for himself the Petitioner's I.Q. and his various psychiatric problems.
The Central Psychiatric Clinic file contained numerous damaging hearsay
statements obtained by employees of the clinic from non-professional individuals
that were highly prejudicial to the Petitioner.  All of this evidence came to the
jury in the trial phase, as the jury is about to determine guilt or innocence.

The prosecutor, not content to simply point out through cross-examination
that Dr. Leland had only spent a limited amount of time with the Petitioner,
went on to object to Dr. Leland's testimony *in toto*, and moved to strike it unless
the defense agreed to submit into evidence all of the Petitioner's Central
Psychiatric records including all the egregious hearsay statements.  (Tr.  906-
912).  The quicksand of Rule 703 grasped Petitioner's counsel; the more they
struggled the quicker they sank.  Defense counsel requested admission of the

clinic records but asked that the offensive and irrelevant hearsay redacted, but to no avail. (Tr. 908). [9]

Thus, instead of taking the proper course and ruling that Dr. Leland's testimony would stand and that only those portions of Petitioner's Central Psychiatric record that reflected the diagnostic testing done by the psychiatrists and psychologist as well as their opinions as to the Petitioner and excluding the hearsay statements made by non-professionals, the court left defense counsel sinking under threat of having all of Dr. Leland's testimony, Petitioner's only expert, excluded.

Without a prior ruling from the lower court and being under threat of having Dr. Leland's entire testimony excluded, the defense was essentially coerced into offering the Petitioner's entire Central Psychiatric Clinic records into evidence including the hearsay statements.  (Tr. 906-912).  Petitioner submits that the introduction of this inflammatory information that was totally unrelated to the crimes charged, was clearly prejudicial error.

The prosecutor's motive in insisting that Petitioner's entire Central Psychiatric Clinic record be admitted into evidence was not done in the search for truth and justice but so that they could engage in further prosecutorial misconduct by commenting extensively in closing argument as to the hearsay

---

[9] Defense Counsel could have solved this problem by removing the offensive items from the Clinic File before giving the file to Dr. Leland.  Dr. Leleand was examining the records for indications of mental retardation and its effect on his interrogation, not to give a life history og Gumm.  These items could have been removed, without jeopardizing Dr. Leland's opinion.  See, also Claim 5.

statements contained in said record and further insuring that said hearsay statements would be present before the jury for deliberations both during the guilt phase and penalty phase of the trial.

Mr. Longano in his closing argument stated as follows:

> When you go through this packet of material, you'll find some reports that were compiled, interviews with various individuals who came into contact with Junior, Karen Ridenour is one of them.
>
> Part of what you will see in that report indicates that, being the youngest child, the adopted baby, Darryl was spoiled, and he got everything he wanted. On occasion, Darryl would do something wrong, and this is someone who is about as close to him as you can possibly get. When Darryl would do something wrong, he would lie to avoid getting punished. The example which Karen gave was when he would steal something.
>
> Is he mentally retarded? I don't think there's much question about that. Does he know right from wrong? He does. When he's caught and when he's afraid of being punished, does he lie? There it is. You have it from his sister.
>
> An individual named Charles Gray was interviewed, a friend who apparently knew Junior Gumm. He described Junior initially as a mellow kid, who admitted that he would really change when he drank, become rowdy and have frequent blackouts. He would make comments to Charles such as, "I'd like to take that one to the river and have my way with her."
>
> He's now talking about having sex with women. You'll see that when you read this, before going to Kentucky, Charles recalls Darryl as acting real strange. He began to shy away from everybody. He did admit that Darryl was drinking more at this time, which fits into what he says in his statement.
>
> Charles recalls hearing a story from his wife of an incident where Darryl threw a raccoon into a five-gallon bucket of paint. Charles admits that Darryl was

cruel to animals and would frequently kick them. On one occasion he recalls Darryl planning to kick the neighbor's dog to death before he was stopped by the dog's owner. Begin to fit the personality?

These are from people who are not police officers, not prosecutors. They're people, if anything, who should be in the defense. They interviewed Betty Gumm, you heard what she said. Darryl knew these buildings and could go through them blindfolded. On another occasion Betty recalls Darryl tried to rape a friend of hers; however, there was not enough evidence on this occasion to convict him. He was described as rowdy, arguing, and fighting when he was drunk. Does that fit the pattern? Betty recalls Darryl as always being cruel to animals.

On one occasion, he recalls Darryl throwing her sister Karen's dog into a space heater and the dog dying. On another occasion, Betty recalls Darryl putting a spoon on the stove until it got hot and then putting it on their nephew's arm.

You'll also find in there a document entitled psychiatric consultation, put together by Gail Hellman, MD, staff psychiatrist. In talking about Darryl Gumm, it stated that he was guarded with information and tended to provide limited and non elaborative answers to most questions.

Guarded when giving responses. What does that mean? He'll tell you what he wants to tell you and he'll guard the rest. He indicates that approximately two to four miles outside of Hazard they picked upon Michael Bies, who was hitchhiking. He denied ever knowing Michael Bies prior to this. He denied speaking with Mr. Bies on the trip to Cincinnati.

Also included in that packet of information is an evaluation form from St. Joseph Orphanage, and there was some testimony about Darryl Gumm spending some time there. . . .

Item No. 2, special problem areas -- and this is from 1980. Twelve years ago we have what we have here today. Special problem areas. Darryl runs from problems, he lies, he steals, he cons, has a poor self-

> image, and doesn't fit in with a group, and he's lazy.
> That sums it up.

(Tr. 974-984).

It is submitted that because of prejudicial error committed by the court in dealing with and admitting into evidence Petitioner's entire Central Psychiatric Clinic records as well as the gross misconduct committed by the prosecutor in insisting that the entire record be admitted and thereafter compounding said misconduct by arguing from said record to the jury, the Petitioner was denied due process of law and a fair trial.

## D.  State Court Ruling and Reply to Legal Arguments cited by the Warden

(1) The Ohio Supreme Court made the following findings with respect to this Claim:

> Gumm contends he was denied due process and the right to a fair trial by the admission of evidence of his prior bad acts. Gumm first challenges the admissibility of testimony elicited from witnesses Phyllis Thacker and Charlotte Baker.   Specifically, Thacker testified that Gumm "was hateful"; that his personality would change when he drank alcohol; and that Gumm told her that he had once had sexual contact with a horse.[10]  Baker testified that Gumm started giving her "strange looks" during the month before the murder and that he had graphically expressed to her his desire to have sex. Gumm

_____

[10] Even the Supreme Court of Ohio dressed up the testimony by exchanging the word "fucked" for "sexual contact" and was incorrect in its use of "sexual contact" as the testimony, if believed, described "sexual conduct."

-52-

asserts that his chance for a fair trial was irretrievably lost after this testimony.

Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." R.C. 2945.59 states: "In any criminal case in which the defendant's motive or intent * * * or system in doing an act is material, any acts of the defendant which tend to show his motive or intent * * * or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant." In *State v. Flonnory* (1972), 31 Ohio St.2d 124, 126, 60 O.O.2d 95, 96-97, 285 N.E.2d 726, 729, this court noted that R.C. 2945.59 permits the showing of "other acts" when such other acts "tend to show" certain things, e.g., motive and intent, as identified in the statute. "If such other acts do in fact 'tend to show' any of those things they are admissible notwithstanding they may not be 'like' or 'similar' to the crime charged." Id.

We note that the prosecution did not revisit these factual disclosures in its summation or emphasize them in any way thereafter.[11] Even assuming, arguendo, that the challenged evidence should have been deemed inadmissible, we find on the basis of the record as a whole that Gumm received a fair trial and that it is beyond a reasonable doubt that the jury would have both convicted this defendant and sentenced him to death even in the absence of this evidence. See *DePew*, supra, 38 Ohio St.3d at 287, 528 N.E.2d at 555. (Op. at 425-426).

---

[11] The state did not need to remind the jury that Petitioner "fucked a horse" (a fact most people would not be able to forget) since they had the complete Central Psychiatric Clinic file, replete with hearsay and reference to other bad acts, which they did argue to the jury.

It is interesting that the Ohio Supreme Court somehow found that because the prosecuting attorney did not "revisit the factual disclosures" during closing argument that somehow the fact that it was admitted as evidence is ameliorated. Closing arguments are not evidence; on the other hand, testimony from the witness stand is evidence and the jury is told to consider it. Therefore it was irrelevant to the argument herein that the prosecutor, having already done his damage by asking the questions, chose not to revisit the topic in closing argument.

Further, the Ohio Supreme Court applied an improper standard in evaluating this claim. The question is not whether the legally admitted evidence was sufficient to support the death sentence, but rather, whether the State has proved " 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *Satterwhite v. Texas* (1988), 486 U.S. 249, 258-259, 108 S.Ct. 1792, 1798, 100 L.Ed.2d 284, 295, quoting *Chapman v. California* (1967), 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710; *Kordenbrock v. Scroggy* (C.A.6, 1990), 919 F.2d 1091, 1097. Under this federal constitutional standard, the burden is on the state to prove beyond a reasonable doubt that the jury's sentencing recommendation was not based, even in part, upon the error. A burden, based on the evidence, the State did not sustain.

It should also be pointed out that in using this erroneous standard, the Court cited to its decision in *State v. DePew* (1988), 38 Ohio St.3d 275, 528 N.E.2d 542, which was reversed by the Sixth Circuit on prosecutorial misconduct,

-54-

*DePew v Anderson*, 311 F3d 742 (6th Cir 2002).   In ruling on prosecutorial misconduct in the sentencing phase of the case, the Sixth Circuit addressed the Ohio Supreme Court's analysis in reviewing whether the prosecutor misconduct was harmless error:

> The Supreme Court of Ohio did not precisely hold all of these manifold errors to be "harmless."  Rather, it said that the crime was "brutal" and that reversal of the death penalty on these grounds violated the "interest of the public, which has every right to expect its criminal justice system to work effectively."  38 Ohio St.3d at 288, 528 N.E.2d at 557.   This is not the proper constitutional definition of harmless error.   The public's, or the voter's, feelings in favor of capital punishment for brutal crimes are a well- known part of our political tradition, but these feelings cannot rise above or displace constitutional provisions insuring a fair trial.

> *Depew*, at 751.

The Ohio Supreme Court's failure to apply the constitutional harmless error standard articulated in *Chapman* resulted in a decision that was contrary to, or involved an unreasonable application of, that Supreme Court decision. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Now the Court is required to determine whether the erroneous admission of this evidence had a "substantial and injurious effect" on the jury's verdict under *Brecht* v. *Abrahamson*, 507 U.S. 619, 631, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).  *Fry v. Pliler*, 127 S. Ct. 2321, 75 U.S.L.W. 4404 (2007)  Here it is clear that the prejudicial nature of the evidence presented, tainted the jury's verdict.

-55-

(2) As it related to the prosecutor's use of the prior bad acts, the Ohio

Supreme Court made the following findings:

> Second, Gumm asserts that the state engaged in prosecutorial misconduct in connection with the testimony of defense witness Dr. Henry Leland. Prior to trial Gumm moved the court to provide funds to procure an expert to assist his presentation of mitigation evidence, should he be found guilty. The motion was granted, and Gumm obtained Dr. Leland, a psychologist with expertise in mental retardation. Dr. Leland was called as a defense witness at the guilt phase of Gumm's trial, where he testified that he had interviewed Gumm, reviewed the transcripts of Gumm's statements to police, and reviewed a packet of information supplied to him by Gumm's counsel outlining tests and interviews undertaken and prepared by the Court Psychiatric Center and psychological reports generated while Gumm was a juvenile. In relying on this information and his own testing of Gumm, Dr. Leland concluded that Gumm demonstrated a mild to borderline level of mental retardation and that Gumm did not have the ability to accurately or consistently describe any series of events.

> Thereafter, the prosecutor moved to strike the testimony of defense witness Dr. Henry Leland, unless the packet of materials prepared by the Court Psychiatric Center and relied on by Dr. Leland was admitted into evidence. Gumm argues that admission of the entire packet of materials permitted the prosecution to engage in further misconduct by allowing it to focus on prior bad acts of defendant (past instances of cruelty to animals and an alleged attempt to rape a friend of his sister).

> This claim is without merit. Dr. Leland was called as the sole defense witness to show that Gumm's confession to police was not reliable. In response to the prosecutor's question whether the packet of information helped him form the basis of his opinions

on Gumm, Dr. Leland stated that the packet "presented the major basis, because when I was able to compare that information with my information, it became clear what the problem was."

Evid.R. 703 provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing." See *State v. Jones* (1984), 9 Ohio St. 3d 123, 9 OBR 347, 459 N.E.2d 526, the syllabus of which provides: "Pursuant to Evid.R. 703, facts or data upon which an expert bases an opinion must be those perceived by him or admitted in evidence at the hearing." (Emphasis added.)

While Gumm may have been forced to offer the Court Psychiatric Center packet into evidence to save the testimony of his only witness, the motion by the prosecutor does not constitute prosecutorial misconduct. The Rules of Evidence and relevant precedent support the propriety of the prosecution's motion in this regard. Because the prosecutor was permitted to comment upon the evidence admitted at trial, as discussed supra, at Part I of this opinion, his reference to materials contained in the packet in his closing argument was permissible. (Opinion at 426-427).

The Ohio Supreme Court fails to recognize that the Evidence Rules do not exist in a vacuum, each separate from the other. Even if admissible under Evid. R. 703, the Court was still required to determine if ALL the evidence was also admissible under Evid. R. 403, which examines the value of the evidence versus the prejudice of to the defendant, as well as the due process clause of the United States Constitution and Gumm's right to a fair trial.

The Court's finding that there was no misconduct in using this otherwise inadmissible and prejudicial evidence ignores what happened in the case as set forth above.  The Prosecuting attorney had no hesitation in making use of this "windfall" evidence to convict Gumm.  One wonders why, if the evidence was "simply so powerful" against Mr. Gumm, as alleged by the Warden (ROW, Doc. 163, p. 37) the prosecuting attorney felt it was necessary to rely on this prejudicial evidence.

The Warden uses a Fifth Circuit decision, from 1976 to argue that the evidence against Gumm was "simply so powerful" that Gumm's right to a fair trial was not denied by the admission of the other acts evidence.  (See, *Hills v. Henderson*, 529 F2d 397, 401 (5th. Cir. 1976) as cited by the Warden in her ROW, Doc. 163, p. 37.)  It would appear that in the thirty one years since *Hills* was decided, that this "simply so powerful" test has not been adopted by any other court, particularly the Sixth Circuit and the United States Supreme Court.  *Hills* is also distinguishable since the evidence, which the court found inadmissible, at least arguably was used to provide identity, while here there was no basis for its use other than to prejudice Gumm.  The Hills court also noted "Evidence of a similar crime must be relevant to a material fact in issue. The court must weigh the prosecutorial need for the evidence and its probative value against its inherent prejudicial effect. *United States v. Lawrance*, 480 F.2d 688 (CA5, 1973)." *Hills*., at 401, fn.7.  Further, the *Hills* court never engaged in a proper harmless error analysis.  *Id.*

-58-

(3)  The Warden responds to this claim by relying on the Federal Rules of Evidence that allow restrictive use of other acts evidence in sexual offense cases. It is obvious that Ohio does not include these evidentiary rules.  Further, the federal rules have safe guards to determine admissibility of this evidence, such as procedures to follow to determine admissibility (Fed. R. Evid 412(c)).  No similar safe guards were present in Gumm's case.

The Warden also relies on *United States v. Castillo*, 140 F3d 874 (10th Cir. 1998) to support her argument.  In Castillo, the court noted:

> When a court admits evidence of a defendant's propensities, such as evidence of the defendant's prior criminal acts, it creates "'the risk that a jury will convict for crimes other than those charged--or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment.'" *Old Chief v. United States*, 519 U.S. 172, 136 L. Ed. 2d 574, 117 S. Ct. 644, 650 (1997) (quoting *United States v. Moccia*, 681 F.2d 61, 63 (1st Cir. 1982)). Those risks of prejudice are present not only when the evidence is offered to show propensity, but whenever a defendant's prior bad acts are admitted. Whenever such evidence is before the jury, the jury may be tempted to convict for the prior bad act, or what it says about the defendant's character, rather than what it says about the likelihood that the defendant committed the charged crime. Therefore, the Supreme Court has described the risk of prejudice associated with evidence admitted under Rule 404(b)--which allows evidence of prior bad acts--in almost precisely the same terms as that associated with propensity evidence. The Court has said that Rule 404(b) evidence presents the risk that "the jury may choose to punish the defendant for the similar rather than the charged act, or [that] the jury may infer that the defendant is an evil person inclined to violate the law." *Huddleston v. United States*, 485 U.S. 681, 686, 99 L. Ed. 2d 771, 108 S. Ct. 1496 (1988); id. at 691

-59-

(citing *Michelson v. United States*, 335 U.S. 469, 475-76, 93 L. Ed. 168, 69 S. Ct. 213 (1948)).

*Castillo*, at 882.

The *Castillo* court also noted that in finding that the Federal Rules (412 and 413) passed constitutional muster; the court relied on the safeguards set forth in Evid. R. 402 and 403. Yet as pointed out above, no state court in this case engaged in a Evid. R. 402, 403 analyses. Further the evidence used under the federal rule must be proved by a preponderance of the evidence, there was no proof of any of the evidence challenged in this claim. Finally, the Warden fails to recognize that the bad acts evidence used against Gumm was broader then "sexual conduct" issue.

The Warden concludes that it was permissible to admit the whole Court Clinic file, including hearsay because it formed the basis of Dr. Leland's testimony. But as recognized by the Ohio Supreme Court, the purpose of Dr. Leland's testimony was to challenge the confession in this case. It is unlikely that the prejudicial material cited herein and used by the prosecuting attorney was used by Dr. Leland in forming the basis of his opinion. The Court Clinic file was broader than the limited testimony of Dr. Leland and included many different sections and kinds of material. The Court could have asked the witness to take out the portions that were not the basis of his testimony.

The admission of all the prior bad acts evidence and the use of the evidence by the prosecuting attorney prejudiced Mr. Gumm and denied him a fair trial.

**E.    Further Factual Development**

No additional factual development of this claim is requested at this time.

### *FOURTH CLAIM FOR RELIEF—PROSECUTORIAL MISCONDUCT*

**A.    Introduction**

A defendant is entitled to a trial which is free from prosecutorial misconduct which renders the proceeding fundamentally unfair. *Donnelly v. DeChristoforo* (1974), 416 U.S. 438. The prosecutor has a special duty and functions as the government's representative, "... whose obligation to govern impartially is as compelling as its obligation to govern at all..." *Berger v. United States* (1935), 295 U.S. 78.

**B.    Procedural Posture**

The Warden concedes that there is no procedural default as it relates to the other acts evidence discussed in Claim 3, supra.

The Warden argues default as it relates to the remaining claims of prosecutorial misconduct because trial counsel failed to object.  As set forth below, under section D., State Court Ruling, the failure to enter an objection was ineffective assistance of counsel which serves as cause to excuse the default. Trial counsel testified at the evidentiary hearing that there was no strategic or tactical decision not to object, he was busy preparing for his closing argument.

**C.    The Claim and Merits Argument**

On habeas corpus review, the standard to be applied to claims of prosecutorial misconduct is whether the conduct "so infected the trial with

unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 1871 (1974). While it may be that each specific instance of prosecutorial misconduct might not *per se* warrant a new trial, the misconduct, taken as a whole, and the cumulative effects of these improprieties denied Gumm a constitutionally fair trial.

The prosecutorial misconduct in this case included the misconduct set forth in Claim Two, withholding *Brady* Evidence and Claim Three, the use of the extensive other acts evidence. In addition, the prosecuting attorney engaged in other misconduct during the course of Gumm's trial, including improper comment regarding facts not in evidence, and asking the jury to speculate.

(1) Improper comment regarding the character of the accused and/or prejudicial other act evidence and argument (Claim 3 misconduct)

At trial, Prosecutor Longano elicited testimony from the state's first witness, Phyllis Thacker, that Petitioner reported he had "fucked a horse" at some unknown time in his past. (Tr.478-480). In response to counsel's objections regarding the relevancy of this other act evidence, Prosecutor Longano asserted that "...it's all part of the background leading up to the homicide." (Tr. 477). The Court overruled the objection and allowed the prejudicial and irrelevant testimony to be admitted. (Tr. 478). Petitioner asserts that the prosecution knew this evidence was improper.

At the evidentiary hearing, Prosecutor Longano stated "I know that I discussed this particular issue with members of the appellate staff prior to doing it because it is somewhat unusual, and I wanted to make sure that I had some basis for asking the question and that there would be some legal reason that it would be admissible." (Doc. # 87, E. Tr. 57:4-8).  Although Prosecutor Longano elicited evidence as to Mr. Gumm's character (Doc. # 87, E. Tr. 65:10-16), he testified at the evidentiary hearing that he thought the evidence went "to one of the other exceptions, in proof of motive". (Doc. # 87, E. Tr. 65:22-23). Longano postulated that the evidence was "a good faith effort on the part of the prosecution to present all the evidence that they thought—that he felt was relevant".  (Doc. # 87, E. Tr. 64:20-25). He recalled at the evidentiary hearing that the consensus was that it would be an appropriate question to be asked and answered in Gumm's case. (Doc. # 87, E. Tr. 62:14-16). Such a contention is belied by a review of caselaw that existed at the time of Petitioner's trial.

As of November 1992 it was (and still is) well-settled that evidence of a defendant's other crimes, wrongs or acts was/is not admissible to demonstrate that the defendant has a propensity for crime or that his character is in conformity with the other acts.  *State v. Hector* (1969), 19 Ohio St.2d 167

In *State v. Thompson* (1981), 66 Ohio St.2d 496, the Court found error in the admission of other act testimony regarding subsequent sexual contacts with the victim.  The Court held:

> "Other acts" testimony is relevant and, thus, admissible, under the "scheme, plan or system" exception of R.C. Section 2945.59 where those acts form part of the immediate background of the crime charged; and hence are "inextricably related" to the act alleged in the indictment; that is, where the challenged evidence plays an integral part in explaining the sequence of events and is necessary to give a complete picture of the alleged crime. * * * The jury is entitled to know the "setting" of a case. " *State v. Wilkinson,* supra, at page 317. *** Here, as in *State v. Eubank* (1979), 60 Ohio St.2d 183 the acts testified to were "chronologically and factually separate occurrences" (supra, at 186). They are not "inextricably related" to the acts alleged in the indictment. *** *Id* at 498.

At trial, Prosecutor Longano argued that the witnesses' report that Petitioner had "fucked a horse" was admissible because: "... it's all part of the background leading up to the homicide."  (Tr. 477) There was no effort to show the act formed part of the immediate background of the crime charged or was "inextricably related" to the acts alleged in the indictment, or that the challenged evidence played an integral part in explaining the sequence of events and was necessary to give a "complete picture" of the alleged crime. In fact, Prosecutor Longano's reference to the "background leading up to the homicide" suggests that he was aware of the line of cases (or was advised of the line of cases by the appellate division) that required such a connection to justify admission: his words reveal his knowledge. Prosecutor Longano (and members of the appellate division) knew or should have known that the act in no way formed part of the immediate background of the crime charged and was not "inextricably related" to the acts alleged in the indictment. Yet, they sought introduction of this

-65-

"somewhat unusual" evidence. (Doc. # 87, E. Tr. 57:4-8). The state's misconduct violated clearly established constitutional principles. *Michelson v. United States* 335 U.S. 469, 475-476 (1948).

Mr. Longano testified that he believed the evidence was relevant to the issue of motive and sexual gratification. (Doc. # 87, E. Tr. 58-59). Sexual gratification is not an element of any offense for which Petitioner was charged. The State's Supreme Court Merit Brief is silent as to the claim of error regarding the admission of evidence of a prior act of sexual perversion with a horse. (App. Vol. 3, pp. 237-245). Rather, the Hamilton County Prosecutor's Office argued that the Defendant in his case in chief admitted all of the information from the court clinic. (App. Vol. 3, pp. 237-238)

The assertion that all of the evidence objected to by the defense at trial was contained in the court psychiatric file as argued by the State in the First District Court of Appeals and in the Ohio Supreme Court, is factually incorrect and misleading. There is nothing in the court psychiatric file that remotely mentions sex with a horse (App. Vol. 9, pp. 98-202), and there is nothing in the State's brief on appeal or in the Ohio Supreme Court which directly responds to Petitioner's claims regarding the admission of this other acts testimony. Eight years after the admission of the evidence at the Evidentiary Hearing, Longano admitted that he did not obtain the information regarding the horse from the court psychiatric file (directly contradicting the State's merits arguments in the First District Court of Appeals and Ohio Supreme Court) but rather, from his

-66-

personal interview with the witness during a visit to Hazard Kentucky. (Doc. #87, E. Tr. 67:5-18). Certainly he could not have relied, in good faith, on the foregoing arguments made on appeal, at the time he sought introduction of the testimony when he knew the true source of the information. As Respondent has pointed out, the issue is not the intent of the prosecutor but rather the effect on the jury. The evidence was offered to inflame the passion of the jury with evidence collateral to the principal issue at bar. It was offered to show that Petitioner acted in conformity with his character as a sexual deviant, on the day in question. The evidence adduced as to Petitioner's claims of sexual perversion with an animal was highly inflammatory, and totally irrelevant. (See, Claim 3 for Relief). The effect was prejudicially devastating.

Petitioner submits that the prosecutor's motive in insisting that Petitioner's entire Central Psychiatric Clinic record be admitted into evidence was not done in a good faith search for truth, but rather, so that they could engage in further prosecutorial misconduct by commenting extensively in closing argument as to the hearsay statements contained in the file, arguing that Petitioner was a "liar" and further insuring that the damaging hearsay statements would be physically present before the jury for deliberations during both the guilt and penalty phases of the trial. This is not the first time that the Hamilton County Prosecutor's Office improperly attacked the character of the

accused or utilized damaging other act evidence in securing a death sentence.[12]

Petitioner's trial prosecutors knew or should have known of the impropriety of

this evidence and argument. *Glenn v. Tate, 71 F.* 3d 1204 (6th Cir. 1995).

In *Glenn,* the Sixth Circuit noted that the lack of preparation and

acquiescence of defense counsel in admitting a court appointed psychiatric report

_____

[12] See *e.g. State v. Steffen* (1987), 31 Ohio St. 3d 11 (Hamilton County Prosecutor introduced irrelevant and prejudicial evidence." Even clearly relevant evidence is inadmissible if its probative value is substantially outweighed by a danger of unfair prejudice. Evid. R. 403(A). *** The potential for prejudice in [the] statement is considerable. *** We believe it should not have been admitted. Id. at p. 120); *State v. Byrd* (1987), 32 Ohio St. 3d 79 (Hamilton County Prosecutor asked questions of a state informant and elicited responses that were objectionable as inadmissible hearsay. The Court found that the hearsay statements were not so prejudicial as to require reversal of Byrd's conviction. Id at p. 90); *State v. Garner (1995),* 74 Ohio St. 3d 49 (Hamilton County Prosecutor's final argument to the jury did not constitute prosecutorial misconduct so egregious as to warrant reversal of the death sentence because the reference to the defendant's prior arrests was fleeting and was promptly followed by a curative instruction. Id at p. 58- 59); *State v. Fautenberry* (1995), 72 Ohio St. 3d 435, (Court finds error in Prosecutor Piepmeier's improper admission of part of the victim impact statement relating to expressions of opinion relating to the appropriate sentence, but error does not warrant reversal *Id.* at p. 439); *State v. Clemons* (1998), 82 Ohio St. 3d 438, (During the trial, Prosecutor Longano, called the defendant a "liar" in his testimony and said about the defense: "I know they're just doing their job." During closing arguments he told jurors he expected the defense attorneys would interrupt him a lot." *** "Prosecutors should be on notice to avoid the comments highlighted here." Id.); *State v. Hill (Genesis)* (1996), 75 Ohio St. 3d 195; (The Hamilton County Prosecutor commented on Hill's prior criminal record (including delinquency adjudications for burglary, arson, breaking into a coin box, resisting arrest), his history as a drug dealer, and his mental condition. Hill also complains the prosecutor suggested that Hill lacked remorse, that he lied in testimony, and that his counsel tried to confuse the jury. The court concluded that the prosecutor improperly interjected his personal opinion that Hill lied. However, Hill failed to object to these remarks and thus waived all but plain error); *State v. Robb* (2000), 88 Ohio St. 3d 59, (Prosecutor Piepmeier's introduction of evidence as to defendant's asserted purchase of marijuana at Lucasville, drug dealing at the Ohio State Reformatory in Mansfield, and the later hunger strike at Mansfield was questionable. Although of doubtful relevance, those relatively minor acts could not have prejudiced defendant and were harmless error. Citing , *State v. Gumm* (1995), 73 Ohio St.3d 413, 426, 653 N.E.2d 253, *266. Id.* at p. 69).

which the trial court should not have admitted which contained damaging and prejudicial evidence, was not strategy but rather an unreasonable abdication of advocacy. Id. at 1209-121211. Despite knowledge of existing precedent which made clear that admission of other act evidence and reference to facts outside the record to inflame the jury was prohibited, the Hamilton County Prosecutor's Office, in a continuing pattern of misconduct, simply ignored the precedent and did what they had to do in order to obtain a conviction and death sentence against Petitioner.

Reference to other unproved misconduct, such as having sex with a horse, is universally recognized as prejudicial. Dean Wigmore's comments on evidence of other crimes states:

> It may almost be said that it is because of the indubitable relevancy of specific bad acts showing the character of the accused that such evidence is excluded. It is objectionable not because it has no appreciable probative value but because it has too much. The natural and inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crimes thus exhibited and either to allow it to bear too strongly on the present charge or to take the proof of it as justifying a condemnation, irrespective of the accused's guilt of the present charge.

1 A Wigmore, Evidence Section 58.2 (Tillers rev. 1983).

It is submitted that the admission into evidence of testimony as to the Petitioner's drinking, sexual drive and sexual habits which were submitted solely for the purpose of prejudicing the jury and were clearly irrelevant and which would antagonize and disgust most people, was clearly prejudicial and deprived Petitioner of any chance for a fair trial.

This claim presents more than an issue of the state court's interpretation of its own rules and is not solely a matter of state law. Where the prosecution knowingly makes improper use of prejudicial and inflammatory other acts evidence erroneously admitted by the trial court in a capital trial, the petitioner has been denied his due process rights to a fundamentally fair trial and Eighth amendment right to be free from cruel and unusual punishment.

(2) Improper comment regarding facts not in evidence, and asking the jury to speculate.

The prosecutors' comments throughout the trial and penalty[13] phase of Petitioner's trial constituted misconduct that was fundamentally unfair and deprived Petitioner of his right to due process of law. This is not a case where the misconduct of the prosecuting attorney was confined to a single instance, but one where such misconduct was comprehensive and persistent with a probable cumulative effect upon the jury which should not be ignored.

Petitioner's Trial Counsel testified at the Evidentiary Hearing that immediately prior to closing argument at Petitioner's trial, while in chambers with the judge and prosecutors, he specifically referenced the "horse" comment and asked if it was safe to assume that the state would not get into any inflammatory argument or focus on factors that were not statutorily appropriate. (Doc. #87, E. Tr. 273:8-25). Accordingly, there was a "gentleman's agreement"

---

[13] While the fact that misconduct also occurred in the penalty phase is now moot, it is illustrative of the pervasive misconduct that infect Mr. Gumm's trial.

that neither side would engage in improper argument. As a result, counsel was "less focused" on what the prosecution argued to the jury. (Doc. #87,E. Tr. 275:9-25).

Notwithstanding this "gentleman's agreement," Prosecutor Piepmeier improperly injected speculation argument about the anguish and agony of the young victim, in a manner calculated to incite the passions and prejudices of the jury.

> "How did he feel?" "Just think of the terror of little Aaron Raines;" "Can you think of anything more terrifying for a boy;" "Just imagine what was going through his mind. How many times did he beg for them to stop? How many times did he say a little prayer for help?" (Tr. 1109-1112).

The prosecutor also erroneously used the victim's picture during closing argument. (Tr. 938). *State v. Combs* (1991), 62 Ohio St.3d 278, 283, 581 N.E.2d 1071, 1077. The prosecutor's speculation concerning the victim's last thoughts and prayers was improper and he knew it. This type of speculation argument of facts not in evidence is almost verbatim the same argument previously made by the same prosecutor and condemned by the Ohio Supreme Court. Mr. Piepmeier also misstated the law excoriating defense counsel for not arguing that mitigation outweighed aggravation; the law does not require same. See, *State v. Hill (Jeffrey)* (1995), 73 Ohio St. 3d 433, (The Hamilton County Prosecutor misstated applicable law by asserting that "mitigating factors do not outweigh the aggravating circumstances.").

Prosecutor Piepmeier testified at the evidentiary hearing that he is sure he read the portion of the Ohio Supreme Court's decision in *Combs* that criticized his argument. (Doc. # 87, E. Tr. 100-101:25-1). "By continually referring to what the victims were thinking, the prosecutor engaged in gross speculation." *Combs*, supra. He stated that he knew Ohio Courts have said that he should not argue speculation and facts not in evidence. (Doc. # 87, E. Tr. 98:10-11). Piepmeier was generally familiar with capital jurisprudence existing at the time of Petitioner's trial, he undoubtedly was aware, as was Mr. Longano, (Doc. # 87, E. Tr. 22:8-13) of several Hamilton County cases where their office was criticized for repeating misconduct criticized in *Combs*. Clearly, he did not refrain from such improper argument in Petitioner's case. Indeed, Prosecutor Piepmeier's track record demonstrates, in direct contrast to his testimony at the evidentiary hearing, that he in fact, continues to make the same improper arguments in Hamilton County death penalty cases.[14] There is cause to excuse any procedural default of this claim due to counsel's ineffectiveness induced by prosecutorial misconduct.

---

[14] *See: State v. Combs, supra; State v. Wogenstahl (1996),* 75 Ohio St. 3d 344, (Prosecutor Piepmeier tried to get the jury to imagine what the victim could have been thinking, "What did she say to him? What went through her mind as she felt that knife pressed against her neck? That is something to consider." The prosecutors comments were objectionable because he invited jury to concentrate on what the victim experienced and was thinking in her last moments of life, under *State v. Combs* such argument invites jury to speculate on facts not in evidence at p.357. "We agree with appellant that the prosecutor's final closing argument was riddled with improper comments regarding the nature and circumstances of the offense Repeatedly, the prosecutor referred to the nature and circumstances of the offense as `aggravation' or `aggravating circumstances.' Worse yet, the prosecutor stated that such `aggravation' was to be balanced against the

The prosecutorial misconduct in this case affected the overall fairness of the trial. Habeas relief should be granted the Petitioner on his claim that his federal constitutional rights were violated by prosecutorial misconduct. State and federal judges throughout history have recognized such conduct as a

---

evidence presented in mitigation. Such comments do not conform to Ohio's death penalty scheme for the reasons stated in our previous discussion, supra."Id at p. 360); *State v, Moore* (1998), 81 Ohio St. 3d 22 (Prosecutor Piepmeier asked the jury to imagine what Mr. Olinger was thinking. "Think a minute what Melvin Olinger went through during that kidnapping. Maybe there was a moment of hope for Mr. Olinger. You know. "They're going to let me out." "Prosecutor also said, "Can you imagine the abject terror Melvin Olinger has at this point? Was he begging for his life?" "Prosecutorial comments continually referring to what the victim was thinking are improper because they ask the jury to speculate on facts not in evidence. *State v. Combs* (1991), 62 Ohio St. 3d 278, 283, 581 N.B. 2d 1071, 1077.While the prosecution is entitled to a certain degree of latitude in summation, ..., comments such as those complained of here are speculative and therefore improper." P. 34 "The prosecutor stated, `These are all the facts that are aggravating circumstances to be weighed against the total void of mitigation presented to you today." Under our decision in *State v. Wogenstahl (1996),* 75 Ohio St. 3d 344, 662 N.E. 2d 311, paragraph two of the syllabus, this comment was clearly improper because it elevates the nature and circumstances of the crime to the level of aggravating circumstances." *Id.* at p. 35); *State v. Shepphard* (1998), 84 Ohio St. 3d 230, (P) (" Here, for the most part, [Prosecutor Piepmeier's] sentencing argument was restrained and straightforward... The two speculative comments on what Wilhide was thinking at the moment he was shot were not so egregious as to constitute prejudicial error. *"Id* at p. 238. "More troublesome, however, is the prosecutor's argument asserting that the defense was underhanded by not entering a plea of not guilty by reason of insanity. The appellant was free to enter whatever plea he wished and cannot be chastised for doing so." *Id.* at p. 239); *State v. Jones (2000),* 90 Ohio St. 3d 403, (Prosecutor Piepmeier intimated that the appellant's girlfriend, who did not testify, lied for him. Objection was sustained. "However, the prosecutor continued to claim that Metcalfe lied, even though she never testified at trial. In addition, the prosecutor argued that shoes found during the search her residence belonged to appellant, even though no evidence at trial supported that assertion. We agree with the court of appeals that the comments concerning Metcalfe and the shoes were improper because they alluded to facts not in evidence. The Prosecutor also used the nature and circumstances of the offense as an aggravating circumstance. "Defense counsel's objection that the prosecutor was arguing the nature and circumstances of the offense as an aggravating circumstance was overruled. The court of appeals found this statement to be improper and erroneous, but found the comment to be nonprejudicial. This type of prosecutorial argument was directly proscribed in *State v. Wogenstahl,* *** Unlike *Wogenstahl,* the defense attorney did object immediately after the comment was made. The comment violated the law as enunciated in *Wogenstahl."* at p. 422).

-73-

challenge to the very foundation of our system of criminal justice. See, e.g., *State v Fears* (1999), 86 Ohio St. 3d 329, Moyer, J. concurring in part, dissenting in part. The United States Supreme Court has explicitly recognized that prosecutors serve a special role in our justice system requiring them to adhere to the highest standards and to avoid improper arguments, insinuations, and assertions calculated to mislead the jury. *Berger v. United States* (1935), 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321.

Egregious prosecutorial misconduct in a capital trial, which prejudices the right of the accused to a just determination of whether he shall live or die requires vacation of a death sentence. On habeas corpus review, the standard to be applied to claims of prosecutorial misconduct is whether the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 1871 (1974); *Washington v. Hofbauer* 228 F. 3d 689 (6th Cir. 2000), By any reasonable measure, the State's comments to the jury in Petitioner's case "so infected the trial with unfairness as to make the resulting conviction a denial of due process. " *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), quoting, *Donnelly v. DeChristoforo*, 416 U.S.367, 643 (1974). As noted by the *Donnelly* Court: "[w]hen specific guarantees of the Bill of Rights are involved, this Court has taken special care to assure that a prosecutor's conduct in no way impermissibly infringes them." Id. at 643. The Eighth Amendment is a specific right guaranteed by the

Bill of Rights. The prosecutor's conduct in this case violated clearly established Eighth Amendment rights.

From the foregoing examples, it is clear that the combined instances of prosecutorial misconduct in this case denied Appellant Gumm a fair trial. The instances of prosecutorial misconduct were prejudicial in and of themselves. However, they cannot be viewed in isolation but rather must be seen as a series of errors which were all designed to work together. This prosecutorial misconduct constituted a violation of Mr. Gumm's right, under the Due Process Clause of the Fourteenth Amendment, to a fair trial and his Eighth Amendment right to a reliable death sentence. His convictions must be overturned.

**D.    State Court Ruling**

In direct appeal proceedings, the trial court appointed two counsel to represent Mr. Gumm. One of those attorneys, Joseph W. Nienaber had never done a capital appeal, and very few appeals. (Doc. # 87, Evid Hrg Vol I, p. 127) His other counsel, David Boyd, had only done one other capital appeal. (Doc. # 87, E. Tr. p. 369). Gumm's first round of appeals to the First District Court of Appeals was dismissed for failing to file a brief. (Doc. # 87, E. Tr. p. 382). While the appeal was later reinstated, this exemplifies the lack of competence on appellate counsel's part.

These original appellate attorneys failed to file an assignment of error alleging ineffective assistance of trial counsel, for failing to make timely objections to the prosecutor's misconduct. On appeal to the Ohio Supreme Court,

Fred Hoefle replaced Joseph Nienaber and filed a proposition of law making that allegation.[15]

Tthe court found that "had objection been made to the prosecutor's invitation to the jury to "imagine" or speculate on aspects of the case not in evidence, *e.g.,* Aaron Raines's final thoughts, a trial court might well in its discretion have sustained that objection. *State v. Lott* (1990), 51 Ohio St.3d 160, 166, 555 N.E.2d 293, 300 (prosecutors "may not allude to matters not supported by admissible evidence")" However, when addressing the claim of ineffective assistance of counsel, the court found: "Gumm argues that appellate counsel was ineffective for not raising the issue of ineffective trial counsel based on failure to object to prosecutorial misconduct during trial. However, failure to make objections does not constitute ineffective assistance of counsel *per se,* as that failure may be justified as a tactical decision." *Gumm*, 73 Ohio St. 3rd at 422-423, 428.

While Gumm agrees that failing to object is not *per se* ineffective assistance of counsel, it can be ineffective assistance of counsel if the failure to object leads the jury to consider prejudicial evidence in their determination. The Court engaged in no analysis as to whether the failure to object in this instance, which allowed the jury to consider the misconduct, prejudiced Mr. Gumm. There is no evidence

---

[15] This replacement took place because Nienaber had been suspended from the practice of law.

in the record in this case that it was a "tactical decision, " in fact the evidence

shows that there was no tactical decision.  During the evidentiary hearing, Herb

Freeman, one of Gumm's trial attorneys testified as follows:

> A.     Hindsight-wise, some of this should have been
> objected to.
>
> Q.     And would you agree with me there was no
> strategic reason for your failure to object?
>
> A.     Well, may I elaborate just a moment?
>
> THE COURT:  Please.
>
> THE WITNESS:     I remember just before closing
> argument we had a powwow in the Judge's office, all of
> the trial counsel and the Judge, and I specifically
> referencing the horse comment said, now, is it okay if
> we can assume that we're not going to get into factors
> that aren't factors and inflammatory stuff, and then I
> made some reference to the horse thing just so that we
> would all know what we were talking about.  So I guess
> I'm saying I remember going out thinking that we were
> on pretty sound footing that we wouldn't have to be
> worried about people focusing on factors that weren't
> statutorily appropriate. So at that time I was paying
> less attention than I very likely would have otherwise
> been because I remember telling the people in the office
> well, good, because this lets  me sit here and work on
> my -- what I want to say and not have to be -- I
> remember saying that it doesn't always make jurors
> happy with either counsel or the Court, for that matter,
> if lawyers are standing up objecting right in the middle
> of people's close, and perhaps maybe we could work out
> some of these issues here so we don't fight about it
> there, come up with the same result anyway, but I
> didn't think a lot of this was ever going to get that way.
> I'm saying this was three-quarters over before I even
> started to pick up what was going on, and it doesn't
> mean that's a defense, but it is an explanation.
>
> BY MS. OVINGTON:

Q.    I certainly understand.  Did you at any point after it hit you that this was prejudicial do something to protect the record?

A.    I don't recall.

Q.    Okay.  Now, this particular part -- this section that I referred you to on page one one one two, that's Prosecutor Piepmeier making the prayer argument is what I've come to call it.

A.    Yeah.  And there's case law that says you shouldn't be doing that.

Q.    And you were aware of that case law?

A.    Yes, ma'am.

Q.    And you didn't cite it to the Court at the time?

A.    Well, as I told you, I was --

Q.    You were busy?

A.    Actually, I was, yeah.

Q.    Uh-hum.

A.    I was thinking we didn't even need to be monitoring what was going on, that neither side would be needing to monitor what the other one was doing.

Q.    Is it fair to say that you felt that you had received assurances from the State that that type of thing wasn't going to happen in close?

A.    Exactly.

Q.    And then --

A.    This was not done on the record.  This was just in the Judge's office.  But when we left there, it was my understanding, Bob and I, that we wouldn't need to police what the other side did because there was, if you will, a gentleman's agreement that aggravating statutes would be restricted to the ones the statute provides for and none more, that there wouldn't be emotional tirades that would be -- even if they were relevant, they would be -- the prejudicial effect would be greater than the relevant value of them.  So I think that's why we appear to be less than focused on this.  We left the office thinking that we had worked that out

before time, which was always the way I was taught you were supposed to do things in a courtroom to try and -- instead of having to have mistakes and do damage control, it's better to try to solve the problem on the front end. As officers of the court, you interact with the Judge and you try and get some guidance as to how you are doing things. I've gone over this a lot because I was asking myself some of these same questions also.

Doc. #88, Evidentiary Hearing transcript, pp. 273-276.

So contrary to the Ohio Supreme Court's finding, there was no tactical decision not to object, counsel was just to "busy" preparing for his own argument. Trial counsel's failure to object serves as cause to excuse the default in this case.

**E.     Further Factual Development**

No additional factual development of this claim is requested at this time.

### FIFTH CLAIM FOR RELIEF—TRIAL COUNSEL WAS INEFFECTIVE

### A.    Introduction

Mr. Gumm was charged with a capital crime and was on trial for his life. The Sixth Amendment to the United States Constitution, guaranteed him that he would have effective representation by counsel again these charges.  He did not receive that constitutional guarantee.

### B.    Procedural Posture

The Warden alleges that this claim is procedurally defaulted.  First, the warden argues that the issue regarded the failure to object to prosecutorial misconduct, although raised in the Ohio Supreme Court was waived because it was not presented to the court of appeals.  The Ohio Supreme Court addressed the merits of the issue, as set forth below in subsection D.

The warden also alleges that the remaining claims of ineffective assistance of counsel "were never presented before *any* Ohio court."  (ROW, Doc. 163, p. 46, emphasis in original).  This is not true.  This issue was raised in two separate proceedings before the Ohio State Courts.  First it was raised in Gumm's App. R. 26(B) application in the court of appeals (App. Vol. 16, pp 6-8) and again raised in the *Atkins* post-conviction petition.  (App. Vol. 9, pp. 36-37)  In ruling on the non-mental retardation claims, the trial court overruled the claims, finding "this Court hereby overrules these, as well as all remaining issues before this Court on the basis that they are moot or barred because of res judicata and/or collateral

-80-

estoppels from decisions previously rendered in either direct appeals and/or post conviction appeals." (App. Vol. 11, p. 309) The court of appeals addressed the merits of this claim, finding it to be without merit. *State v. Gumm*, 169 Ohio App. R. 26(B).3d 650, 2006-Ohio-6451, at ¶30.

## C.     The Claim and Merits Argument

*Strickland v. Washington,* 466 U.S. 668 (1984) sets out to test for ineffectiveness claims:

> First, the Defendant must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed the Defendant by the Sixth Amendment. Second, the Defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the Defendant of a fair trial, a trial whose result is reliable.
>
> Id., at 687.

To determine whether defense counsel's performance was deficient, this Court must first determine whether counsel's representation of Gumm fell below an objective standard of reasonableness under prevailing professional norms. See *Strickland*, at 688. "Counsel . . . has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." Strickland, at 689. "[T]he ABA standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the "prevailing professional norms" in ineffective assistance cases. This principle adds clarity,

-81-

detail and content to the more generalized and indefinite 20-year-old language of *Strickland* quoted above." *Wiggins v. Smith*, 123 S.Ct. 2527, 2536 (2003).

Although defense counsel is accorded deference in making decisions as part of a sound trial strategy, no decisions can be found to have been reasonable, strategic decisions unless defense counsel first conducts a reasonable investigation. See *Strickland* at 689, 691; *Wiggins v. Smith*, supra. However, "the mere incantation of 'strategy' does not insulate attorney behavior from review." *Brecheen v. Reynolds*, 41 F.3d 1343, 1369 (10th Cir.1994) *Fisher v. Gibson,* 282 F3d 1283, 1296 (10th Cir. 2002).

As stated in *Combs v. Coyle*, 205 F3d 269, 289-90 (6th Cir 2000):

> Counsel's overall performance is particularly shocking given the fact that this case involves the death penalty. *Strickland* instructed that "[p]revailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice 4-1.1 to 4- 8.6 (2d ed.  1980) ('The Defense Function'), are guides to determining what is reasonable, but they are only guides." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052.  ABA Standard 4-1.2(c) states that "[s]ince the death penalty differs from other criminal penalties in its finality, defense counsel in a capital case should respond to this difference by making extraordinary efforts on behalf of the accused." ABA Standards for Criminal Justice Prosecution Function and Defense Function 120 (3d ed.1993).

Counsel in this case did not make extraordinary efforts on behalf of Petitioner Gumm.  If he had, he would have investigated the witnesses involved in the case, instead, counsel threw all his eggs in one basket, suppression of the

confession.  When the trial court failed to suppress the confession, counsel failed to pursue other challenges to his client's guilt.

While Petitioner in no way concedes that the State did not have the obligation to turn over exculpatory evidence, counsel also had the obligation to investigate the case.  Had counsel done so, he would have been able to uncover evidence that would have cast a reasonable doubt on the State's case.  Even evidence collected by the Court Psychiatric Clinic could have provided counsel with available witnesses.  (App. Vol. 9, pp. 98-202)  Counsel obviously had this document because he gave it to Dr. Leland to review.

If counsel had investigated the case, or had been allowed to hire a mitigation specialist the whole fiasco with the court clinic file could have been avoided.  Counsel could have obtained the records and background necessary for the expert to render an opinion without the extraneous hearsay information.  At a minimum, counsel should have removed the hearsay information that was irrelevant to the expert's determination from the Court Clinic file before the file was handed over, the question Dr. Leland testified concerning was whether Gumm understood the *Miranda* rights and waiver of them, therefore much of the material in the file was irrelevant to this determination.

Counsel failed to make the appropriate objections to prosecutorial misconduct and to the trial court's instructions. (See Section B of Claims 3 and 9 for merits argument)  Counsel have a duty to make legally appropriate objections necessary to protect the client from unfair prejudice or unscrupulous behavior at

trial.  Had this evidence not been introduced, and the correct instructions give, there is a reasonable probability that the outcome would have been different.

The two attorneys who represented Petitioner Gumm at his capital trial did not fulfill these basic duties. The deficient conduct of Petitioner's trial attorneys resulted in very real prejudice.  The jury was allowed to consider the prejudicial evidence put forth by the prosecuting attorney and were erroneously instructed, which affected their decision-making process.  Their deficient performance was unreasonable and so prejudicial that it serves to undermine confidence in the outcome of Petitioner's conviction.

Both of Gumm's trial counsel lacked Rule 65(now Rule 20) certification. Even thought the rule became effective on October 1, 1987 and Mr. Gumm was tried in 1992.  Moreover, neither counsel had tried a capital murder case before. (Doc. # 88, E. Tr. 223:13-15). They did not appreciate the importance of preserving claims of constitutional error for the record.

Trial Counsel had difficulty during the entire trial with Judge Ruehlman's handling of the case. (Doc. #88, E. Tr. 206, 219, 223). The trial court's rush to judgment rendered counsel ineffective because they were given insufficient time to prepare.  No motion to continue was ever filed because it would have been an exercise in futility with this particular judge.  Nonetheless, the Ohio Courts relied on this failure in addressing the issue.

The actions, and inactions of counsel so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just verdict.

## D.     State Court Ruling

In ruling on the ineffective assistance of counsel raised in the Ohio Supreme Court, the Court found:

> However, each act of counsel with which Gumm finds fault was either not asserted as error in the court of appeals, and thus waived, or may be justified as a strategic decision.     Nor has Gumm demonstrated prejudice, *i.e.,* "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

The Court also addressed the claim when reviewing the ineffective assistance of appellate counsel:  "Gumm argues that appellate counsel was ineffective for not raising the issue of ineffective trial counsel based on failure to object to prosecutorial misconduct during trial.    However, failure to make objections does not constitute ineffective assistance of counsel *per se,* as that failure may be justified as a tactical decision."  *Gumm*, 73 Ohio St. 3rd at 422-423, 428.

While Gumm agrees that failing to object is not *per se* ineffective assistance of counsel, it can be ineffective assistance of counsel if the failure to object leads the jury to consider prejudicial evidence in their determination.  The Court engaged in no analysis as to whether the failure to object, which allowed

-85-

the jury to consider the misconduct prejudiced Mr. Gumm.  There is no evidence in the record in this case that it was a "tactical decision, " in fact the evidence shows that there was no tactical decision.  During the evidentiary hearing, Herb Freeman, one of Gumm's trial attorneys testified as follows:

> A.    Hindsight-wise, some of this should have been objected to.
>
> Q.    And would you agree with me there was no strategic reason for your failure to object?
>
> A.    Well, may I elaborate just a moment?
>
> THE COURT:  Please.
>
> THE WITNESS:    I remember just before closing argument we had a powwow in the Judge's office, all of the trial counsel and the Judge, and I specifically referencing the horse comment said, now, is it okay if we can assume that we're not going to get into factors that aren't factors and inflammatory stuff, and then I made some reference to the horse thing just so that we would all know what we were talking about.  So I guess I'm saying I remember going out thinking that we were on pretty sound footing that we wouldn't have to be worried about people focusing on factors that weren't statutorily appropriate. So at that time I was paying less attention than I very likely would have otherwise been because I remember telling the people in the office well, good, because this lets  me sit here and work on my -- what I want to say and not have to be -- I remember saying that it doesn't always make jurors happy with either counsel or the Court, for that matter, if lawyers are standing up objecting right in the middle of people's close, and perhaps maybe we could work out some of these issues here so we don't fight about it there, come up with the same result anyway, but I didn't think a lot of this was ever going to get that way. I'm saying this was three-quarters over before I even started to pick up what was going on, and it doesn't mean that's a defense, but it is an explanation.
>
> BY MS. OVINGTON:

Q.      I certainly understand.  Did you at any point after it hit you that this was prejudicial do something to protect the record?

A.      I don't recall.

Q.      Okay.  Now, this particular part -- this section that I referred you to on page one one one two, that's Prosecutor Piepmeier making the prayer argument is what I've come to call it.

A.      Yeah.  And there's case law that says you shouldn't be doing that.

Q.      And you were aware of that case law?

A.      Yes, ma'am.

Q.      And you didn't cite it to the Court at the time?

A.      Well, as I told you, I was --

Q.      You were busy?

A.      Actually, I was, yeah.

Q.      Uh-hum.

A.      I was thinking we didn't even need to be monitoring what was going on, that neither side would be needing to monitor what the other one was doing.

Q.      Is it fair to say that you felt that you had received assurances from the State that that type of thing wasn't going to happen in close?

A.      Exactly.

Q.      And then --

A.      This was not done on the record.  This was just in the Judge's office.  But when we left there, it was my understanding, Bob and I, that we wouldn't need to police what the other side did because there was, if you will, a gentleman's agreement that aggravating statutes would be restricted to the ones the statute provides for and none more, that there wouldn't be emotional tirades that would be -- even if they were relevant, they would be -- the prejudicial effect would be greater than the relevant value of them.  So I think that's why we appear to be less than focused on this.  We left the office thinking that we had worked that out

> before time, which was always the way I was taught you were supposed to do things in a courtroom to try and -- instead of having to have mistakes and do damage control, it's better to try to solve the problem on the front end. As officers of the court, you interact with the Judge and you try and get some guidance as to how you are doing things. I've gone over this a lot because I was asking myself some of these same questions also.

Doc. # 88, Evidentiary Hearing transcript, pp. 273-276

So contrary to the Ohio Supreme Court's finding, there was no tactical decision not to object, counsel was just to "busy" preparing for his own argument.

The remaining ineffectiveness claims were raised in the App. R. 26(B) application. Both courts found that his application was time-barred and never reached the merits of the issues presented.

Ohio R.App. P. 26(B) is not an adequate and independent state ground upon which to premise a federal default. State procedural rules bar federal habeas corpus review only if the rules are "firmly established and regularly followed." This Court has already found that Ohio App. R. 26(B) is not so firmly established and regularly followed:

> At this point in time, it cannot be said that the Ohio App. R. 26(B) timeliness/good cause rule is firmly established and regularly followed in Ohio capital cases. In most of the foregoing cases, the courts of appeals enforced the rule even as to persons whose convictions became final long before *Murnahan* or 26(B)'s effective date. The Ohio Supreme Court appeared to be headed in that direction, but then shifted its course. In every capital case raising the question in 2001, the court failed to affirm a court of appeals' ruling that a 26(B)

-88-

> application was untimely and instead reached the
> merits. In none of those cases did it overturn the court of
> appeals' timeliness ruling, it merely failed to discuss it.
>
> The Court holds that Ohio App. R. 26(B) is not presently
> firmly established and regularly followed in Ohio capital
> cases so as to prevent merits review of Mr. Landrum's
> claims of ineffective assistance of appellate counsel
> presented to the Ohio courts in his 26(B) application.

*Landrum v. Anderson,* 185 F.Supp. 2d 868, 872-873 (SD OH 2002).

Further, as the court found in *Franklin v. Anderson,* 434 F. 3d 412, 428-29 (6th

Cir. 2006): "Rule 26(B) also fails to meet the second part of the *Maupin* test, that

courts "actually enforced the state procedural sanction." 785 F.2d at 138. A

review of the relevant case law reveals that the Ohio Supreme Court has been

erratic in its handling of untimely Rule 26(B) applications in capital cases."

Since neither the Court of Appeals or the Ohio Supreme Court reached the

merits of this claim, there is no adjudication on the merits of this claim and the

court may review the claim de novo. See, *Williams* and *Wiggins,* supra.

**E.     Further Factual Development**

No additional factual development of this claim is requested at this time.

-89-

### SIXTH CLAIM FOR RELIEF—APPELLATE COUNSEL WAS INEFFECTIVE

**A.    Introduction**

Mr. Gumm had the right to effective counsel in the direct appeal of his capital trial.

**B.    Procedural Posture**

The Warden concedes this claim is not procedurally defaulted.

**C.    The Claim and Merits Argument**

Once a capital defendant is convicted and sentenced to death, his direct appeals become critical.  Issues raised on direct appeal can make the difference between life and death.

Effective counsel in a death penalty case does not "winnow" issues. *Mapes v. Coyle*, 171 F.3d at 417-18. Since the death penalty differs from other criminal penalties in its finality, defense counsel in a capital case should respond to this difference by making extraordinary efforts on behalf of the accused.    ABA Standards for Criminal Justice (3d ed. 1991), Standard 4-1.2(c).

Counsel in capital cases clearly have a different responsibility, duty, and standard of care than counsel in non-capital cases.  Winnowing issues is not an option.   See, 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases,, Guideline 10.15.1(c). ("Post-conviction counsel should seek to litigate all issues, whether or not previously presented,

that are arguably meritorious under the standards applicable to high quality capital defense representation, including challenges to any overly restrictive procedural rules. Counsel should make every professionally appropriate effort to present issues in a manner that will preserve them for subsequent review." Id.)

Even if appellate counsel has no constitutional duty to raise every single non-frivolous issue, counsel must still exercise reasonable professional judgment in presenting the appeal. See *Jones v. Barnes*, 463 U.S. 745, 750 (1983). Appellate counsel may choose which issues to appeal as long as his or her performance is "within the range of competence demanded of attorneys in criminal cases and assures that indigent defendant an adequate opportunity to present his claims fairly in the context of the state's appellate process." *Jones v. Barnes*, 463 U.S. at 755 (Blackmun, J., concurring). See also *Alvord v. Wainwright*, 725 F.2d 1282 (11th Cir. 1984); *Sullivan v. Wainwright*, 695 F.2d 1306, 1309 (11th Cir. 1983); *Cunningham v. Henderson*, 725 F.2d 32, 36 (2nd Cir. 1984). See, 2003 ABA Guidelines 10.15.1(c), supra.

The failure to raise meritorious issues, especially when weaker claims are raised, falls below the prevailing professional norms. *Mapes v. Coyle*, 171 F.3d 408, 427-428 (6th Cir. 1999). Omitting a "dead-bang winner" from an appeal is not objectively reasonable. *United States v. Cook*, 45 F.3d 388, 395 (10th Cir. 1995). See also *Matire v. Wainwright*, 811 F.2d 1430 (11th Cir. 1987); *People v. Bowen,* 791 F.2d 861 (11th Cir. 1986); *Ragan v. Dugger*, 544 So. 2d 1052 (Fla. Dist. 1 Ct. App. 1989); *Whitt v. Holland*, 342 S.E.2d 292 (W. Va. 1986).

Appellant's appellate counsel lacked any significance experience in death penalty cases. Mr. Nienaber was not experienced in appeals at all and in fact, Gumm was his first *capital* appeal.[16] (Doc. # 87, Evid. H. Tr. 127:3-5). Mr. Boyd had handled only one capital appeal before Gumm, *State v. Cedric Carter.* (Doc. #88, Evid. H. Tr. 369:22-24; 370:1). Neither had any explanation for why they did not raise the issues in Mr. Gumm's direct appeal, there was no evidence it was "strategy" or "winnowing".

At least half of the assignments of error contained in Mr. Gumm's brief to the court of appeals were "canned," taken directly from the Cedric Carter brief. (Doc.# 88, Evid. H.Tr. 372:21-22), even if not applicable to this case, as exhibited by the thirteenth and fourteenth assignments of error.

Here appellate counsel failed to raise the following issues[17]:

    I.  Errors in the Jury Instructions (See, Claim 9, below)

    II.  Trail Counsel Ineffectiveness (See, Claim 5, above)

    III.All instances of Prosecutorial Misconduct (See, Claim 4, above)

When counsel fails to raise errors in the court of appeals and then later tries to raise them in the Ohio Supreme Court they are either viewed as waived or

---

[16] At the time he was working on the Gumm brief Mr. Nienaber was defending himself against a complaint filed by the Cincinnati Bar Association alleging that he had falsified time sheets. (Doc. # 87, Evid. H. Tr. 153-155, A-203). Mr. Nienaber was ultimately suspended and later, after another suspension (indefinite) he ceased practicing law altogether.

[17] Again it is important to remember that the only trial phase issues remain after the finding that Mr. Gumm is mentally retarded. There was considerably more ineffective assistance of both trial and appellate counsel as it related to the penalty phase.

viewed under the harsh plain error standard. A much higher standard to meet then when addressing a properly raised claim. The failure to raise meritorious issues, especially when weaker (or irrelevant) claims are raised, constitutes ineffective assistance of appellate counsel. *Mapes v. Coyle*, 171 F.3d 488, 427-428 (6th Cir. 1999).

Counsel's conduct fell below the acceptable standards of representation as enunciated in *Strickland* and cannot be explained away as sound appellate tactics, strategies or reasonable professional judgment, as illustrated in the testimony of Mr. Gumm's appellate counsel. There simply are no explanations.

The failure to raise the issues set out Claims 4, 5 and 9 support the finding that appellate counsel were ineffective for not raising the issues in Mr. Gumm's appellate brief. Counsel's errors were so serious that counsel was not functioning as counsel as guaranteed to a defendant by the Sixth and Fourteenth Amendments. Counsel simply failed to properly prepare for the appeal of Mr. Gumm's case.

**D.    State Court Ruling**

Gumm pursued two separate avenues of appellate ineffective assistance of counsel. First, after his case was affirmed in the court of appeals, because Petitioner's appellate counsel, Mr. Nienaber, had been suspended from the practice of law, he could not proceed with Petitioner's appeal to the Ohio Supreme Court. Mr. Fred Hoefle was later appointed by the court. Mr. Hoefle called to Mr. Boyd's attention numerous errors that should have been asserted in

the direct appeal so that they could be included in the Ohio Supreme Court. (Doc. # 88, E. Tr. 405-406:23-1).

On appeal to the Ohio Supreme Court, counsel raised ineffective assistance of appellate counsel for failing to raise the claim of trial counsel ineffectiveness. Mr. Boyd and Mr. Hoefle raised the following ineffective assistance of counsel issues in the Ohio Supreme Court:

> Appellant contends that he was deprived of the effective assistance of counsel in several respects: (1) failure to object to the prejudicial prosecutorial misconduct in argument at both phases of the proceedings; (2) the consent to the admission of the other act evidence contained in the clinic report; (3) failure to present evidence with respect to Appellant's alibi defense; (4) failure to object or demand a mistrial following the prosecution's injection of prejudicial other act evidence, and (5) presenting facts in mitigation which were more aggravating than mitigating. " (Ohio Supreme Court, Appellant's Merit Brief at pp. 43, 44).

The Ohio Supreme Court found:

> Gumm's claim of ineffective assistance of counsel before the court of appeals should also be rejected. Gumm argues that appellate counsel was ineffective for not raising the issue of ineffective trial counsel based on failure to object to prosecutorial misconduct during trial. However, failure to make objections does not constitute ineffective assistance of counsel *per se,* as that failure may be justified as a tactical decision. Furthermore, appellate counsel need not raise every conceivable issue on appeal. See *Campbell, supra,* 69 Ohio St.3d at 53, 630 N.E.2d at 353. Moreover, the process of " 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail * * * is the hallmark of effective appellate advocacy." *Smith v. Murray* (1986), 477 U.S. 527, 536, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434, 441.

-94-

While Gumm agrees that failing to object is not *per se* ineffective assistance of counsel, it can be ineffective assistance of counsel if the failure to object leads the jury to consider prejudicial evidence in their determination.  The Court engaged in no analysis as to whether the failure to object *in this instance*, which allowed the jury to consider the evidence prejudiced Mr. Gumm.

There is no evidence in the record in this case that it was a "tactical decision, " in fact the evidence shows that there was no tactical decision.  During the evidentiary hearing, Herb Freeman, one of Gumm's trial attorneys testified as follows:

> A.     Hindsight-wise, some of this should have been objected to.
>
> Q.     And would you agree with me there was no strategic reason for your failure to object?
>
> A.     Well, may I elaborate just a moment?
>
> THE COURT:  Please.
>
> THE WITNESS:   I remember just before closing argument we had a powwow in the Judge's office, all of the trial counsel and the Judge, and I specifically referencing the horse comment said, now, is it okay if we can assume that we're not going to get into factors that aren't factors and inflammatory stuff, and then I made some reference to the horse thing just so that we would all know what we were talking about.  So I guess I'm saying I remember going out thinking that we were on pretty sound footing that we wouldn't have to be worried about people focusing on factors that weren't statutorily appropriate. So at that time I was paying less attention than I very likely would have otherwise been because I remember telling the people in the office well, good, because this lets  me sit here and work on my -- what I want to say and not have to be -- I remember saying that it doesn't always make jurors happy with either counsel or the Court, for that matter,

if lawyers are standing up objecting right in the middle of people's close, and perhaps maybe we could work out some of these issues here so we don't fight about it there, come up with the same result anyway, but I didn't think a lot of this was ever going to get that way. I'm saying this was three-quarters over before I even started to pick up what was going on, and it doesn't mean that's a defense, but it is an explanation.

BY MS. OVINGTON:

Q.    I certainly understand.  Did you at any point after it hit you that this was prejudicial do something to protect the record?

A.    I don't recall.

Q.    Okay.  Now, this particular part -- this section that I referred you to on page one one one two, that's Prosecutor Piepmeier making the prayer argument is what I've come to call it.

A.    Yeah.  And there's case law that says you shouldn't  be doing that.

Q.    And you were aware of that case law?

A.    Yes, ma'am.

Q.    And you didn't cite it to the Court at the time?

A.    Well, as I told you, I was --

Q.    You were busy?

A.    Actually, I was, yeah.

Q.    Uh-hum.

A.    I was thinking we didn't even need to be monitoring what was going on, that neither side would be needing to monitor what the other one was doing.

Q.    Is it fair to say that you felt that you had received assurances from the State that that type of thing wasn't going to happen in close?

A.    Exactly.

Q.    And then --

A.    This was not done on the record.  This was just in the Judge's office.  But when we left there, it was my

> understanding, Bob and I, that we wouldn't need to police what the other side did because there was, if you will, a gentleman's agreement that aggravating statutes would be restricted to the ones the statute provides for and none more, that there wouldn't be emotional tirades that would be -- even if they were relevant, they would be -- the prejudicial effect would be greater than the relevant value of them. So I think that's why we appear to be less than focused on this. We left the office thinking that we had worked that out before time, which was always the way I was taught you were supposed to do things in a courtroom to try and -- instead of having to have mistakes and do damage control, it's better to try to solve the problem on the front end. As officers of the court, you interact with the Judge and you try and get some guidance as to how you are doing things. I've gone over this a lot because I was asking myself some of these same questions also.

> Doc. # 88, Evidentiary Hearing transcript, Vol. II, pp. 273-276

So contrary to the Ohio Supreme Court's finding, there was no tactical decision not to object, counsel was just too "busy" preparing for his own argument.

This issue (IAC) was stronger than other issues raised in the court of appeals, particularly the "canned" issues (thirteenth and fourteenth assignments of error) taken directly from the Cedric Carter brief. even though they were not applicable to Gumm's case.

The second time Gumm raised the ineffective assistance of counsel was in his App. R. 26(B) filed in the court of appeals. Both courts found that his application was time-barred and never reached the merits of the issues presented.

Ohio R. App. P. 26(B) is not an adequate and independent state ground upon which to premise a federal default.  State procedural rules bar federal habeas corpus review only if the rules are "firmly established and regularly followed." This Court has already found that Ohio App. R. 26(B) is not so firmly established and regularly followed:

> At this point in time, it cannot be said that the Ohio App. R. 26(B) timeliness/good cause rule is firmly established and regularly followed in Ohio capital cases. In most of the foregoing cases, the courts of appeals enforced the rule even as to persons whose convictions became final long before *Murnahan* or 26(B)'s effective date. The Ohio Supreme Court appeared to be headed in that direction, but then shifted its course. In every capital case raising the question in 2001, the court failed to affirm a court of appeals' ruling that a 26(B) application was untimely and instead reached the merits. In none of those cases did it overturn the court of appeals' timeliness ruling, it merely failed to discuss it.

> The Court holds that Ohio App. R. 26(B) is not presently firmly established and regularly followed in Ohio capital cases so as to prevent merits review of Mr. Landrum's claims of ineffective assistance of appellate counsel presented to the Ohio courts in his 26(B) application.

*Landrum v. Anderson,* 185 F.Supp. 2d 868, 872-873 (SD OH 2002). Further, as the court found in *Franklin v. Anderson,* 434 F. 3d 412, 428-29 (6th Cir. 2006): "Rule 26(B) also fails to meet the second part of the *Maupin* test, that courts "actually enforced the state procedural sanction."  785 F.2d at 138. A review of the relevant case law reveals that the Ohio Supreme Court has been erratic in its handling of untimely Rule 26(B) applications in capital cases."

Since neither the Court of Appeals or the Ohio Supreme Court reached the merits of this claim, there is no adjudication on the merits of this claim and the court may review the claim de novo.  See, *Williams* and *Wiggins,* supra.

**E.    Further Factual Development**

No additional factual development of this claim is requested at this time.

### SEVENTH CLAIM FOR RELIEF—REMOVAL FROM KENTUCKY

**A.    Introduction**

Gumm was improperly removed from the State of Kentucky.

**B.    Procedural Posture**

This issue was presented on direct appeal and the Warden concedes it is not defaulted.  (ROW, Doc. 163, p. 58)

**C.    The Claim and Merits Argument**

Petitioner was, at the time he was placed in the back of a police cruiser and taken from Brooksville, Kentucky to the Cincinnati Police Department, a resident of the State of Kentucky. He lived in a trailer on a tobacco farm, an hour's drive from Cincinnati, Ohio.

At the time he was taken from the State of Kentucky, the Cincinnati Police had obtained physical evidence (fingerprints) and statements from Petitioner.  They knew that the statements were inconsistent with statements they had obtained from "reliable" witnesses.

They knew of Petitioner within days of the crime but did not know his whereabouts. His whereabouts were established in late July, 1992, and Cincinnati Police personnel contacted the local Sheriff for Brooksville, Kentucky on July 24, l992, to obtain directions to where Petitioner was living.

Four days later, Cincinnati Police personnel returned to the State of Kentucky and seized Petitioner, placed him in the back seat of a police cruiser,

and transported him back across state lines, knowing that the statements given days earlier were inconsistent with other witness statements. Contrary to the Warden's characterization, Gumm was not availing himself of a free ride back to Cincinnati, Ohio. The transportation of Gumm was more like an impromptu extradition procedure.

At no time was Gumm, a mentally retarded individual, and in the opinion of one witness at trial suffered an organic brain dysfunction from a prenatal incident, told that the brutal death of Aaron Raines, about which he was to be questioned, could subject him to the death penalty or that he did not have to accompany the police personnel back to Cincinnati.

The United States Constitution Article IV, Section 2, Clause 2 states that a person charged in any State with Treason, Felony or other crime, who shall flee from Justice, and be found in another state, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the crime.

No person may be lawfully removed from one state to another by virtue of Article IV, Section 2, Clause 2 unless:

> he is charged in one state with treason, felony or other crime;

> he has fled from justice; and

> a demand is made for his delivery to the state wherein he is charged with crime and if either of these conditions are absent, the Constitution affords no warrant for a restraint of the liberty of that person. *Pierce v. Creecy, Missouri*, 28 S.Ct. 714, 210 U.S. 387 (l908).

Petitioner was not charged with a crime until after he had been removed from the State of Kentucky to the Cincinnati Police Department headquarters and gave statements to seasoned police interrogators; Petitioner had therefore not fled from justice and finally no demand had been made by any executive for the surrender of Petitioner's person in the State of Ohio.

Petitioner's removal from the State of Kentucky to the State of Ohio, at a time where Petitioner was one of two targets in the death of Aaron Raines, and after physical evidence and inconsistent statements had been previously obtained, violates Petitioner's constitutional right to be free from removal protected by Article IV, Section 2, Clause 2 of the United States Constitution. It further violates due process of law as guaranteed by the Fourteenth Amendment of the United States Constitution.

**D.      State Court Ruling**

In ruling on this issue, the Ohio Supreme Court found that "The record, however, supports the sole conclusion that Gumm voluntarily returned to Ohio with Cincinnati police officers." *State v. Gumm*, 73 Ohio St.3d 413, 430 (1995). Of course the Court does not cite to any facts in the record that supports that conclusion, nor does the warden. In an attempt to hedge their decision, the court continues:

> Assuming, *arguendo,* that Gumm was coerced, tricked, induced or deceived into returning to Ohio, such a circumstance would not necessarily invalidate a conviction. *Ker v. Illinois* (1886), 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421; *Frisbie v. Collins* (1952), 342 U.S.

> 519, 72 S.Ct. 509, 96 L.Ed. 541; *Tomkalski v. Maxwell* (1963), 175 Ohio St. 377, 378-379, 25 O.O.2d 278, 278-279, 194 N.E.2d 845, 846; *State v. Thierbach* (1993), 92 Ohio App.3d 365, 635 N.E.2d 1276. See Annotation, Modern Status of Rule Relating to Jurisdiction of State Court to Try Criminal Defendant Brought Within Jurisdiction Illegally or as Result of Fraud or Mistake (1983), 25 A.L.R.4th 157 (*Ker-Frisbie* rule overwhelmingly recognized with possible exception only in cases of outrageous illegal conduct involving kidnapping, torture, or excessive force).
>
> *Gumm*, at 430.

Neither *Ker* nor *Frisbee* were grounded in Article IV, Section 2, Clause 2 of the Constitution therefore their application to the case at bar is a reasonable application of law as determined by the United States Supreme Court.

## E.     Further Factual Development

No additional factual development of this claim is requested at this time.

## *EIGHTH CLAIM FOR RELIEF—GRUESOME PHOTOS*

### A.  Introduction

Due process is violated with the introduction of cumulative, gruesome and inflammatory photographs of the corpse of the deceased as well as a videotape walk through by the defendant being led by the police through the crime scene.

### B.  Procedural Posture

This issue was raised on direct appeal and the Warden concedes it is not defaulted.  (ROW, Doc. 163, p. 60)

### C.  The Claim and Merits Argument

The exhibits introduced at trial consisted of gruesome and inflammatory evidence that was likely to unfairly prejudice the jury against Petitioner. The trial court admitted over defense counsel's objection (Tr. 602-609), many photographs of the deceased little boy, and also included videotape of the scene where he was found, with the body still in place. Perhaps the most prejudicial photograph, which was selected by the prosecution for enlargement, was a 2×3 foot colored, close-up photograph of the victim's face, eyes open and severely damaged.  This large facial photograph had no purpose but to inflame the jury.  It was certainly repetitive as a smaller version was also admitted.

### C.  State Court Ruling

The Supreme Court of Ohio's conclusion that the probative value of each photograph outweighed the danger of material prejudice to Petitioner resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. *State v. Gumm*, 73 Ohio St.3d 413, 425 (1995). The same is true as to the court's conclusion regarding the videotape showing Petitioner walking through the crime scene with the police as they questioned him about what had occurred. In a very real sense, this was Petitioner's trial because the minute the jury saw the videotape and the gruesome photographs of the child victim they (nor anyone else who saw them) could not help but become inflamed in passion and prejudice against Petitioner.

**E.      Further Factual Development**

No additional factual development of this claim is requested at this time.

### NINTH CLAIM FOR RELIEF—JURY INSTRUCTION ERRORS

**A.     Introduction**

A capital defendant has a right to receive proper jury instructions in the trial phase of his capital case. The jury instructions regarding police office credibility, non-unanimous verdict, causation and purposeful murder, violated Darryl Gumm's rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments.

**B.     Procedural Posture**

The Warden claims that Gumm has never presented this claim to any Ohio Court, (ROW, Doc. 163, p. 63) this is not true. Gumm first raised this issue in his App. R. 26(B) application (App. Vol. 16, pp. 8-10)

**C.     The Claim and Merits Argument**

Jury Instructions go to the heart of the decision making process in our judicial system. Courts have consistently held that juries "are presumed to follow the court's instruction." Therefore when the jury is erroneously instructed, the fact-finding process is skewed. The following erroneous instructions skewed the fact-finding process in the trial phase of Mr. Gumm's trial.

Police Office Credibility

The trial court instructed the jury as follows:

> Now we had witnesses here who were police officers.
> And remember, they are tested by exactly the same
> tests of believability as any other witness. They are
> not entitled to more credibility nor any less credibility
> simply because they're officers of the law. Tr. 999.

The subject of witness credibility was covered in the general jury charge.

The court instructed the jurors that they were the "sole judges of * * * the credibility of the witnesses and the weight of the evidence" and that they must consider "the witness' * * * interest and bias" in judging credibility. Where a trial court gives instructions such as these, which apply equally to all witnesses, there is no need for any special comment or instruction regarding police credibility. *State v. Taylor* (Feb. 9, 1999), Medina App. No. 2783-M, 1999 *266 WL 61619. See, also, *Bell v. Philadelphia* (1985), 341 Pa.Super. 534, 546, 491 A.2d 1386; *State v. McKenzie* (1996), 197 W.Va. 429, 442-444, 475 S.E.2d 521

Such a special instruction runs afoul of the principle and that a trial judge may not single out a particular witness or group of witnesses to discuss their credibility, since such discussion exerts an undue influence on the jury. *Curtis v. State* (1925), 113 Ohio St. 187, 209- 210, 148 N.E. 834; *State v. Group* (2002) 98 Ohio St3d 248 at ¶¶ 115-118.

In this case, the police officer testimony was crucial to Mr. Gumm's conviction. By singling out police officers, the trial court highlighted their testimony. This was error.

Non- Unanimous Verdict

Gumm was indicted with felony-murder in the course of a kidnapping and/or rape. The jury was then instructed that in order to find the defendant guilty they must find that the defendant caused the death of Aaron Raines while committing or attempting to commit * * * the offense of kidnapping and/ or rape.

This instruction deprived him of his right to a unanimous jury verdict because some jurors might have convicted him of aggravated murder on the basis of kidnapping and others on the basis of rape. The form of the charge, combining "kidnapping and/or rape," was unnecessary and perilous. Using "and/or" can create ambiguity. See Garner, Dictionary of Modern Legal Usage (2d Ed.1995) 56. *State v. Noling* (2002), 98 Ohio St3d 44.

Gist of the Offense

The trial court instructed:

> A person acts purposely when the gist of the offense is
> a prohibition against certain conduct of a certain
> nature, regardless of what the offender intends to
> accomplish thereby, if it is his or her specific intention
> to engage in conduct of that nature" Tr. 1002

The "gist of the offense" language is confusing in a murder prosecution which requires "purpose." R.C. 2901.22(A); 4 Ohio Jury Instructions (1995) 52, 409.01(3)(Comment). *State v. Wilson* (1996), 74 Ohio St.3d 381, 393.

The indictment charged Gumm with aggravated murder, in violation of R.C. §2903.01(B). The prosecution had to demonstrate beyond a reasonable doubt that Gumm "purposely caused the death" of the victim in the course of the commission of a felony. The definition of "purpose" is written in the *alternative,*

-108-

that is, a person acts purposely *either* when he specifically intends to cause a certain result or when the person specifically intended to commit the offense and the gist of the offense is prohibited conduct of a certain nature. Thus, both definitions should not be given.

The second alternative definition of purpose does *not* require a specific intent. The second definition states only that a person acts purposely when he engages in some sort of prohibited conduct, *"regardless of what the offender intends to accomplish thereby"*. This is a classic definition applicable to a strict liability offense because it "makes certain acts *** criminal without regard to whether the actor intended for proscribed consequences to occur or knew that they would occur". W. LaFave, A. Scott, *Substantive Criminal Law* (1986), 219.

The trial court should not have given the "gist of the offense" definition of "purpose" in the present case. Its effect was to relieve the State of the burden to prove every element of the offense of aggravated murder.

An instruction which relieves the State of its burden to prove each essential element of a crime violates the Due Process Clause of the Fourteenth Amendment. *Sandstrom vs. Montana,* 442 U.S. 510, 520-523 (1979); *Francis vs. Franklin,* 471 U.S. 307, 313 (1985). The Due Process Clause of the Fourteenth Amendment requires the State prove every element of a crime beyond a reasonable doubt. *In Re Winship,* 397 U.S. 358 (1970).

This improper "gist of the offense" instruction also violated Gumm's right to trial by jury as guaranteed by the Sixth and Fourteenth Amendments: " A

defendant charged with a serious crime has the right to have a jury determine his guilt or innocence.". *Cabana vs. Bullock,* 474 U.S. 376, 384 (1986). "[A] jury's verdict cannot stand if the instructions provided the jury do not require it to find each element of the offense ***." Id. "[T]he existence of an accused's purpose *must* be found by the jury under proper instructions from the trial court and can never be determined by the Court as a matter of law.". *State vs. Scott,* 61 Ohio St.2d 155 (1980), paragraph four of the syllabus. (Emphasis added).

Instructional errors that prevent a jury from considering an issue are not subject to harmless error analysis. *Rose vs. Clark; 478* U.S. 570, 580 fn. 8 (1986); *Carpenters vs. United States,* 330 U.S. 395 (1947). Harmless error analysis is not appropriate because "the question is not whether guilt may be spelt out of a record, but rather, whether guilt has been found by *a jury* according to the procedure and standards appropriate for criminal trials.". *Bollenbach vs. United States,* 326 U.S. 607, 614 (1946). (Emphasis added).

Causation

The trial court instructed:

> Cause occurs when the death is the natural and foreseeable result of the act. * * * Result occurs when the death is naturally and foreseeably caused by the act * * *The test of foreseeability is whether a reasonably prudent person * * * Tr. 1004.

The comment to 4 O.J.I. 503.01 provides

> The Committee believes that this definition is more appropriate in an aggravated murder case than that provided by 4 OJI 409.55, which connotes liability for

-110-

"the natural and foreseeable consequences" of an act. This is not applicable to the facts presented at trial in an aggravated murder trial and this concept would violate the defendant's constitutional rights by introducing a civil law concept of liability that effectively eliminates the State's burden to prove the mens rea element of the underlying offenses. The Ohio Supreme Court has at least cautioned trial courts against using "foreseeable consequences" language in homicide cases. See e.g., *State v. Getsy* (1998), 84 Ohio St.3d 180, 196; *State v. Burchfield* (1993), 66 Ohio St.3d 261, 263.

The erroneous instructions in the trial phase of the case denied Petitioner Gumm a fair determination of his guilt or innocence. An instruction which relieves the State of its burden to prove each essential element of a crime violates the Due Process Clause of the Fourteenth Amendment. *Sandstrom vs. Montana,* 442 U.S. 510, 520-523 (1979); *Francis vs. Franklin,* 471 U.S. 307, 313 (1985). The Due Process Clause of the Fourteenth Amendment requires the State prove every element of a crime beyond a reasonable doubt. *In Re Winship,* 397 U.S. 358 (1970).

**D.** **State Court Ruling**

As set forth above, this issue was raised in Gumm's App. R. 26(B) application. Both courts found that his application was time-barred and never reached the merits of the issues presented.

Ohio R.App. P. 26(B) is not an adequate and independent state ground upon which to premise a federal default. State procedural rules bar federal habeas corpus review only if the rules are "firmly established and regularly followed."

This Court has already found that Ohio App. R. 26(B) is not so firmly established and regularly followed:

> At this point in time, it cannot be said that the Ohio App. R. 26(B) timeliness/good cause rule is firmly established and regularly followed in Ohio capital cases. In most of the foregoing cases, the courts of appeals enforced the rule even as to persons whose convictions became final long before *Murnahan* or 26(B)'s effective date. The Ohio Supreme Court appeared to be headed in that direction, but then shifted its course. In every capital case raising the question in 2001, the court failed to affirm a court of appeals' ruling that a 26(B) application was untimely and instead reached the merits. In none of those cases did it overturn the court of appeals' timeliness ruling, it merely failed to discuss it.

> The Court holds that Ohio App. R. 26(B) is not presently firmly established and regularly followed in Ohio capital cases so as to prevent merits review of Mr. Landrum's claims of ineffective assistance of appellate counsel presented to the Ohio courts in his 26(B) application.

*Landrum v. Anderson,* 185 F.Supp. 2d 868, 872-873 (SD OH 2002). Further, as the court found in *Franklin v. Anderson,* 434 F. 3d 412, 428-29 (6th Cir. 2006): "Rule 26(B) also fails to meet the second part of the *Maupin* test, that courts "actually enforced the state procedural sanction."  785 F.2d at 138. A review of the relevant case law reveals that the Ohio Supreme Court has been erratic in its handling of untimely Rule 26(B) applications in capital cases."

Since neither the Court of Appeals or the Ohio Supreme Court reached the merits of this claim, there is no adjudication on the merits of this claim and the court may review the claim de novo.  See, *Williams* and *Wiggins,* supra.

-112-

E.    **Further Factual Development**

No additional factual development of this claim is requested at this time.

## CONCLUSION

For the preceding reasons, Darryl Gumm's third amended petition for a writ of habeas corpus should be granted.  Gumm requests the following:

1.    That he be discharged from custody;

2.    Or, in the alternative, that he be granted a new trial;

3.    That he be granted discovery pursuant to Habeas Rule 6, if requested;

5.    Following discovery, that he be granted an evidentiary hearing, if requested;

6.    For such other and further relief as this Court may deem just and proper.

Respectfully submitted:
_s/Lawrence J. Greger_____
Lawrence J. Greger
Attorney at Law (0002592)
1100 Liberty Tower
120 W. Second Street
Dayton, Ohio 45402
(937) 223-3153
lgreger912@aol.com

and

_/s Kathleen McGarry_____
Kathleen McGarry (0038707)
McGarry Law Office
P.O. Box 310
Glorieta, New Mexico 87535
(505) 757-3989
kate@kmcgarrylaw.com

Counsel for Petitioner Darryl Gumm

-114-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing PETITIONER DARRYL GUMM'S TRAVERSE TO THE WARDEN'S RETURN OF WRIT was filed electronically on January 7, 2008. All parties are therefore served electronically through the Court's electronic filing system.

*/s Kathleen McGarry*_____
COUNSEL FOR PETITIONER
