# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

DARRYL GUMM,

                                 :

         Petitioner,                    Case No. 1:98-cv-838

                                 :          District Judge Walter Herbert Rice

     -vs-                                   Magistrate Judge Michael R. Merz

BETTY MITCHELL, Warden,         :

         Respondent.

---

## REPORT AND RECOMMENDATIONS

---

In 1992, Petitioner Darryl Gumm was indicted for the murder, attempted rape, and kidnapping of ten-year-old Aaron Raines in May of that year. (Appendix 2,[1] Vol. 1 at 11-13.) The murder count included three capital specifications. *Id.* At trial, Gumm was found guilty on all counts and specifications (Trial Tr. at 1043-46), and the jury recommended a sentence of death on the murder count (Trial Tr. at 1141-42). On

---

[1] In the course of these habeas corpus proceedings, it was necessary for Gumm to return to the state courts to litigate his mental retardation claim pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), and *State v. Lott*, 97 Ohio St. 3d 303, 779 N.E.2d 1011 (2002). Upon completion of the state court proceedings, Gumm filed his third amended petition for a writ of habeas corpus (Doc. No. 157), and Respondent filed a return of writ (Doc. No. 163). Pursuant to this Court's order (Doc. No. 159), Respondent also filed a comprehensive appendix to replace the appendix filed with Respondent's original return of writ in 1999 (Doc. No. 14). It appears, however, that some documents included in the first appendix are not included in the second. Thus, the Court will differentiate between the two appendices by designating the 1999 appendix "Appendix 1" and the later appendix "Appendix 2" when citing to either.

December 2, 1992, the trial court adopted the jury's recommendation and sentenced

Gumm to death for the murder, eight to fifteen years of incarceration for the attempted

rape, and ten to twenty-five years of incarceration for the kidnapping of Aaron Raines.

(Appendix 2, Vol. 1 at 190-201.) All sentences were to run consecutively. *Id*. at 12.

Gumm filed a petition for a writ of habeas corpus in the this Court on November

6, 1998, subsequently amending it three times. (Docs. No. 6, 72, 105, 157.[2]) In its final

iteration, Gumm's petition contains the following nine grounds for relief:

1. Petitioner's Fifth, Sixth and Fourteenth Amendment rights were violated by the interrogation of Petitioner, wherein inculpatory statements were obtained.

2. The State of Ohio failed to provide exculpatory and impeachment evidence to the defene [sic] as required by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

3. The admission of evidence of prior bad acts of the Petitioner in his capital murder trial, which acts bear no relation to the offenses for which he was tried, violated his right to a fundamentally fair trial secured to him by the Due Process Clause and Eighth Amendment of the United States Constitution.

4. The cumulitive [sic] effect of the prosecution's improper pattern of misconduct in Petitioner's capital trial deprived him of his due process rights to a fundamentally fair trial.

---

[2]The Court will cite the last of Gumm's amendments, his third amended petition for writ of habeas corpus (Doc. No. 157) as "Petition," for the sake of brevity.

5.      Petitioner Gumm was denied the effective assistance of counsel at his capital trial; his conviction violates the Sixth and Fourteenth Amendments.

6.      Petitioner Gumm was deprived of the effective assistance of counsel on his direct appeal as of right in violation of the Sixth Amendment and Due Process Clause of the Fourteenth Amendment.

7.      The jury's verdict is void as it violates Article Four, Section 2, Clause 2 of the United States Constutition.

8.      The trial court denied Petitoner [sic] Gumm his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution by permitting the state to introduce gruesome photographs in the trial phase and instructing the jury that they may consider same in the penalty phase.

9.      A capital defendant has the right to receive proper jury instrucitons [sic] in the trial phase of his case, the failure to do so violates the First, Sixth and Fourteenth Amendments to the United States Constitution.

(Third Amended Petition for Writ of Habeas Corpus, Doc. No. 157.)

Since Gumm's latest amended petition, Respondent has filed a return of writ (Doc. No. 163), Gumm has filed his reply (Doc. No. 169), and both parties have submitted post-evidentiary-hearing briefs (Docs. No. 191, 192, 193). The case is now ripe for decision.

## FACTS

The facts of Gumm's case, as found by the Ohio Supreme Court, are as follows:

Early on the morning of May 12, 1992, the bludgeoned body of ten-year-old Aaron Raines was found by police in the

basement of an abandoned building in the lower Price Hill section of Cincinnati. . . .

At 11:00 p.m. on May 11, 1992, Aaron Raines's family reported Aaron as missing to the Cincinnati police. An extensive neighborhood search took place, culminating in the discovery of Aaron's body in the basement of an abandoned building adjacent to a neighborhood part where Aaron had previously been playing.

Several weeks later Betty Gumm, a friend of the Raines family and defendant's sister through adoption, learned that her brother Darryl had been in the neighborhood on the day of Aaron's murder. Betty knew that her brother was acquainted with Aaron, and was familiar with the abandoned buildings where Aaron's body was found, having stripped copper out of them many times at night. Betty called the local "Crime Stoppers" number to report her information.

On July 24, 1992, Cincinnati police interviewed appellant at his job site, a tobacco farm in Brooksville, Kentucky. At that time, Gumm told police he hadn't been in Cincinnati since March 1992, and indicated his desire to cooperate with police. On July 27[,] Cincinnati police returned to Brooksville to talk to Gumm again, and Gumm accompanied them back to Cincinnati, ostensibly to clear himself of any wrongdoing. After extensive questioning in which he changed his statement several times, Gumm eventually confessed involvement in the murder of Aaron Raines.

Gumm's statement disclosed that he and one Michael Bies, a Kentucky acquaintance, were driven to Cincinnati on May 11 by acquaintances and dropped off around noon. Gumm told police that he and Bies went to a bar to drink beer, and later went to the Price Hill park adjacent to two abandoned buildings, where they encountered Aaron. Gumm and Bies were observed at approximately 7:00 p.m. sitting on a bench

-4-

in the park in which Aaron last played. Gumm admitted that he lured Aaron into the abandoned buildings for sexual purposes by telling him he would be paid $10 to help strip copper from the buildings. According to Gumm, after the three entered the first building and crossed over a walkway into the second building, Bies asked Aaron to perform oral sex for money. When Aaron refused, Gumm claimed that Bies punched Aaron several times, picked him up and carried him downstairs to the basement. According to Gumm, Bies there hit Aaron several additional times, once on the head with a "two by four." After that, Gumm stated that he and Bies fled the scene. Gumm claims that he himself did not hit Aaron at all, but conceded that he might have stepped on his body as he was attempting to flee from the basement.

When police found Aaron's body at the basement crime scene, they noticed several objects around the body that contained blood and hairs consistent with the victim's. These objects included a chunk of concrete, a pipe, pieces of wood, and twine found wrapped around Aaron's neck.

Amy Martin, M.D., a former deputy coroner of Hamilton County, examined Aaron's body at the crime scene and conducted the post-mortem exam at the coroner's office. Dr. Martin testified that Aaron sustained twenty-one lacerations to the back of his head, representing twenty-one separate blows from an object, and that some of these wounds manifested lines that matched the threading on the pipe found next to the body. Five of Aaron's ribs were broken, which Dr. Martin found unusual for a boy of his age, since such bones are usually flexible. Dr. Martin opined that "something like a kicking or stomping" would be the type of force necessary to break a young boy's ribs. Dr. Martin further testified that the left side of Aaron's face was completely crushed in a manner consistent with a blow from the chunk of concrete found lying next to the body. Several "chevron pattern" bruises consistent with the tread of a Nike gym shoe were found on several areas of Aaron's body.

Gumm had told police that he thought Bies had been wearing L.A. Gear gym shoes, and acknowledged that he had thrown his own shoes away.

Dr. Martin testified that Aaron also sustained a broken jaw, chipped teeth and cut lips, a deep laceration and bone chip on the underside of his jaw, compression wounds and hemorrhages in the eyes probably caused by compression of twine wrapped around his neck, and pattern bruises typical of injuries caused by being struck with a stick or rod.

Dr. Martin found no evidence of any defensive wounds on Aaron's body, and opined that the absence of defensive wounds was consistent with Aaron having been held or restrained while his injuries were being inflicted. Dr. Martin determined that the cause of death was a combination of blunt impacts to the head, chest and abdomen, as well as blunt injury to the neck.

*State v. Gumm*, 73 Ohio St. 3d 413, 413-15, 653 N.E.2d 253 (1995).

## PROCEDURAL HISTORY

**Direct Appeal**

Following his convictions and sentencing, Gumm took an appeal to the Ohio First District Court of Appeals, raising twenty-five assignments of error. (Appendix 2, Vol. 2 at 54-145.) The court of appeals overruled each assignment of error, *State v. Gumm*, Nos. C-920907, B-925608, 1994 WL 44411 (Ohio App. 1st Dist. Feb. 16, 1994) (unreported). On further appeal to the Ohio Supreme Court, Gumm claimed twenty-two errors (Appendix 2, Vol. 3 at 21-125), all of which were ultimately rejected, *State v. Gumm*, 73 Ohio St. 3d 413, 653 N.E.2d 253 (1995). Gumm's requests that the Ohio Supreme Court reconsider

his appeal (Appendix 2, Vol. 4 at 46-134) were similarly unavailing, *State v. Gumm*, 74 Ohio St. 3d 1423, 655 N.E.2d 742 (1995) (table). Gumm petitioned the United States Supreme Court for a wit of certiorari (Appendix 1, Vol. 2 , Exhibit R), which was summarily denied, *Gumm v. Ohio*, 516 U.S. 1177 (1996), as was Gumm's request for a rehearing of his petition, *Gumm v. Ohio*, 517 U.S. 1204 (1996).

**Post-Conviction Petition Proceedings**

On September 17, 1996, Gumm filed a petition for post-conviction relief in the state trial court, asserting ten claims for relief. (Appendix 2, Vol. 5 at 10-61.) All of Gumm's claims were found by the court to have been issues which could have been raised on direct appeal, and were barred from consideration in post-conviction by the Ohio criminal doctrine of *res judicata*. (Appendix 2, Vol. 5 at 103-111.) Gumm appealed to the state court of appeals (Appendix 2, Vol. 6 at 16-33), which affirmed the trial court's conclusion that all of Gumm's post-conviction claims could have been or were raised on direct appeal, and were therefore barred in post-conviction by *res judicata*. *State v. Gumm*, No. C-960972, 1997 WL 752608 (Ohio App. 1st Dist. Dec. 5, 1997 ) (unreported). Further appeal to the Ohio Supreme Court was not allowed, *State v. Gumm*, 81 Ohio St. 3d 1495, 691 N.E.2d 1057 (1998) (table), and the United States Supreme Court denied Gumm's subsequent petition for a writ of certiorari, *Gumm v. Ohio*, 525 U.S. 884 (1998).

On June 20, 2002, the United States Supreme Court handed down *Atkins v.*

*Virginia*, 536 U.S. 304 (2002), in which it held that execution of the mentally retarded constitutes cruel and unusual punishment violative of the Eighth Amendment of the United States Constitution. That decision precipitated Gumm's return to the state court to litigate the issue of his mental retardation in a second petition for post-conviction relief, during which these habeas proceedings were held in abeyance. (See Docs. No. 124, 126.) On April 7, 2003, Gumm filed his *Atkins* post-conviction petition. (Appendix 2, Vol. 9 at 11-44.) After a hearing on Gumm's petition, the trial court concluded that Gumm is mentally retarded under the criteria identified by the Ohio Supreme Court in *State v. Lott*, 97 Ohio St. 3d 303, 779 N.E.2d 1011 (2002). (Appendix 2, Vol. 11 at 292-302.) The state appealed (Appendix 2, Vol. 13 at 60-77), and the state court of appeals affirmed the trial court's decision, but denied each of Gumm's cross-appeal issues. *Id*. at 163-81. The state's further appeal to the Ohio Supreme Court was dismissed as not involving any substantial constitutional question. (Appendix 2, Vol. 15 at 6-35, 146.)

On July 23, 2007, Gumm was resentenced as follows:

1. Count 1 Aggravated Murder (R.C. 2903.01) life imprisonment with parole eligibility only after serving 30 full years of imprisonment . . . .

2. Count 2 Attempted Rape (R.C. 2923.02) . . . 8 actual years of incarceration in the Department of Corrections to 15 years[.]

3. Count 3 Kidnapping . . . (R.C. 2905.01) . . . 10 actual

years in the Department of Corrections to 25 years.

(Appendix 2, Vol. 18 at 12-13.)

**Application to Reopen Direct Appeal**

At the same time he was litigating his *Atkins* post-conviction petition, Gumm

pursued an application to reopen his direct appeal in the state court. (Appendix 2, Vol.

16 at 5-16.) On January 16, 2004, the court of appeals denied Gumm's application because

he failed to demonstrate good cause for its late filing. *Id*. at 204-5. Gumm appealed that

decision to the Ohio Supreme Court (Appendix 2, Vol. 17 at 13-45), but that court

affirmed the lower court and denied a later motion for reconsideration. *Id*. at 284-302.

## ANALYSIS

Since Gumm filed his original petition for a writ of habeas corpus after the

effective date of the Anti-terrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214

(the "AEDPA"), the amendments to 28 U.S.C. § 2254 embodied in that Act are applicable

to his petition. (*See* Petition, Doc. No. 21.) The Sixth Circuit has summarized the

standard of review under the AEDPA as follows:

> Under the Antiterrorism and Effective Death Penalty Act of
> 1996 (AEDPA) . . . , a federal court
>
> > may not grant a writ of habeas to a petitioner in state
> > custody with respect to any claim adjudicated on the
> > merits in state court unless (1) the state court's decision
> > "was contrary to, or involved an unreasonable
> > application of, clearly established Federal law, as

determined by the Supreme Court" . . . or (2) the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."

*Taylor v. Withrow*, 288 F.3d 846, 850 (6ᵗʰ Cir.2002) (quoting 28 U.S.C. § 2254(d)).

This standard requires the federal courts to give considerable deference to state-court decisions. *Herbert v. Billy*, 160 F.3d 1131, 1135 (6ᵗʰ Cir.1998) ("[the AEDPA] tells federal courts: Hands off, unless the judgment in place is based on an error grave enough to be called unreasonable"). (Citation and quotation marks omitted.)

The first line of analysis under [the] AEDPA involves the consistency of the state-court decision with existing federal law. A state-court decision is considered "contrary to . . . clearly established Federal law" if it is "diametrically different, opposite in character or nature, or mutually opposed." *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (emphasis and quotation marks omitted). Alternatively, to be found an "unreasonable application of . . . clearly established Federal law," the state-court decision must be "objectively unreasonable" and not simply erroneous or incorrect. *Id.* at 409-11.

The second line of analysis under [the] AEDPA concerns findings of fact made by the state courts. [The] AEDPA requires federal courts to accord a high degree of deference to such factual determinations. "A federal court is to apply a presumption of correctness to state court findings of fact for habeas corpus purposes unless clear and convincing evidence is offered to rebut this presumption. The [federal] court gives complete deference to the . . . state court's findings of fact supported by the evidence." *McAdoo v. Elo*, 365 F.3d 487, 493-94 (6ᵗʰ Cir.2004) (citations omitted).

*Nields v. Bradshaw*, 482 F.3d 442, 449 (6th Cir. 2007)(parallel citations omitted).

In addition, the Sixth Circuit Court of Appeals requires a four-part analysis when a respondent alleges a habeas claim is precluded by procedural default. *Reynolds v. Berry*, 146 F.3d 345, 347-48 (6th Cir. 1998), *citing Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261 F.3d 594 (6th Cir. 2001).

> First the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction. . . . Third, the court must decide whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. [O]nce a court determines the petitioner did not comply with a state procedural rule, and the rule is an adequate and independent state ground, then the petitioner must demonstrate cause for not following the procedural rule and prejudice resulting from the alleged constitutional error.

*Reynolds,* 146 F.3d at 347-48. It is with these principles in mind that this Court considers the merits of Gumm's grounds for relief.

**FIRST GROUND FOR RELIEF**

In his first ground for relief, Gumm contends that the statements he made during his interrogation and subsequently videotaped walk-through of the crime scene were obtained in violation of his federal constitutional rights under *Miranda v Arizona*, 384 U.S. 436 (1966). (Petition, Doc. No. 157 at 20-27.) Essentially, Gumm argues that his waiver

of his *Miranda* rights was neither knowing, voluntary, nor intelligent because he is

mentally retarded. *Id*. Respondent concedes the issue is preserved for habeas corpus

review, but argues that the Ohio Supreme Court's resolution of the claim was neither

contrary to nor an unreasonable application of federal law. (Return of Writ, Doc. No. 163

at 35-39.)

In a very recent case, the *en banc* Sixth Circuit Court of Appeals summarized the

federal law governing *Miranda* claims raised in habeas corpus as follows:

> [A habeas petitioner] has the burden of establishing that,
> under the totality of the circumstances, he did not knowingly
> and intelligently waive his rights before speaking to the
> police. *Clark v. Mitchell*, 425 F.3d 270, 283 (6th Cir. 2005). "We
> are also mindful that in a habeas proceeding the petitioner
> 'has the burden of establishing his right to federal habeas
> relief . . . .'" *Caver v. Straub*, 349 F.3d 340, 351 (6th Cir. 2003)
> (quoting *Romine v. Head*, 253 F.3d 1349, 1357 (11th Cir. 2001)).
> Under this inquiry, we examine "the particular facts and
> circumstances surrounding [the] case, including the
> background, experience, and conduct of the accused."
> *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *see also Edwards v.
> Arizona*, 451 U.S. 477, 482 (1981). The relevant question is not
> whether the "criminal suspect [knew] and [understood]
> every possible consequence of a waiver of the Fifth
> Amendment privilege," but rather whether the "suspect
> [knew] that he [could] choose not to talk to law enforcement
> officers, to talk only with counsel present, or to discontinue
> talking at any time." *Colorado v. Spring*, 479 U.S. 564, 574
> (1987).
>
> . . .
>
> It is well-established [sic], in this circuit and others, that

mental capacity is one of many factors to be considered in the totality of the circumstances analysis regarding whether a *Miranda* waiver was knowing and intelligent. Thus, diminished mental capacity alone does not prevent a defendant from validly waiving his or her *Miranda* rights. [Citations omitted.] Rather, that factor must be viewed alongside other factors, including evidence of the defendant's conduct during, and leading up to the interrogation.

*Garner v. Mitchell*, 557 F.3d 257, 260-61, 264 (6th Cir. 2009)(parallel citations omitted). The court explained that the original purpose of the *Miranda* decision was to "'reduce the likelihood that the suspects would fall victim to constitutionally impermissible practices of police interrogation.'" *Id*. at 262, *quoting New York v. Quarles*, 467 U.S. 649, 656 (1984). As the Seventh Circuit Court of Appeals has explained:

The relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers . . . . [T]he knowledge of the police is vital. If they have no reason . . . to think that the suspect doesn't understand them, there is nothing that smacks of abusive behavior. It would seem to follow that the question is not whether if [a defendant] were more intelligent, informed, balanced, and so forth he would not have waived his *Miranda* rights, but whether the police believed he understood their explanation of those rights; more precisely, whether a reasonable state court judge could have found that the police believed this.

*Rice v. Cooper*, 148 F.3d 747, 750-51 (7th Cir. 1998), *citing Colorado v. Connelly*, 479 U.S. 157, 161-62 (1986). The Sixth Circuit has softened the harshness of *Connelly*, however, suggesting that if it is apparent that because of illness, insanity, or mental retardation a

suspect is incapable of rationally waiving his *Miranda* rights, an officer's calculated, conscious effort to extract a waiver from him would be an abusive practice. *Garner*, 557 F.3d at 263 n.1. However, "[t]he underlying police-regulatory purpose of *Miranda* compels that [the] circumstances [surrounding the waiver of rights] be examined, in their totality, primarily from the perspective of the police." *Garner*, 557 F.3d at 263.

At the pretrial suppression hearing in Gumm's case, Officer Gary Seal of the Cincinnati Police Department's homicide unit testified that Gumm voluntarily returned to Cincinnati with him and another officer, Royce Winters, on July 27, 1992. (Trial Tr. at 66.) Gumm was neither under arrest nor in custody during his transport to Cincinnati. *Id*. at 67. Seal testified that he and Sergeant Robert Disbennett reviewed Gumm's constitutional rights with him prior to their interview. *Id*. at 69. The officers were aware that Gumm could not read or write, so they "went through [the rights waiver form] word for word and explained it to him" as a means of assuring themselves and Gumm that Gumm understood his rights and the waiver form. *Id*. at 70. Gumm stated he understood each of his rights, never asked for an attorney, and never indicated that he wished to terminate the interview. *Id*. at 70-71. Officer Seal testified that he believed in his own mind that Gumm fully understood his rights as they had been explained to him. *Id*. at 71-72. Seal also accompanied Gumm through the buildings at the scene of Aaron's murder. He testified that in the course of his police-station interview of Gumm, he

suggested that he and Gumm could go to the scene and walk through the buildings. (Trial Tr. at 74.) Gumm agreed and did so after having had his rights explained to him again. *Id.* Seal acknowledged that in the course of his conversations with Gumm, he told Gumm he knew Gumm was lying and that he had better tell the truth. *Id.* at 83.

Officer Royce Winters also testified at the suppression hearing. Gumm represented that he had completed the ninth grade, but after reading the waiver of rights form to Gumm, Winters believed Gumm's level of education to be somewhat less than what Gumm had claimed. (Trial Tr. at 92.) Although Gumm indicated he understood his waiver of his rights, Winters was aware that Gumm could neither read nor write, so he read each sentence separately to Gumm to make sure Gumm understood each point. *Id.* at 92, 95. Winters explained to Gumm that he could stop talking at any time, that he could leave at any time, and that the officers could not force him to stay. *Id.* Gumm never gave any indication that he wanted to terminate the interview, have the assistance of an attorney, or leave the interview room or the police station. *Id.* Winters denied ever threatening Gumm with the death penalty. *Id.* at 96.

Finally, psychologist Nancy Schmidtgoessling testified that she was appointed to evaluate whether Gumm had been capable of knowingly, intelligently, and voluntarily waiving his constitutional rights prior to his interrogation. She testified that although Gumm was substantially below average in intelligence, placing him in the mild to

borderline mentally retarded range, he read "fairly decently" in terms of the rights form and could recognize most of the words and knew their meanings as well. (Trial Tr. at 113, 116.) She noted that her findings contradicted Gumm's claim that he could not read or write. *Id*. at 116. In addition, Gumm contradicted his own prior statement when he claimed to have been reading law books while he was at the jail. *Id*. at 119. Dr. Schmidtgoessling found Gumm to be guarded, indicative of a desire to protect himself which she stated would be a common desire for anyone in his position. *Id*. at 120-21. Gumm's diminished intelligence could affect his ability to foresee the consequences of his waiver, but Dr. Schmidtgoessling testified that "normal people who have no knowledge of the courts[] also wouldn't know what they were giving up at that particular time." *Id*. at 119. Or, put another way, "intelligence level is very significant, but it's not the total picture in terms of the decision" one makes to wave his constitutional rights. *Id*. at 119-20.

At the conclusion of the suppression hearing, the trial judge denied Gumm's motion, relying on the officers' testimonies respecting their meticulous reading of Gumm's rights to him, Gumm's demeanor in the taped and videotaped portions of his various statements, Gumm's attempts to "talk his way out of this," his guardedness during Dr. Schmidtgoessling's meetings with him, her inability to render an opinion on whether Gumm was capable of voluntarily waiving his *Miranda* rights, and Dr.

Schmidtgoessling's testimony that Gumm read and understood most of the words in the

rights-waiver form.  (Trial Tr. at 126-28.)

Gumm took an appeal to the state court of appeals (Appendix 2, Vol. 2 at 78-81),

which denied the claim, stating as follows:

> At the hearing on appellant's motion to suppress evidence, appellant presented the testimony of Dr. Nancy Schmidtgoessling.  Dr. Schmidtgoessling testified that she examined appellant and found that he was below average in intelligence.  She also testified that when she reviewed the *Miranda* rights form with him, "he actually read fairly decently * * * [and h]e recognized most of those words, seemed to know what they meant as well, not just recognizing."  However, she formed no opinion as to appellant's mental capacity to understand the rights form.  In addition, the police officers who questioned appellant testified that, in their opinion, appellant understood his rights and waived them voluntarily.  The officers further stated that appellant was advised of his rights several times during the interview, and that at no time did he indicate that he did not understand his rights.
>
> In overruling the motion to suppress, the trial court concluded that appellant's waiver of his rights was voluntary despite his low level of intelligence.  At a suppression hearing, the evaluation of evidence and the credibility of witnesses are issues to be determined by the trier of fact.  In considering the totality of the circumstances, including the intelligence of appellant, we hold that the evidence supports the trial court's finding that appellant's statements to the police were voluntary.

*State v. Gumm*, Nos. C-920907, B-925608, 1994 WL 44411 at *6 (Ohio App. 1st Dist. Feb. 16,

1994) (unreported).

Next, Gumm presented his *Miranda* claim to the Ohio Supreme Court as his seventeenth proposition of law on direct appeal. (Appendix 2, Vol. 3 at 99-102.) That court rejected Gumm's claim, reasoning as follows:

> While at police headquarters, Gumm waived his *Miranda* rights several times and signed two waiver of rights forms. A review of the audio and videotape interviews of Gumm also include waivers of *Miranda* rights, and exhibit no signs of police coercion, threats, mistreatment or physical deprivation. While the state carries the burden of proving the voluntariness of a confession by a preponderance of the evidence, a low mental aptitude of the interrogee is not enough to show evidence of overreaching. *State v. Hill,* . . .64 Ohio St. 3d [313,] 318, 595 N.E.2d 884, [890 (1992)]. See, also, Annotation, Mental Subnormality of Accused as Affecting Voluntariness or Admissibility of Confession (1981), 8 A.L.R. 4th 16. While Gumm alleges that he can neither read nor write, defense witness Dr. Nancy Schmidtgoessling testified at the motion to suppress hearing that she discovered that Gumm could "actually read fairly decently in terms of the rights forms that we went over together. He recognized most of those words, seemed to know what they meant as well, not just recognizing."
>
> In determining the validity of his waivers we look to the totality of the circumstances. *State v. Smith* (1991), 61 Ohio St. 3d 284, 288, 574 N.E.2d 510, 515. Under the governing totality of circumstances test the trial court correctly held Gumm's waiver of *Miranda* rights to be voluntary and his subsequent confession to be admissible.

*State v. Gumm,* 73 Ohio St. 3d 413, 429, 653 N.E.2d 253 (1995).

**Return to the State Courts**

When arguing the instant ground for relief, Gumm places great importance on his

return to the state courts after the Supreme Court handed down the *Atkins* case, where he prosecuted a second petition for post-conviction relief to litigate the issue of his mental retardation as it related to his death sentence. (Appendix 2, Vol. 9 at 11-44.) His third cause of action in that petition claimed that his statements to police were involuntary due to his mental retardation. *Id.* at 24-27. The state trial court found Gumm ineligible for the death penalty based upon his mental retardation, but overruled his *Miranda* claim on *res judicata* and/or collateral estoppel grounds. (Appendix 2, Vol. 11 at 292-302, 309.) The state appealed the trial court's decision, and Gumm filed a cross appeal, contending it was error for the trial court to have overruled his *Miranda* claim. (Appendix 2, Vol. 13 at 116-19.) The court of appeals disposed of Gumm's claim of error as follows:

> [Ohio Rev. Code §] 2953.23 closely circumscribes the circumstances under which a common pleas court may entertain a tardy postconviction claim. The petitioner must show either that he was unavoidably prevented from discovering the facts upon which is claim depends, or that his claim is predicated upon a new or retrospectively applicable federal or state right recognized by the United States Supreme Court since the time prescribed by R.C. 2953.21 expired. And he must show by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found him guilty of the offense of which he was convicted.
>
> Gumm's third . . . postconviction claim[] challenged the voluntary nature of his confession . . . . [T]he record does not demonstrate that Gumm was unavoidably prevented from discovering the facts underlying the claim[]. Nor does it show that the claim[] w[as] based upon a new or

> retrospectively applicable federal or state right recognized by
> the United States Supreme Court since the time for filing his
> petition expired.
>
> We therefore conclude that the court below properly
> declined to entertain his third . . . claim[].

*State v. Gumm*, 169 Ohio App. 3d 650, 659-60, ¶¶ 34-35 , 864 N.E.2d 133 (Ohio App. 1st

Dist. 2006). The Ohio Supreme Court declined further appeal. *State v. Gumm*, 114 Ohio

St. 3d 1410, 867 N.E.2d 844 (2007) (table).

Gumm argues here that the state court of appeals' introductory statement

prefacing its discussion of his non-*Atkins* post-conviction claims, where the court stated

it found "no merit to any aspect of the claims," amounted to a decision on the merits.

(Petitioner's Reply to Respondent's Response to Petitioner's Motion for Evidentiary

Hearing ("Reply"), Doc. No. 166 at 3 n.7.) But as the excerpt above demonstrates, the

court of appeals specifically held that Gumm had failed to satisfy either of the two

prerequisites for bringing his post-conviction *Miranda* claim that was otherwise out of

time.

Gumm has thus presented his claim to the state courts both in his direct appeal,

and in his post-conviction proceedings following *Atkins*. The United States Supreme

Court very recently addressed the effect of repeated presentation to state courts of a claim

in relation to procedural default in habeas corpus proceedings. The Court stated as

follows:

When a state court declines to review the merits of a petitioner's claim on the ground that it has done so already, it creates no bar to federal habeas review. In *Ylst v. Nunnemaker*, 501 U.S. 797, 804, n.3 (1991), we observed in passing that when a state court declines to revisit a claim it has already adjudicated, the effect of the later decision upon the availability of federal habeas is "nil" because "a later state decision based upon ineligibility for further state review neither rests upon procedural default nor lifts a pre-existing procedural default." When a state court refuses to readjudicate a claim on the ground that it has been previously determined, the court's decision does not indicate that the claim has been procedurally defaulted. To the contrary, it provides strong evidence that the claim has already been given full consideration by the state courts and is thus ripe for federal adjudication. See 28 U.S.C. §2254(b)(1)(A) (permitting issuance of a writ of habeas corpus only after "the applicant has exhausted the remedies available in the courts of the State").

A claim is procedurally barred when it has not been fairly presented to the state courts for their initial consideration – not when the claim has been presented more than once.

*Cone v. Bell*, ___ U.S. ___, 129 S.Ct. 1769, 1781 (2009). Thus, Gumm's claim was fully preserved for habeas corpus review by his presentation of it to the state court on direct appeal, and it is that court's decision to which this Court must apply the AEDPA.

**First Evidentiary Hearing in Habeas Corpus Proceedings**

At the first of Gumm's two evidentiary hearing in these habeas proceedings, he presented both of his trial attorneys' testimonies. Relevant to the instant ground for relief, Robert Sachs testified that although he did not have any difficulty communicating

with Gumm during his representation, he did notice that Gumm was "not very bright." (First Evid. Hrg. Tr., Doc. No. 87 at 195.) Similarly, Herbert Freeman suspected Gumm might suffer from some cognitive deficits early in his representation. (First Evid. Hrg. Tr., Doc. No. 88 at 256.) Freeman testified that the defense considered suppression of Gumm's statements to police as their best chance of avoiding a guilty verdict and that Gumm's incompetence to waive his *Miranda* rights was the best basis upon which admission of those statements could be challenged. (First Evid. Hrg. Tr., Doc. No. 88 at 322.) Freeman suggested that "Dr. Hellman's" report was helpful in that regard, but this Court finds no mention of or report from a "Dr. Hellman" in the record, and Dr. Schmidtgoessling was the only psychological expert to testify at the suppression hearing. (Trial Tr. at 112-126.)

**Second Evidentiary Hearing in Habeas Corpus Proceedings**

After Gumm completed his *Atkins* post-conviction proceedings in the state court, he requested a second evidentiary hearing in the federal court seeking, among other things, to present evidence to support his *Miranda* claim. (Doc. No. 158.) That request was initially denied without prejudice (Doc. No. 168), but upon renewal (Doc. No. 172), was granted with certain reservations (Doc. No. 177). Among the Court's concerns was the propriety of permitting Gumm to present evidence at his second evidentiary hearing that appears to have been available to Gumm at the time of his first evidentiary hearing,

and indeed at his pretrial suppression hearing in the state court. (Doc. No. 177 at 1.) The Court allowed Gumm to present evidence relating to his first ground for relief despite its prior availability and his failure to explain why he should not be precluded from doing so by Fed. R. Civ. P. 59. *Id*. at 2.

Rather than offer an explanation as requested by this Court, Gumm instead conceded that he could not meet the requirements of Fed. R. Civ. P. 59, which governs motions for new trials, because more than ten days had passed since the judgment was entered. (Renewed Motion for Evid. Hrg., Doc. No. 172 at 2-3.) Gumm mistakenly identified the *state* court's November 25, 1992, judgment or alternatively its July 23, 2007, judgment as the relevant triggering event for purposes of Rule 59's time limitation. *Id*. The federal rule, however, implicitly refers to the date of a *federal* court's judgment. There having been no judgment in Gumm's federal habeas corpus case to date, the time within which he might file a motion for a new trial under Rule 59 in these proceedings has not yet begun to run. Therefore, nothing precluded him from filing a motion for a new trial and the Court construes his request for a second evidentiary hearing as just such a motion[3] for purposes of determining whether this Court may consider evidence Gumm presented to support the instant claim at his second evidentiary hearing.

---

[3]Rather than address the Court's concern respecting Fed. R. Civ. P. 59, Gumm posited that he should be granted relief from the judgment under Fed. R. Civ. P. 60(b)(6). (Renewed Motion for Evid. Hrg., Doc. No. 172 at 3-4.) There being no judgment in his case to date, however, there can be no relief from the same granted.

The decision to grant a new trial under Rule 59(a) is "confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chemical Corp. v. Daiflon*, 449 U.S. 33, 36 (1980). Although the rule does not enumerate all possible grounds for a new trial, they have been generally summarized as (1) the verdict is against the weight of the evidence, (2) the damages are excessive, (3) for other reasons the trial was unfair, (4) there were substantial errors in the admission or rejection of evidence or the giving or refusal of instructions, and (5) there is newly discovered evidence. 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2805 (2009). The first and second of those justifications for a new trial do not apply in Gumm's case: his motion was filed before any verdict or judgment in his federal case, and damages are not an issue in habeas corpus. The fourth justification is inapposite as well, since any error he claims in the admission of his confession occurred in the state trial court, not in the evidentiary hearing in these proceedings. In addition, Gumm has never suggested this Court's first evidentiary hearing was in any way unfair. Finally, Gumm has not claimed that the evidence he wished to present on his first ground for relief in the second evidentiary hearing was newly discovered or unavailable to him at the time of his first evidentiary hearing. (Doc. No. 158 at 4-7; Doc. No. 166 at 2-5; Doc. No. 172 at 2-9.) This is true despite the fact that this Court explicitly asked Gumm why he should not be precluded from presenting the evidence for that very reason when it initially denied

Gumm's request for a second evidentiary hearing. (Doc. No. 168 at 7.) Rather than respond to the Court's question, Gumm instead contended he should be permitted to present the desired evidence because of some amorphous "fraud upon the court" as evidenced by the state's "subterfuge on a mentally retarded person."[4] (Renewed Motion for Evid. Hrg., Doc. No. 172 at 3-4.) In addition, Gumm argued that *Atkins v. Virginia*, 536 U.S. 304 (2002), wherein the United States Supreme Court determined that the constitution forbids execution of the mentally retarded, changed or somehow revitalized – Gumm uses the word "fortified" -- his claim that his mental retardation rendered his confession involuntary. (Doc. No. 172 at 4.)

Nothing of the sort occurred, however. The holding in *Atkins* had no effect on Gumm's claim that his statements to police were involuntary because of his mental retardation. Gumm notes that he raised the voluntariness issue in his *Atkins* post-conviction petition in the state court, but that fact does not transform the claim into one that has been born anew. The issue presented in his post-*Atkins* claim is indistinguishable from the claim as advanced in the suppression hearing and on direct appeal in the state courts. (See Appendix 2, Vol. 3 at 99-102.) Thus, Gumm's argument

_____

[4]Gumm contended he is entitled to relief from the judgment under Fed. R. Civ. Proc. 60(b). (Renewed Motion for [Second] Evidentiary Hearing, Doc. No. 172 at 2-4.) There being no judgment of a federal court in his case to date, however, the Court assumes that the judgment from which he seeks relief is one of the state court. Gumm cannot be granted relief from a state court judgment under Fed. R. Civ. Proc. 60(b): such relief would properly be pursued under Ohio's equivalent, Ohio R. Civ. Proc. 60(B).

that the voluntariness claim "arose as a natural result of the *Atkins* decision" (Doc. No. 172 at 5), is simply incorrect.

Gumm also points out that "[t]here had never been a ruling by the state courts as to the mental retardation of the Petitioner and at best there was an inconclusive result reached by at least one expert in the State Court as to whether Petitioner waived his constitutional rights knowingly, intelligently and voluntarily." (Doc. No. 172 at 5.) But that statement does not explain *why* the evidence Gumm wanted to present at the second evidentiary hearing was not presented at the first. This Court can conceive of no valid reason why such evidence could not have been discovered and presented at Gumm's first hearing in these proceedings. Mental retardation is certainly not a condition that has only recently afflicted Gumm, as the state court found. *State v. Gumm*, 169 Ohio App. 3d 650, 658 ¶ 26, 864 N.E.2d 133 (2006). All of the evidence Gumm presented at his second habeas hearing was available to Gumm at the time of his first evidentiary hearing in federal court, and indeed at the time of his suppression hearing in the state court prior to his trial, and Gumm does not contend otherwise. His failure to present the evidence at the first evidentiary hearing consequently precludes his presentation of it in the second hearing. Accordingly, this Court will disregard the evidence presented in the second evidentiary hearing in making its recommendations respecting Gumm's first ground for relief.

**Applying the AEDPA to the Ohio Supreme Court's Decision on Direct Appeal**

In his petition and reply, Gumm does not challenge the Ohio Supreme Court's decision on direct appeal rejecting his claim that his mental retardation interfered with his ability to knowingly, intelligently, and voluntarily waive his *Miranda* rights by making him more susceptible to police coercion. (Doc. No. 157 at 20-27; Doc. No. 166 at 2-5.) Instead, he focuses on the state courts' responses to his claim when he raised it for a second time in his *Atkins* post-conviction proceedings. (Petition, Doc. No. 157 at 26-27; Reply, Doc. No. 166 at 3-5.) Gumm's only argument relating to the Ohio Supreme Court's decision on direct appeal appears in his post-evidentiary hearing brief. (Doc. No. 191 at 27-32.) There he contends that the state supreme court "ignored" certain portions of Dr. Schmidtgoessling's suppression hearing testimony, and focused only on her finding that Gumm could read and, for the most part, understand the rights waiver form. (Doc. No. 191 at 27-29.) Gumm seems to equate the state court's failure to list every fact that went into its decision with its ignorance of the fact. In reality, the state appellate courts explicitly stated that they had considered the totality of circumstances in coming to their decisions to affirm the trial court's denial of Gumm's motion to suppress his statements to police. *State v. Gumm*, 73 Ohio St. 3d 413, 429, 653 N.E.2d 253 (1995); *see also State v. Gumm*, Nos. C-920907, B-925608, 1994 WL 44411 at *6 (Ohio App. 1st Dist. Feb. 16, 1994) (unreported).

Gumm also argued that the Ohio Supreme Court failed to consider the testimony of Dr. Henry Leland in determining whether Gumm's mental retardation rendered his confession involuntary. (Doc. No. 191 at 29-32.) The problem with that argument is that Dr. Leland's testimony was not offered until the defense's case-in-chief during the trial, long after the suppression hearing and after Gumm's statements to police had been testified to in the prosecution's case-in-chief. (Trial Tr. at 861-905.) In reviewing the trial court's decision for error, the state court of appeals and then the state supreme court were both limited to the evidence offered in the suppression hearing, just as the trial court was at the time. It is not error for a trial court to deny a motion to suppress without considering evidence that is yet to be presented, especially in cases where the evidence could have been presented at a suppression hearing. Likewise, neither the state appellate court nor the state supreme court erred in not considering the later-presented testimony of Dr. Leland.

Even so, Dr. Leland's testimony, particularly the excerpts cited by Gumm in his post-evidentiary hearing brief, relate to the reliability, or in other words, the truth or falsity of Gumm's confession, not to whether his will was overwhelmed by police coercion. As such, even if the state supreme court could properly have taken Dr. Leland's testimony into consideration on direct appeal, the result would be the same because the truth or falsity of a confession is irrelevant to a question of the confession's voluntariness,

as the Supreme Court has observed:

> In *Jackson v. Denno*, 378 U.S. 368, . . . 377-91 [1964], . . . we traced the genesis of the view that due process forbids the use of coerced confessions, whether or not reliable. The court had departed from that view in *Stein v. New York*, 346 U.S. 156 . . . (1953), whose premise was that a confession is excludable because of its inherent untrustworthiness. The *Stein* premise was repudiated in *Rogers v. Richmond*, [365 U.S. 534 (1961)] and *Rogers* was reaffirmed in *Davis v. North Carolina*, 384 U.S. 737 . . . 739 [1966], and *Johnson v. New Jersey*, 384 U.S. 719, 729 n.9 (1966). That case continues to serve as the basis for evaluating coercion claims.

*Lego v. Twomey*, 404 U.S. 477, 485 n.13 (1972). The Court further stated that the constitutional prohibition against coerced confessions was "designed to safeguard the right of an individual, entirely apart from his guilt or innocence, not to be compelled to condemn himself by his own utterances," rather than to reduce the possibility of convicting innocent individuals. *Lego*, 404 U.S. 485. Consequently, Dr. Leland's testimony respecting the reliability of Gumm's confession was irrelevant to the state courts' decision on whether the confession was voluntary. Nevertheless, the Court observes that Respondent has argued that the voluntary nature of Gumm's confession can be inferred from its factual consistency with the circumstances of Aaron Raines' murder (Return of Writ, Doc. No. 163 at 29), and finds that argument out of line with the well-established precedent discussed above.

What *was* relevant to the voluntariness of Gumm's confession was whether the

necessary predicate of coercive police activity that would have rendered Gumm's confession involuntary had been demonstrated in the state courts. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). In *Connelly*, the Supreme Court held that "[w]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." *Id.* at 165. Where there has been no police conduct causally related to the confession, there is no basis for concluding that a state actor has deprived a defendant of due process of law. *Id.* at 164.

In his petition, Gumm claims that the officers interrogating him called him a liar and told him he had better tell the truth. (Doc. No. 157 at 22-23.) In his post-evidentiary hearing brief, he contends Sergeant Disbennett "befriended" Gumm, and "acted as if he was [sic] concerned about him and was [sic] his friend." (Doc. No. 191 at 31.) In addition, Gumm argues that the extended length of his interrogation, albeit with frequent breaks in questioning, exerted such pressure on him to confess that it amounted to a violation of his right to due process of law. (Doc. No. 157 at 22-23.) Although some of the police officers' behavior could be perceived as slightly coercive, the state supreme court's decision to the contrary was not out of line with federal law as determined by the United States Supreme Court. *See McCalvin v. Yukins*, 444 F.3d 713, 720 (6th Cir. 2006).

In *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973), the Supreme Court stated that

"[i]n determining whether a defendant's will was overborne in a particular case, the Court . . . [must assess] the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation."  The Court went on to identify several factors to be included in the "totality of all the surrounding circumstances":  the age, education, and intelligence of the defendant; whether the defendant has been informed of his *Miranda* rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food or sleep.  *Id*.

In Gumm's case, he was an adult at the time of his interrogation, and although he is mentally retarded with only a grade-school education, Dr. Schmidtgoessling testified that he could read "fairly decently" in terms of the waiver-of-rights form, that he recognized most of the words on the form, and that he knew what the words meant as well.  (Trial Tr. at 116.)  Gumm was also carefully advised of his *Miranda* rights several times throughout his questioning.  (Trial Tr. at 69-71, 79, 92, 94-95.)  Although Gumm argues eight hours of questioning to which he was subjected is coercive, he does not contend that he was interrogated for that length of time without a break or that he was deprived of food, water, sleep, or the opportunity to visit the restroom, etc.  (Post-Evid. Hrg. Brief, Doc. No. 191 at 31.)  Nor is any other form of physical punishment alleged.

This Court is aware of no case in which the Supreme Court has ever held that

calling a defendant, even a mentally retarded defendant, a liar or telling him he must tell the truth is a coercive police practice.[5] Nor has the Court ever condemned the "good cop, bad cop" approach to interrogation as a violation of a defendant's right to due process. *See Hardaway v. Young*, 302 F.3d 757, 765 (7th Cir. 2002)(denying habeas corpus relief where confession of 14-year-old boy was found voluntary after police employed "good cop, bad cop" interrogation technique); *Crowe v. County of San Diego*, 359 F.Supp. 2d 994, 1034 (S.D. Cal. 2005) (describing "good cop, bad cop" interrogation technique as "relatively common and certainly not shocking, even when juveniles are involved"); *United States v. Beckwith*, 22 F.Supp. 2d 1270, 1286 n.8 (D. Utah 1998) (commenting that "good cop, bad cop" interrogation technique's propriety depends on how it is used and whether the practice is "so coercive to be likely to overcome a defendant's free will"), *citing Spano v. New York*, 360 U.S. 315 (1959). Rather, such interrogation techniques are simply factors to be considered by a court reviewing the totality of circumstances surrounding confession. The same is true of a total of eight hours of questioning over the course of a day, such as Gumm claims occurred on July 27, 1992.

---

[5]In his post-evidentiary brief, Gumm contends one of his statements to police was "filled with threats by the police officers as to what they would do" to him (Doc. No. 191 at 31), but he does not identify the threats or where a recording of or testimony about them might be found in the record. The Court has listened to the audio tape containing the state's trial exhibits 112 and 113 which are recordings of at least portions of Gumm's July 27, 1992, police interrogation, and finds no threats were uttered by the police during those segments of his interrogation. Furthermore, at the suppression hearing Officer Royce Winters denied he told Gumm he could file an aggravated murder charge against Gumm, making him eligible for the death penalty. (Trial T. at 96.) Thus, there is a lack of evidence to support Gumm's claim that parts of his interviews with police were "filled with threats."

Nothing in the testimony presented at the suppression hearing in the state court suggests that the officers interrogating Gumm believed or had reason to believe that Gumm did not understand their reading of his *Miranda* rights to him. Their careful and meticulous reading of his rights was an exercise of caution rather than calculation. Even though they suspected Gumm was of diminished intelligence, that knowledge alone would not automatically render Gumm's waiver involuntary or the product of coercion, *Garner, supra*, and indeed Officer Seal testified that he took extra care to assure Gumm's understanding of his rights during the waiver process. (Trial Tr. at 70-71.)

Gumm contends that the state failed to meet its burden of proving his confession was knowing, intelligent, and voluntary by a preponderance of the evidence given Dr. Schmidtgoessling's inability to render an opinion on that point. (Post-Evid. Hrg. Brief, Doc. No. 191 at 31.) The state courts' determinations, however, were not based solely on Dr. Schmidtgoessling's testimony at the suppression hearing. Each of the three state courts to address Gumm's claim expressly considered the totality of circumstances surrounding his confession and rejected the claim on its merits. (Trial Tr. at 126.) *See also State v. Gumm*, Nos. C-920907, B-925608, 1994 WL 44411 at *6 (Ohio App. 1st Dist. Feb. 16, 1994) (unreported); *State v. Gumm*, 73 Ohio St. 3d 413, 428-29, 653 N.E.2d 253 (1995).

Gumm has not demonstrated that the Ohio Supreme Court's decision was contrary to or an unreasonable application of federal law as determined by the United

States Supreme Court, or that it was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Having failed to do so, he is not entitled to habeas corpus relief on this claim.

**SECOND GROUND FOR RELIEF**

In his second ground for relief, Gumm contends that the state violated the holding of *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding material exculpatory evidence from him throughout his trial. (Petition, Doc. No. 157 at 27-32.) Respondent argues the claim is both procedurally defaulted and meritless. (Return of Writ, Doc. No. 163 at 40-43.) Gumm counters that the claim is preserved for habeas review and warrants relief. (Reply, Doc. No. 166 at 5-12.)

Gumm did not present his *Brady* claim to the state court in his first petition for post-conviction relief. (Appendix 2, Vol. 5 at 10-61.) As he states in his reply, however, he did raise the claim in his second, post-*Atkins* petition for post-conviction relief as his fifth cause of action. (Doc. No. 166 at 6-7; Appendix 2, Vol. 9 at 28-31.) The trial court denied Gumm's claim because it was either moot or barred by the doctrines of *res judicata* and/or collateral estoppel. (Appendix 2, Vol. 11 at 309.) It also found Gumm to be mentally retarded and therefore ineligible for a sentence of death.

The State's appeal followed. Gumm cross-appealed, raising the instant ground for

relief as his fourth assignment of error.  (Appendix 2, Vol. 12 at 130-33.)  After the court

of appeals determined that Gumm had been unavoidably prevented from discovering

the facts underlying the claim prior to his *Atkins* post-conviction petition, it resolved the

claim as follows:

> In support of his fifth claim, Gumm offered Crimestopper
> reports, lead and tip sheets, and investigation notes and
> summaries memorializing information received and
> gathered by the police during their investigation.  These
> records showed what the investigating officers stated at
> Gumm's trial:  that the police had initially had few leads and
> had cast a very wide net to find the killer.  The officers
> inquired about sex offenders known to live in or frequent the
> neighborhood surrounding the abandoned building where
> the victim had been found.  They followed tips, often based
> on rumor and second- and third-hand information,
> concerning individuals who had made incriminating
> statements or had exhibited suspicious behavior, individuals
> who had been seen in or around the abandoned building or
> the surrounding neighborhood, and individuals who had
> been seen with the victim around the time of the murder.
> They also obtained information that impeached the victim's
> brother's credibility and contradicted the state's theory
> concerning when the murder had occurred.
>
> From our review of the record, we conclude that the
> undisclosed evidence, viewed collectively, was not
> "material" in that it could not "reasonably be taken to put the
> whole case in such a different light as to undermine
> confidence in the verdict[s]."  Therefore, the state's failure to
> disclose the evidence did not deny Gumm his constitutional
> right to a fair trial.  Moreover, the record will not permit the
> conclusion that, but for the state's failure to disclose the
> evidence, no reasonable factfinder would have found him
> guilty of the offenses of which he was convicted.  Thus,

> Gumm failed to satisfy the R.C. 2953.23 jurisdictional requirement of outcome-determinative constitutional error. We therefore hold that the common pleas court properly declined to entertain his fifth postconviction claim.

*State v. Gumm*, 169 Ohio App.3d 650, 661 ¶¶ 39-40, 864 N.E.2d 133 (Ohio App. 1st Dist. 2006). The Ohio Supreme Court declined to hear Gumm's further appeal. *State v. Gumm*, 114 Ohio St. 3d 1410, 867 N.E.2d 844 (2007).

The state court of appeals' ruling on Gumm's claim is perplexing. First, the court determined the merits of the claim, and having found none, declared that it lacked jurisdiction to hear the claim. Extensive research into the state courts' treatment of Ohio Rev. Code § 2953.23(A)(1)(b)[6] establishes that the state courts of appeals unanimously interpret the requirement that petitioners demonstrate outcome-determinative constitutional error by clear and convincing evidence as a prerequisite to the courts' subject matter jurisdiction. *State v. Beuke*, 130 Ohio App. 3d 633, 636, 720 N.E.2d 962 (Ohio App. 1st Dist. 1998); *State v. Israfil*, No. 17472, 1999 WL 960971 at *3 (Ohio App. 2d Dist. July 16, 1000) (unreported); *State v. Troglin*, No. 14-05-56, 2006 WL 1519700 at *3-4 ¶¶ 11-12 (Ohio App. 3d June 5, 2006) (unreported); *State v. Barney*, No. 05CA11, 2006 WL 2590015 at *3 ¶12 (Ohio App. 4th Dist. Sept. 6, 2006)(unreported); *State v. Moses*, No. 05 CA 13-0, 2006 WL 1660747 at *1-2 ¶ 9(Ohio App. 5th Dist. June 13, 2006) (unreported); *State*

---

[6]In 2003, the Ohio legislature amended Ohio Rev. Code § 2953.23, which renumbered the provision at issue here, changing it from §2953.23(A)(2), to its current identification as §2953.23(A)(1)(b). The Court will refer to the provision as it appears in the current code.

*v. Padilla-Montano*, No. L-05-1099, 2006 WL 75251 at *2 (Ohio App. 6th Dist. Jan 13, 2006) (unreported); *State v. Moore*, No. 99-BA-5, 2000 WL 341117 at *2 (Ohio App. 7th Dist. Mar. 31, 2000) (unreported); *State v. Halliwell*, 134 Ohio App. 3d 730, 734, 732 N.E.2d 405 (Ohio App. 8th Dist. 1999); *State v. Kasubienski*, No. 97CA006684, 1997 WL 760909 at *2 (Ohio App. 9th Dist. Nov. 12, 1997) (unreported); *State v. Friley*, No. 05AP-15, 2006 WL 164417 at *1 ¶ 6 (Ohio App. 10th Dist. Jan. 24, 2006) (unreported); *State v. Alls*, No. 2000-T-0113, 2001 WL 855930 at *2 (Ohio App. 11th Dist. July 27, 2001) (unreported); *State v. Schroyer*, No. CA2005-05-032, 2006 WL 902368 at *2 ¶ 15 (Ohio App. 12th Dist. Apr. 10, 2006) (unreported). Taken to its logical conclusion, that interpretation leaves the state courts with jurisdiction only over winning claims. In addition, a state court's determination of the merits of a claim over which the court ultimately finds it has no jurisdiction is not entitled to the presumption of correctness imposed on a federal court performing habeas corpus review under 28 U.S.C. § 2254(e)(1). *See Wehrle v. Wehrle*, 39 Ohio St. 365, 366-67, 1883 WL 193 at **1 (1883) (stating "if the court in fact had no jurisdiction of the subject-matter . . . any judgment or order which may be rendered . . . is a mere nullity, and may be so treated in a collateral as well as in a direct attack"); *Patton v. Diemer*, 35 Ohio St. 3d 68, 70, 518 N.E.2d 941 (1988) (observing that "a judgment rendered by a court lacking subject matter jurisdiction is void *ab initio*"). Both scenarios illustrate the difficulty of the state courts' interpretation of the law, but federal courts are bound by state court

interpretations of the State's own statutes. *Railey v. Webb*, 540 F.3d 393 (6th Cir. 2008),

quoting *Bradshaw v. Richey,* 546 U.S. 74, 76 (2005)("We have repeatedly held that a state court's

interpretation of state law, including one announced on direct appeal of the challenged conviction,

binds a federal court sitting in habeas corpus"); *Maldonado v. Wilson*, 416 F.3d 470 (6th Cir.

2005); *Vroman v. Brigano*, 346 F.3d 598 (6th Cir. 2003); *Caldwell v. Russell*, 181 F.3d 731, 735-

36, (6th Cir. 1999); *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986).

Because of the Ohio courts' holdings on their own subject matter jurisdiction, the

"findings" of the state court of appeals in its jurisdictional evaluation are a nullity for

federal habeas corpus purposes. That is, they do not constitute a state court adjudication

on the merits or factual determination that this Court must presume to be correct under

28 U.S.C. §2254(d). Consequently Gumm's claim is not procedurally defaulted as

Respondent asserts. Instead, Gumm fairly presented the claim to the state court, and the

court determined that it had no jurisdiction over the claim, as noted above. Furthermore,

there exists no available state process through which Gumm might still pursue relief in

the state courts, which means the claim is exhausted. Accordingly, this Court must

address Gumm's claim *de novo*. *Howard v. Bouchard*, 405 F.3d 459, 467 (6th Cir. 2005).

The United States Supreme Court has recently summarized the law governing

claims that prosecutors withheld material exculpatory evidence from a defendant as

follows:

Although the State is obliged to "prosecute with earnestness

-38-

and vigor," it "is as much [its] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger* [*v. United States*], 295 U.S. [78], 88 [(1935)]. Accordingly, we have held that when the State withholds from a criminal defendant evidence that is material to his guilt or punishment, it violates his right to due process of law in violation of the Fourteenth Amendment. See *Brady* [*v. Maryland*], 373 U.S. [83], 87 [(1963)]. In *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.), we explained that evidence is "material" within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. In other words, favorable evidence is subject to constitutionally mandated disclosure when it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995); accord, *Banks v. Dretke*, 540 U.S. 668, 698-699 (2004); *Strickler v. Greene*, 527 U.S. 263, 290 (1999).

*Cone v. Bell*, ___ U.S. ___, ___, 129 S.Ct. 1769, 1782-83 (2009)(parallel citations omitted).

The Court has also held that the good or bad faith of the prosecutor is irrelevant to the analysis of a *Brady* claim. *Brady*, 373 U.S. at 87. In addition, "[i]mpeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985), *citing Giglio v. United States*, 405 U.S. 150, 154 (1972).

Gumm claims that the prosecutors in his case withheld evidence regarding several other suspects in the murder of Aaron Raines; that they withheld evidence that could have been used to impeach Aaron's brother, trial witness Dallas Hayes; and that they withheld evidence that was inconsistent with the prosecution's theory of the case.

(Petition, Doc. No. 157 at 28-32.)  The Court will consider each category of alleged *Brady* material in turn, then cumulatively.

**Other Suspects**

### Roger Cordray

First, Gumm contends that the prosecution was required by law to disclose to him information the police obtained respecting allegedly inculpatory statements made by Roger Cordray.  (Petition, Doc. No. 157 at 28.)  Gumm refers the Court to several exhibits that were presented to the state courts in his post-*Atkins* petition for post-conviction relief.  Those exhibits contain copies of "Crime-Stoppers" and other tips, police interview notes, transcriptions of recordings made by police in the course of their investigation, and what appears to be a witness statement, although the witness is not identified. (Appendix 2, Vol. 10 at 184-210.)

The "Crime-Stoppers" tips include information that an individual by the name of Roger was known to sleep in the building where Aaron's body was found.  (Appendix 2, Vol. 10 at 184.)  Roger also frequently drank in the building next door.  *Id*.  Another tip came from Barb Desborough, who indicated that Roger Cordray confessed to the murder. *Id*. at 185.  Desborough also informed police that Vivian Stimetz might know who heard Roger confess, but the tip sheet stated that Vivian had not been located as of May 18, 1992.  *Id*.  Barb Desborough reported hearing from people who attended Aaron's funeral

that Roger Cordray was bragging that he had killed Aaron, and that he was glad Aaron was dead. *Id*. at 186. The police eventually found Vivian Stimetz, who was Aaron's aunt, and interviewed her. She stated that Betty Gumm, Petitioner's sister, communicated a rumor to Stimetz that Cordray was bragging about how he had beaten Aaron. *Id*. at 187-88. Stimetz also repeated the rumor that Cordray lived in the abandoned building where Aaron's body was found, but stated that she had never seen him anywhere but on the street. *Id*. There is a reference to Cordray's having been taken away by the paramedics after he said "this," but the context of that comment is unclear. *Id*.

The police also interviewed Christine Robertson, who said that "supposedly" there was a coat belonging to Cordray found in the building where Aaron's body was discovered. *Id*. at 189. Robertson stated that she had been threatened by Cordray not to say anything about the coat or he would harm her. *Id*. Anthony Steele told the police that Roger Cordray had confessed to him that he had killed "the little kid." *Id*. at 190. Steele noticed that Cordray's hands and knuckles were scraped up, too. *Id*. Steele also stated that Cordray had confided to him that Cordray was a suspect in the murder, but that he could never "do that" because he loves kids. *Id*. at 191.

In an investigative summary, a police officer described a meeting with Anthony and Theresa Steele, who stated they were near the murder scene with Cordray on an unspecified date when Cordray told them he had killed "the little kid." *Id*. at 192.

Although both Anthony and Theresa were under the influence of drugs or alcohol at the time, both believed Cordray was being honest with them. *Id*. The officers returned to the Steele home to talk with Anthony and Theresa again. The Steeles repeated their story with somewhat more detail during the second conversation. *Id*. at 193-94.

The officers eventually located Cordray and took pictures of his shoes and fingerprinted him. *Id*. at 194. Cordray described his activities on the night of the murder and denied knowing Aaron Raines or seeing him the night of the murder, and stated he would never do anything to hurt a child. *Id*. In addition, the tread on Cordray's shoes did not match the imprints from the crime scene. *Id*. A comparison of Cordray's palm print to one found at the scene revealed similarities, but no points upon which an identification of the found print as Cordray's might be made. *Id*. The author of the investigative summary expressed his belief that Cordray was being truthful, and skepticism that Cordray was involved in Aaron's murder. *Id*.

In notes from an interview of Betty Gumm, Petitioner's sister, it is stated that Donna Jones heard Roger Cordray state that he killed Aaron. *Id*. at 197. There is also a note indicating that Paul Worthington heard Cordray "bragging to the cops + priest that he had done the killing." *Id*. at 197-98. Talk around the neighborhood was that Cordray had committed the murder. *Id*. at 200. Another investigative summary basically repeats the information gathered from Barb Desborough. *Id*. at 202. A conversation with Roberta

Shinkle indicated that William O'Malley beat Cordray because Cordray said he and a friend had killed Aaron. *Id*. at 204. One story that traveled through several people before reaching the police involved Rick Baker's desire to have a pair of very bloody jeans washed. Baker explained the blood on his jeans by stating that after Cordray was beaten, he helped Cordray, getting Cordray's blood on his jeans in the process. *Id*. at 205-6. An unidentified individual stated that he or she saw Aaron the night he was murdered, and that he or she saw Cordray with two other men sitting on some steps in the vicinity that same night. *Id*. at 209.

**Reggie Hetsler**

Gumm also claims he should have been provided with the information fifteen-year-old Larry Peters reported to the police on May 14, 1992, which is, verbatim, as follows:

> States an unknown stranger approached him at the bus stop on Fountain Square and told him he killed + raped the little boy at 8th + State along with his brother - Peters asked him to write their names and address down - the unk. subject wrote:
>
> Steve Pence 1658 Carll St
> Reggie Hetsler 1437 Walnut St
>
> Peters states the subject was MW19 leather jacket, blk "Metallica" t-shirt, white jeans, 5'08" thin, blk short hair, low top McGregor gymshoes, scars on nose + walked with limp (Reggie Hetsler)

(Appendix 2, Vol. 10 at 211-12.) Peters' statement is patently incredible and warrants no

further consideration insofar as Gumm's *Brady* claim is concerned.

**Cody Duffey**[7]

The information provided to police respecting Cody Duffey came through an anonymous caller who stated that she considered Duffey a suspect because he is "weird, harrasses [sic] the neighborhood kids, [and] always carries a large crowbar." (Appendix 2, Vol. 10 at 213.) The tipster stated she was a neighbor of Duffey's and that shortly after Aaron's body was found, Duffey approached her and asked her what she thought she would do if someone had killed her child. *Id*. The caller described Duffey's demeanor as "strange and cold sounding . . . as if he knew something" about Aaron Raines' murder. *Id*. at 214. Duffey's criminal record shows numerous traffic violations, one arrest for disorderly conduct in 1990, and one arrest for domestic violence in 1984. *Id*. at 218-22. A copy of Duffey's fingerprint card is also included in the materials Gumm claims should have been disclosed to him at the time of his trial. *Id*. at 220.

**"Serious Suspects"**

Gumm also contends he should have been provided with the consent forms respecting the fingerprinting of several juveniles who, according to the forms, there was probable cause to believe may have been involved with a delinquent act that took place

---

[7]Gumm refers to the individual as "Duffy Cody," but the exhibits to which he directs the Court's attention all identify him as "Cody Duffy" or "Cody Duffey." This Court adopts the latter form because it matches Duffey's signature on his fingerprint card. (Appendix 2, Vol. 10 at 220.)

at 2139 West 8th Street in Cincinnati. (Appendix 2, Vol. 10 at 361-68.) Along with those forms is a cryptic note with the names of two individuals and their addresses. *Id*. at 361. The note contains the following incomplete sentences: (1) "Takes boys into vacant building to have sex"; and (2) "2000/2040 Last time saw Aaron playing." *Id*.

**Garland Inman**

Several of the documents Gumm claims should have been disclosed to him at trial concern an individual named Garland Inman. An undated flier indicates that at some point in time, Inman was wanted on two juvenile parole violations. (Appendix 2, Vol. 10 at 225.) He also had a lengthy criminal record that included various sexually oriented offenses. *Id*. at 229-31. The documents included a 1989 juvenile investigative report detailing Inman's sexual abuse of children left in his care, and a request and authorization to obtain the phone records for Inman's father's telephone. *Id*. at 237-43. The rest of the documents are investigative summaries stating one or another person's expressed belief that Inman may have had something to do with Aaron's murder, that Inman was recently released from detention, and that described Inman's suspected whereabouts following the murder. *Id*. at 244-60.

**Claude Justice**

Next, Gumm argues he should have been informed of the existence of another alleged suspect, Claude Justice. (Petition, Doc. No. 157 at 29.) The basis for Gumm's

-45-

claim is a Crime Stoppers tip in which an anonymous caller stated that he knew Justice to be a homosexual who propositioned boys for sex, that Justice had approached the caller himself when he was younger, and that the caller had seen Justice engaged in sex with a boy under a viaduct some twenty years earlier. (Appendix 2, Vol. 10 at 261-62.) The caller also stated he had in the past seen Justice come out of the vacant building where Aaron's body was found, sometimes followed minutes later by a boy. *Id*. at 162. Finally, there appears in the record what purports to be a copy of Justice's criminal record, but it merely shows the number of traffic violations, misdemeanors, and felonies Justice had been convicted of without revealing the substance of the convictions. *Id*. at 263.

**Raymond Moore**

During the investigation into Aaron's murder, several people, including Aaron's uncle, William Raines, called the police to say that they thought Raymond Moore could be a suspect. (Appendix 2, Vol. 10 at 264-68.) It seems that Moore told Raines that he had twice searched without success for Aaron in the building where the boy's body was ultimately found. *Id*. at 268. Raines stated that Moore had been living in that same building for years, and that Moore was acting strangely when he related his story to Raines. *Id*.

Soon after the police received the tips from Raines and several unknown tipsters,

they learned that Moore was living in the basement of his aunt's house. (Appendix 2, Vol. 10 at 269.) The officers went to the home and transported Moore to the police station where they photographed Moore's shoes even though they did not resemble the shoe prints left at the scene of the murder. *Id*. Moore's palm prints were taken. *Id*. Moore related to the police that he joined in the search for Aaron after he was reported missing at the request of the police. *Id*. at 270. He searched for three or four hours, entering several abandoned buildings, including the one in which Aaron's body was eventually found. *Id*. After questioning Moore about his activities the night Aaron was murdered and driving Moore past the building where Aaron's body was found, Moore told the officers he was not sure he went into that building after all. *Id*. at 271. The officers apparently saw no point in pursuing Moore any further due to his shoes not matching the shoe prints found on and around Aaron's body, Moore's admittedly "shot" memory, and their determination of his truthfulness. *Id*. at 271-72.

**Luther Hatton**

Luther Hatton is the next alleged suspect Gumm contends the prosecution should have disclosed to him. (Petition, Doc. No. 157 at 29.) Some of the information to which Gumm claims entitlement originated with an ex-convict named Mark Jackson. Jackson told police that Hatton is gay, and that the word in the Lucasville Correctional Institution was that Hatton killed Aaron Raines. (Appendix 2, Vol. 10 at 273.) Jackson stated Hatton

was very violent and had "supposedly" been arrested for molesting children before, providing the basis for Jackson's belief that Hatton killed Aaron. *Id*. at 274. The officer who talked with Jackson noted that Jackson's information was "real vague" other than "pointing the finger at Hatton" for the murder. *Id*. In addition, Jackson admitted that he had no affection for Hatton, but denied that was the reason he implicated him in Aaron's death. *Id*. Jackson was also intoxicated during his interview, and mixed up words and ideas during the discussion. *Id*. Jackson's shoes did not share a brand name or tread pattern with the shoes that left prints in and around the murder scene, and Jackson's fingerprints were taken for the purpose of eliminating him as a possible suspect. *Id*.

Aaron's uncle Clayton Raines[8] also mentioned Hatton to police as a possible suspect. *Id*. at 276. Clayton Raines told police that he heard Hatton and his brother were in the vicinity of the abandoned building the night Aaron was killed. *Id*. He directed the officers to Beverly Fitch, who had been drinking with the Hatton brothers on the night Aaron disappeared not far from where his body was found. *Id*. at 277. Fitch stated that she had left the brothers to buy more beer, and that when she returned to their drinking spot ten or fifteen minutes later, she could not find the men. *Id*.

**Carl Miller**

The prosecutor also withheld evidence of alleged alternative suspect Carl Miller

---

[8]Elsewhere in the record, Clayton Raines is identified as Aaron's father. (Appendix 2, Vol. 10 at 288.)

from Gumm. (Petition, Doc. No. 157 at 29.) Clayton Raines told police that another person thought Miller had something to do with Aaron's murder because Miller was "excited and high and wanted to get out of the neighborhood" the night Aaron disappeared. (Appendix 2, Vol. 10 at 283.) Clayton Raines also expressed that "he has a strong feeling" about Miller for the same reason. *Id*. at 285. In spite of Miller's apparently urgent desire to leave town the night Aaron disappeared, Clayton Raines continued to see him in the neighborhood days later. *Id*. at 288-89.

**The Brothers Shelton, Jimmy Ball, and an Unidentified Individual**

An investigative summary dated May 18, 1992, suggests that Aaron had apparently gotten into an argument with either one of the Shelton brothers or another person in their company, and that Jim or Sandy Ball provided Aaron a ride home after the argument. (Appendix 2, Vol. 10 at 290.) Another investigative summary indicates that police received differing accounts of the altercation. *Id*. at 316. Police units did respond to a fight in the area the night Aaron disappeared, and the dispatched officers' reports show that Robert Shelton fought with Duane Poff. *Id*. Witnesses who were companions of the combatants denied Aaron was present that night, but a nearby resident stated he saw Aaron at that time. *Id*.

A May 20, 1992, investigative summary explains how Aaron's aunt's niece's friend said that an individual named Jimmy, last name unknown, knew who had committed the

murder. (Appendix 2, Vol. 10 at 317.) The report later mentions that someone named Tommy Otten received a phone call from one of Aaron's uncles who told him that the police were looking for Jim Ball. *Id.* at 319. There also appears in the record a note written on May 15, 1992, indicating that a woman named Theresa Wright called the police to provide the following information: Aaron and Robert Shelton were fighting with Jimmy Ball; Aaron left at approximately 6:30am; Jimmy offered him a ride; she thinks Jimmy "did it." *Id.* at 320. A notation at the bottom of the page stated that Ms. Wright had been contacted and that no further follow-up was needed. *Id.*

Taken in its totality, the information Gumm claims should have been disclosed to him under *Brady* does not create a "probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). Much of the alleged *Brady* material is nothing more than rumor, hearsay, hearsay upon hearsay, hearsay upon hearsay upon hearsay, or worse. Gumm has not explained how any of that "evidence" would have been rendered admissible in court, or how it would have led to admissible evidence. Roger Cordray's alleged statements to others that he had killed "the little kid," for instance, are inadmissible hearsay, and Cordray himself denied making the statements attributed to him when questioned directly about them by the police. The officers eliminated him as a suspect after noticing that Cordray's shoes did not possess the tread pattern seen at the crime scene and his palm print did not

match one found at the scene.  (Appendix 2, Vol. 10 at 194.)  In addition, they assessed

Cordray's truthfulness and found his denial of involvement in Aaron's murder credible.

*Id*.  Thus, all that remained of the "evidence" that Cordray had anything to do with the

murder was rumor, hearsay, and conjecture.

For the same reason, the information police possessed respecting Cody Duffey,

Garland Inman, Claude Justice, Luther Hatton, Carl Miller, the Shelton brothers, and

Jimmy Ball does not put Gumm's case in such a different light that confidence in the

jury's verdict is undermined.  *See Kyles v. Whitley*, 514 U.S. 419, 435 (1995).  As for the

"serious suspects" whose fingerprint consent forms Gumm argues should have been

disclosed, Gumm has not suggested that disclosure of those forms would have led to the

discovery of admissible exculpatory or impeachment evidence.  The forms themselves

are neither, of course.

Nor is the evidence respecting Raymond Moore *Brady* material.  Whatever was

communicated to the police through Aaron's uncle was hearsay and inadmissible, but

the officers found Moore and questioned him directly.  They ultimately concluded that

Moore's shoes did not match the tread marks found at the crime scene and that, although

Moore was being truthful with them in their estimation, his memory was unreliable or,

as Moore put it "shot."  The officers eliminated Moore as a suspect.  Even if the Court

assumes the evidence respecting Moore is admissible and that what Moore said was true,

it is immaterial. In addition, if Moore had testified at Gumm's trial that he looked for Aaron in the building where his body was eventually found, that evidence does not tend to exculpate Gumm. Moore's statements do not contradict any part of the evidence against Gumm, and it is highly unlikely that its withholding affected the outcome of Gumm's trial in any way, much less a material way. *See Apanovitch v. Houk*, 466 F.3d 460, 482 (6th Cir. 2006).

**Evidence to Impeach Dallas Hayes' Testimony**

On June 3, 1992, police officers administered a polygraph test to Aaron's older brother Dallas Hayes. (Appendix 2, Vol. 10 at 342.) Officer Royce Winters, who administered the test, was certain Hayes was being untruthful on all questions relating to Aaron's murder. *Id*. at 342-44. Hayes maintained his innocence even when the police lied to him and told him they had found his fingerprints in the basement of the building where Aaron's body was found. *Id*. Following the polygraph and some vigorous interrogation, police concluded that there was no physical evidence to link Hayes to his brother's murder, and released him. *Id*. at 344.

Gumm argues that he should have been informed that Hayes was a suspect in Aaron's murder. (Petition, Doc. No. 157 at 30.) In support, he offers a Notification of Rights form upon which Dallas Hayes' name does not appear anywhere, and a Crime Stoppers tip sheet reflecting an anonymous caller's belief that the police should "check

out the stepbrother of Aaron Raines." (Appendix 2, Vol. 10 at 345-46.) In addition, Gumm contends he should have been provided with the statement of one of Aaron's young friends, who stated that approximately five days before the murder, he had seen Aaron and some other boys playing in the building where Aaron's body was found. *Id*. at 340. That information would have been helpful in impeaching Dallas Hayes' testimony, according to Gumm. Gumm argues the statement of one of Dallas Hayes' friends should have been provided to him at trial, as well. (Petition, Doc. No. 157 at 30.) The alleged *Brady* material is a statement that Dallas expressed to his friend a desire for more freedom and a wish that his mother spent more time with him. (Appendix 2, Vol. 10 at 360.) From the statement, however, it is also apparent that Dallas loved Aaron ("Dallas was Aaron + Aaron was Dallas") and was protective of him ("Dallas would take up for Aaron - wouldn't let anybody mess with him"). *Id*.

The evidence Gumm claims would have been helpful in impeaching Dallas Hayes' testimony fails to meet the requirements of *Brady* and its progeny. The polygraph test and Officer Winter's interpretation of it are inadmissible and Gumm has made no showing that disclosure of the test would have led to admissible evidence favorable to his case. The officers acknowledged that there was no physical evidence to connect Hayes to his little brother's murder, and that Hayes adamantly stuck to his story even in the face of a vigorous interrogation that included deception on the part of the police. An

anonymous caller's suggestion that the police ought to check Hayes out advances

Gumm's case not one bit.  In addition, even if it was true that Aaron sometimes played

in the abandoned buildings with his friends, that contradiction to Hayes' testimony is

hardly enough to impeach his credibility with respect to Aaron's and his own activities

on the night Aaron was murdered.  Finally, Dallas Hayes' statements to his friend about

desiring more time with his mother is hearsay and does not come close to suggesting that

Dallas bore any responsibility for Aaron's death, especially when the same friend

described Dallas as protective of Aaron.  The conglomeration of all of that information

does not amount to the type of material evidence contemplated by *Brady*, and it does not

undermine confidence in the verdict in Gumm's case.

**Inconsistent Evidence**

Gumm also claims entitlement to evidence that was allegedly inconsistent with the

state's theory of the case.  (Petition, Doc. No. 157 at 31.)  He argues that since the theory

of the state's case was that Aaron had been murdered early in the evening on May 11,

1992, evidence that he was seen alive later that night should have been disclosed to the

defense.  (Petition, Doc. No. 157 at 31; Appendix 2, Vol. 10 at 290, 320, 323, 348-59.)  The

state, however, did not present evidence respecting the time of Aaron's death.  (Trial Tr.

at 470-805.)  Furthermore, the doctor who performed the autopsy on Aaron, Dr. Amy

Martin, did not estimate the time of Aaron's death when she testified at trial to his

injuries and the cause of his death. *Id*. at 769-805. Thus, that Aaron may have been seen late in the evening does not contradict the state's evidence at all, and does not present a *Brady* issue.

**"Misleading or False Evidence"**

Gumm next contends that the prosecution has a duty not to present misleading or false evidence. (Petition, Doc. No. 157 at 31.) His argument, however, has nothing to do with the prosecutor's presentation of evidence, and instead pertains to the police officers' telling Gumm they had incriminating evidence against him as part of their interrogation of him. *Id*. Aside from this part of Gumm's claim having nothing whatsoever to do with *Brady*, police are permitted, at least to some degree, to "mislead" suspects during interrogation. *Frazier v. Cupp*, 394 U.S. 731, 739 (1969).

Having considered each category of alleged *Brady* material individually and cumulatively, the Court finds no merit to Gumm's claim of constitutional error, and recommends that his second ground for relief be denied.

**THIRD GROUND FOR RELIEF**

In his third ground for relief, Gumm contends he was deprived of a fair trial by the introduction, over objection, of evidence that he had "fucked a horse," was "hateful" when he drank alcohol, leered at the females of the families with whom he lived, and

talked about his desire to have sexual intercourse in some detail. (Petition, Doc. No. 157 at 32-44.) He also argues that hearsay statements contained in a psychiatric report admitted into evidence should have been excluded and were damaging to his case. *Id*. at 44-52. Respondent acknowledges the claim is preserved for habeas corpus review, but contends it is without merit. (Return of Writ, Doc. No. 163 at 44-52.) Gumm does not argue the matter in his reply. (Doc. No. 166.)

Gumm raised the instant claim as his eighth, ninth, and tenth propositions of law on direct appeal in the Ohio Supreme Court. (Appendix 2, Vol. 3 at 72-82.) That court evaluated Gumm's claims under the relevant state evidentiary rules and concluded that "on the basis of the record as a whole . . . Gumm received a fair trial." *State v. Gumm*, 73 Ohio St. 3d 413, 425-27, 653 N.E.2d 253 (1995). This Court must first consider whether the state court's handling of Gumm's claim amounts to an "adjudication on the merits" to which the standard of 28 U.S.C. § 2254(d) may be applied, or whether some other standard is applicable.

In *Wiggins v. Smith*, 539 U.S. 510 (2003), the United States Supreme Court was confronted with an ineffective assistance of counsel claim in which the state courts had never reached the prejudice prong of the test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). Rather than engaging in an elaborate discussion of the standard applicable in such circumstances, the Court merely stated that "[i]n this case, our review

is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis," implying that a state court's failure to reach a fairly presented claim is not an "adjudication on the merits" for habeas corpus purposes. *Wiggins*, 539 U.S. at 534.

In similar circumstances, however, the Sixth Circuit Court of Appeals, both before and after *Wiggins*, has determined that if the state court's prejudice or harmless-error analysis, or its consideration of the claim under state law bears "some similarity" to the requisite constitutional analysis, a federal court must carefully review the record and the applicable law, and reverse only if the state court's decision is contrary to or an unreasonable application of federal law.[9] *Bey v. Bagley*, 500 F.3d 514, 520 (6th Cir. 2007); *Filiaggi v. Bagley*, 445 F.3d 851, 854 (6th Cir. 2006); *Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005); *Howard v. Bouchard*, 405 F.3d 459, 467-68 (6th Cir. 2005); *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). *But cf., Danner v. Motley*, 448 F.3d 372, 376 (6th Cir. 2006) (stating that in the absence of an indication that the state court considered the petitioner's Sixth Amendment claim, the "state case law upon which the state courts relied is too attenuated to consider the Sixth Amendment claim to have been 'adjudicated on the merits'"); *McKenzie v. Smith*, 326 F.3d 721, 726-27 (6th Cir. 2003)(stating that "[w]here the

---

[9]Although the court has called its formulation a "modified" form of AEDPA review, *Maldonado v. Wilson*, 416 F.3d 470, 475 (6th Cir. 2005), practically speaking, this Court is at a loss to explain how that standard differs from the one set forth in 28 U.S.C. §2254(d)(1), since determining whether a state court's decision was contrary to or an unreasonable application of federal law necessarily requires a careful review of the record and the applicable law.

state court addressed the claim only under state evidentiary rules, 'there are simply no results, let alone reasoning [respecting the federal claim], to which this court can defer'" and that in such circumstances, *de novo* review is appropriate).

Although it did not use the precise words "harmless error" or "prejudice," the state court evaluated Gumm's claim for both as evidenced by its findings that "Gumm received a fair trial" and that it was "beyond a reasonable doubt that the jury would have . . . convicted [him] . . even in the absence of this evidence." *State v. Gumm*, 73 Ohio St. 3d 413, 427, 543 N.E.2d 253 (1995). With respect to Gumm's instant claim, this Court concerns itself only with whether Gumm's trial was fundamentally fair, *Bugh v. Mitchell*, 329 F.3d 496, 512-13 (6ᵗʰ Cir. 2003), an inquiry that bears real (not just "some") similarity to the state court's determination that admission of the challenged evidence was harmless error if error at all, and that Gumm's trial was fair. Consequently, the task before this Court is to "carefully review both the record and the applicable law" and determine whether the state court's finding that Gumm's trial was fair is contrary to or an unreasonable application of federal law. *Filiaggi*, 445 F.3d at 854.

**Irrelevant Prior Misconduct**

It has long been recognized that the "[c]onstitution entitles a criminal defendant

to a fair trial, not a perfect one." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). The Constitution has never been thought to establish a federal court as a "rule-making organ for the promulgation of state rules of criminal [or evidentiary] procedure." *Spencer v. Texas*, 385 U.S. 554, 564 (1967). Thus, an inquiry into whether certain evidence was admitted at trial in violation of a state's evidentiary rules "is no part of a federal court's habeas review of a state conviction." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007); *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983). Indeed, erroneous admission of evidence, even of uncharged prior bad acts, does not necessarily implicate the Due Process Clause. Edward Imwinkelried, 2 Uncharged Misconduct Evidence § 10:16 at 2, December 2008.[10] "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000), *quoting Montana v. Egelhoff*, 518 U.S. 37, 43 (1996).

Two cases, one from the Supreme Court, and one from the Sixth Circuit, are instructive, but distinguishable from Gumm's case. In *Dowling v. United States*, 493 U.S. 342 (1990), the Supreme Court described the category of evidentiary infractions that

---

[10]Available at http://web2.westlaw.com/find/default.wl?rs=WLW9.07&ifm=NotSet&fn=_top&sv=Split&cite=UNMEV+10%3a16&vr=2.0&rp=%2ffind%2fdefault.wl&mt=Westlaw, attached hereto as Appendix A.

violate fundamental fairness as being very narrow. *Id*. at 352. In that case, Dowling was charged with bank robbery. *Id*. at 344-45. At trial, prosecutors presented testimony from a Mrs. Henry about a previous burglary of her home for which Dowling had actually been tried and acquitted. *Id*. Immediately after Henry's testimony, the trial court informed the jurors of Dowling's acquittal on the burglary charge, and instructed them on the limited purpose for which Henry's testimony was offered. *Id*. at 346. The admonition was repeated in the final instructions to the jury as well. *Id*. The Supreme Court repeated what it first stated in *United States v. Lovasco*, 431 U.S. 783, 790 (1977):

> "Judges are not free, in defining 'due process,' to impose on law enforcement officials [their] 'personal and private notions' of fairness and to 'disregard the limits that bind judges in their judicial function.' *Rochin v. California*, 342 U.S. 165, 170 (1952) . . . . [They] are to determine only whether the action complained of . . . violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' *Mooney v. Holohan*, 294 U.S. 103, 112 (1935), and which define 'the community's sense of fair play and decency,' *Rochin v. California*, *supra*, at 173."

*Dowling*, 493 U.S. at 353 (parallel citations omitted). The Court concluded that "in light of the limiting instructions provided by the trial judge, we cannot hold that the introduction of Henry's testimony merits this kind of condemnation. Plainly Henry's testimony was at least circumstantially valuable in proving petitioner's guilt." *Id*.

In the Sixth Circuit case, the habeas corpus petitioner claimed his due process right to a fair trial was violated by the prosecutor's introduction of evidence of the petitioner's

prior murder conviction.  *Bey*, 500 F.3d at 517-18.  At the close of trial, the court instructed

the jury that the evidence of the prior murder could only be considered for the "purpose

of determining the identity of the person who had committed the offense for which [the

defendant] was being tried."  *Id*. at 518.  Bey's conviction was upheld through direct

appeal and post-conviction proceedings in the state courts.  *Id*.  He then petitioned for

habeas corpus relief in the federal district court, but was unsuccessful.  *Id*.

On appeal, the Sixth Circuit Court of Appeals stated that

> [T]he "other acts" evidence was highly probative of the
> murderer's identity.  The unusual facts of the [prior] murder
> – an offense that Bey confessed to, and was convicted of
> committing – were remarkably similar to those of the . . .
> offense for which Bey was on trial.  Both victims were small
> business owners whose shops were robbed [sic] and who
> were killed by stab wounds to their chests; both victims were
> apparently alone when the crimes occurred; the pants of each
> victim had been removed; the shoes of each victim had been
> removed and placed neatly next to the victim's body; and the
> killer did not remove the jewelry from either victim.
>
> To be sure, evidence of the [prior] murder was prejudicial to
> Bey's defense at his trial for the [murder at issue here], and
> no doubt greatly increased in the minds of the jurors the
> likelihood that Bey committed that crime.  But, *all* evidence
> tending to prove guilt is prejudicial to a criminal defendant.
> If it were otherwise, the State would not produce it as
> evidence and the court would not admit it as relevant.  The
> critical point in this case is that nothing in the record
> indicates that the prejudice was *unfair*.  Defense counsel was
> fully apprised, well prior to trial, that this evidence would be
> introduced; counsel had a full and fair opportunity to
> challenge this evidence, cross-examine witnesses, and

present rebuttal evidence. Furthermore, the trial court carefully instructed the jury that it was to consider that evidence only for the limited purpose of determining identity. We presume that the jury followed that instruction, *see, e.g., Richardson v. Marsh*, 481 U.S. 200, 211 (1987), and Bey has provided us with no evidence to call that presumption into question. Finally, as Bey himself has admitted – both in his habeas petition and again here on appeal – the other evidence of Bey's guilt was very strong.

*Bey*, 500 F.3d at 522.

In both of the cases above, evidence of other offenses was permitted to be introduced into evidence; in one case the defendant had been acquitted of the prior charge, and in the other, the defendant had been convicted. Even though Dowling had been acquitted of the burglary offense, the challenged evidence came from an eyewitness to the crime, who positively identified him as the person who burglarized her home, and testified that the gun and mask used in the bank robbery were similar to the ones Dowling used during the burglary. *Dowling*, 493 U.S. at 345. In addition, the jury was repeatedly instructed on the limited purpose for which Henry's testimony was offered. *Id*. at 346.

In *Bey*, the defendant had confessed and been found guilty of the prior murder. *Bey*, 500 F.3d at 517. Thus, in his second trial, the challenged evidence was particularly reliable, and because of the unusual similarities between both murders, the evidence was "highly probative of the murderer's identity." *Id*. at 522. As in *Dowling*, the *Bey* jury was

given a limiting instruction respecting the challenged evidence. In addition, Bey's defense counsel were aware the evidence was going to be presented well prior to trial.

In Gumm's case, the first witness called by the prosecutor was Phyllis Thacker. (Trial Tr. at 470.) She testified that Gumm had sporadically lived with her family for an unspecified period of time. *Id*. at 473. In early 1992, Gumm came to live with her and her family in Hazard, Kentucky. *Id*. at 474. Soon thereafter, Gumm told her that her horse told Gumm that the horse was mad at him because he wasn't taking care of the horse. *Id*. at 479. Gumm told Thacker that the horse also accused Gumm of mistreating the horse and "told him that [s]he didn't love him anymore." *Id*. at 479. After being instructed to use the words Gumm had used, and after prodding by the prosecutor, Thacker testified that Gumm told her he "fucked the horse."[11] *Id*. at 480.

The evidence that Gumm "fucked a horse" is egregiously unreliable, unlike the "other acts" evidence in *Dowling* and *Bey*. Rather than eyewitness testimony, or a conviction after confession, the evidence presented at Gumm's trial consisted of testimony that Gumm had told the witness he had "fucked a horse." The reliability of that testimony is fatally compromised by Gumm's additional and contemporaneous

---

[11]As is discussed below, just prior to the "fucked the horse" testimony, defense counsel objected on relevance grounds when Thacker was asked about events that occurred a few months before the murder. (Trial Tr. at 477.) Both prosecutors, Longano and Piepmeier, explained to the judge that their question was intended to bring out evidence of Gumm's change in behavior around that time, his drinking habits, and as background leading up to the murder, never mentioning the horse evidence. *Id*. at 477-78. Within four questions, the prosecutor elicited the testimony that Gumm had told Thacker he had engaged in sexual activity with her horse. *Id*. at 479. Clearly, neither defense counsel nor the trial court had been advised to expect the "fucked a horse" testimony. That fact further distinguishes Gumm's circumstances from those in *Bey*.

report to her that the horse had talked to him (Trial Tr. at 479), and by the fact that there is not a shred of evidence that Gumm's statement regarding his activities with the horse was true. Thacker's testimony, in fact, is among the most outrageously inflammatory evidence this Court has ever read in a capital case transcript. Furthermore, the evidence that Gumm had "fucked a horse," even if it were true, does not tend to prove any element of the offenses with which he was charged; it is blatantly irrelevant.

The state supreme court nevertheless found Gumm's trial was fair. That conclusion is objectively unreasonable under the governing law cited above. "'Clearly established federal law, as determined by the Supreme Court of the United States" refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Terry Williams v. Taylor*, 529 U.S. 362, 412 (2000).

Moreover, admission of the damaging evidence cannot be considered harmless. In *Fry v. Pliler*, 551 U.S. 112 (2007), the United States Supreme Court held that the "harmless error" standard applicable to a federal court's habeas corpus review of a state conviction is one which counsels that the error is harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 116, *citing Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993). If a federal court is in "'grave doubt' whether the error had such an effect, 'that error is not harmless.'" *Franklin v. Bradshaw*, 545 F.3d 409, 415 (6th Cir. 2008), *quoting O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). Erroneous

admission of inappropriate and inflammatory evidence, as trial error, may be "quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless." *Arizona v. Fulminante*, 499 U.S. 279, 307-8 (1991). In doing so, a federal court "consider[s] both the impact of the improperly admitted evidence and the overall weight of the evidence presented at trial." *Peterson v. Warren*, No. 07-1405, 2009 WL 383730 at **7 (6th Cir. Feb. 17, 2009), *citing Brecht*, 507 U.S. 639. For several reasons, this Court cannot conclude that the admission of the "fucked a horse" evidence was harmless.

First, Thacker's testimony was the very first evidence offered in the case. Putting such evidence in the minds of the jurors at the outset guaranteed significant prejudice against Gumm throughout the trial. As Gumm has argued, "once the jury heard that Petitioner had 'fucked the horse,' (from the state's very first witness), Petitioner's chance for a fair trial was gone for good." (Petition, Doc. No. 157 at 35.) This Court agrees.

Second, no limiting instruction respecting Thacker's testimony about the horse was given; not when the testimony was elicited, not when the prosecutor repeated it in his rebuttal argument, and not in the charge to the jury. Thus, unlike *Bey* and *Dowling*, the jurors in Gumm's case were left free to consider the patently unreliable, outrageously inflammatory "fucked a horse" evidence for any purpose at all.

Third, the evidence of Gumm's guilt is not particularly strong. There was no

physical evidence connecting Gumm to Aaron Raines' murder. No eyewitness to the murder testified at Gumm's trial, although some testimony placed Gumm in a park near the scene of the murder on the day of Aaron's disappearance. (Trial Tr. at 509-15, 520-21.) Other "evidence" consisted of testimony from Gumm's former female housemates that he made them feel afraid or uncomfortable by acting strange or by the way he looked at them (Trial Tr. at 476, 478, 497-98), that he frequently talked about sex with women (Trial Tr. at 500, 505, 517), that his personality changed when he drank alcohol (Trial Tr. at 475), and that when he drank he became "hateful" (Trial Tr. at 475), none of which is probative with regard to the offenses charged.

But Gumm did confess. (Appendix 1, Vol. 3, Exhibits AH, AI, and AJ.) For decades, however, there has been grave concern about the reliability of mentally retarded individuals' confessions. *See Jurek v. Estelle*, 623 F.2d 929, 938 (5th Cir. 1980); James W. Ellis & Ruth A. Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo. Wash. L. Rev. 414, 445-52 (March-May 1985). Indeed, the United States Supreme Court has commented on mentally retarded persons' "diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Atkins v. Virginia*, 536 U.S. 304, 318 (2002). The Court also recognized the "abundant evidence" that the mentally retarded "are followers rather than leaders." *Id.*,

*citing* Ellis & Luckasson, *supra*, Levy-Shiff, Kedem, & Sevillia, *Ego Identity in Mentally Retarded Adolescents*, 94 Am.J.Mental Retardation 541, 547 (1990); Whitman, *Self Regulation and Mental Retardation*, 94 Am. J. Mental Retardation 347, 360 (1990); Everington & Fulero, *Competence to Confess: Measuring Understanding and Suggestibility of Defendants with Mental Retardation*, 37 Mental Retardation 212, 212-13, 535 (1999). The Court further noted that "a disturbing number of inmates on death row have been exonerated," among them at least one mentally retarded person who had falsely confessed." *Id*. at 321, *citing* Baker, *Death-Row inmate Gets Clemency; Agreement Ends Days of Suspense*, Washington Post, Jan. 15, 1994, p. A1. *See also Hill v. Anderson*, 300 F.3d 679, 683 (6th Cir. 2002), *citing* Morgan Cloud et al., *Words without Meaning: The Constitution, Confessions, and Mentally Retarded Suspects*, 69 U. Chi. L. Rev. 495, 511-12 (2002) (noting that the retarded are "unusually susceptible to the perceived wishes of authority figures . . . ," have "a generalized desire to please . . . ," "are often unable to discern when they are in an adversarial situation . . . ," and "have difficulty distinguishing between the fact and the appearance of friendliness"), and Welsh S. White, *What is an Involuntary Confession Now?*, 50 Rutgers L. Rev. 2001, 2044 (1998) (stating there is "ample support for [the] conclusion that mentally handicapped suspects are 'especially vulnerable to the pressures of accusatorial interrogation'").

There is little doubt that the mentally retarded are particularly susceptible to

police interrogation techniques even if the techniques are not coercive in the constitutional sense, and that the mentally retarded are consequently more likely to falsely confess to crimes. Eugene R. Milhizer, *Confessions After Connelly: An Evidentiary Solution for Excluding Unreliable Confessions*, 81 Temp. L. Rev. 1, 14-15 (2008); Brandon L. Garrett, *Judging Innocence*, 108 Colum. L. Rev. 55, 88-95 (2008); Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891, 919 (2004); Paul T. Hourihan, *Earl Washington's Confession: Mental Retardation and the Law of Confessions*, 81 Va. L. Rev. 1471, 1473 (1995); Ellis & Luckasson, *supra* at 446. Even a critic of wrongful convictions agrees that of the false confession cases he concedes have put a genuinely innocent person behind bars, the vast majority of those individuals, eight out of the nine cases, have been mentally retarded. Paul G. Cassell, *The Guilty and the "Innocent": An Examination of Alleged Cases of Wrongful Conviction from False Confessions*, 22 Harv. J. L. & Pub. Pol'y 523, 582-587 (1999). Post-*Atkins* studies have demonstrated that the mentally retarded are disproportionately represented in "false confession" cases. Brandon L. Garrett, *Judging Innocence*, 108 Colum. L. Rev. 55, 88-89 (2008) (finding that of the thirty-one cases of wrongful convictions in which a false confession was given, eleven, or about 35% of those defendants are mentally retarded); Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891, 920, 971 (2008) (finding at least twenty-eight cases, or approximately 22%, of a false

confession data set of 125 cases that involve mentally retarded defendants). Mental retardation affects only about 1-3% of the general population. Animated Dissection of Anatomy for Medicine Medical Encyclopedia [Internet]. Atlanta (GA): A.D.A.M., Inc.; ©1997-2009. Mental retardation; [updated Nov. 12, 2007; cited July 28, 2009; Available from: http://www.nlm.nih.gov/ medlineplus/ ency/article/001523.htm (attached hereto as Exhibit B).

Because Gumm is mentally retarded, he is more susceptible to police interrogation methods. One group of researchers have identified seven "common and well-known psychological characteristics that make [mentally retarded individuals] susceptible to the pressures generated by contemporary police interrogation methods." Cloud, *supra* at 511. The seven characteristics are as follows:

> First, mentally retarded people are unusually susceptible to the perceived wishes of authority figures. Even when no direct pressure is exerted on them, they may be inclined to make false statements out of a desire to please perceived authority figures. A common phenomenon is the mental process of "cheating to lose," that is, accepting blame so that others will not be angry. If an authority figure such as a police officer makes it clear to the individual that he wants a confession, even an innocent disabled person may confess so a law enforcement officer will not become angry with him.
>
> Second, a generalized desire to please may predispose many mentally retarded people to give biased responses. . . . [A] disabled individual may give an incorrect response to a question if he believes that this is the answer that an authority figure like a police officer seeks.

Third, mentally retarded people often are unable to discern when they are in an adversarial situation, especially with police officers. . . . The susceptibility of this population to threats and coercion is significant, but their inability to cope with a complex social event such as custodial interrogation also is influenced by their vulnerability to an outward display of friendliness that is designed to induce confidence and cooperation. Mentally retarded people may have difficulty distinguishing between the fact and the appearance of friendliness, making them particularly vulnerable to subtle and nonphysical intimidation and coercion.

Fourth, people with mental retardation tend to have incomplete or immature concepts of blameworthiness and culpability. . . . A mentally retarded individual may confess to a crime that he did not commit because he believes that blame should be assigned to someone, and he is unable to understand the concept of causation and his role in the incident.

Fifth, mentally retarded people often appear to be impulsive or to have poor impulse control. . . . Deficits in attention or impulse control may cause mentally retarded people to answer a question without giving any consideration to the consequences.

Sixth, some retarded people have inaccurate views of their own capacities. It is not uncommon for disabled people to overrate their skills. . . . A disabled person may feel compelled to answer a question, even if the question exceeds his ability to answer.

Finally, all of these problems can be compounded by a tendency not to identify themselves as disabled.

Cloud, *supra* at 511-13. Several of those characteristics are apparent in Gumm's

confession and were discussed in Dr. David Ott's testimony at Gumm's second

evidentiary hearing in these proceedings. (*See* Appendix 1, Exhibit AH at 11, 14-15; Exhibit AI at 1, 3; Exhibit AJ at 2, 4, 7, 9, 22; Second Evid. Hrg. Tr., Doc. No. 189 at 62-65, 69, 74-81.) Gumm's mental retardation, therefore, might well have compromised the reliability of his confession in the minds of the jurors.

Fourth, in finding Gumm's claim meritless, the state supreme court erroneously stated that the prosecutor had not revisited the "fucked a horse" evidence in any way after Thacker's testimony. *State v. Gumm*, 73 Ohio St. 3d 413, 426, 653 N.E.2d 253 (1995). In fact, the prosecutor brought up the bestiality testimony in his rebuttal argument in the guilt phase of the trial as evidence of Gumm's motive for killing Aaron Raines, even as he acknowledged that motive is not an element of any of the offenses with which Gumm was charged. (Trial Tr. at 990.) Thus, the state court's decision rests upon an obvious factual error, one shown plainly by the record.

To sum up, the damaging testimony was elicited from the prosecution's first witness, tainting the trial from the outset. The challenged testimony was irrelevant to the offenses charged, highly inflammatory, of exceedingly questionable veracity, and not counterbalanced by a limiting instruction or overwhelming evidence of Gumm's guilt to render its admission harmless. The Ohio Supreme Court's conclusion that Gumm's trial was nevertheless fair is premised on a factual error. Considering the totality of those circumstances in the context of Gumm's trial as a whole, this Court is convinced that

Gumm's right to a fair trial was violated by the admission of the "fucked a horse"

testimony. The Ohio Supreme Court's conclusion otherwise is contrary to federal law,

and was based on upon an unreasonable determination of the facts in light of the

evidence presented to that court.


**Hearsay in the Psychiatric Report**


Gumm also claims his due process right to a fair trial was violated by the

introduction of hearsay statements contained in a psychiatric report relied upon by the

only witness he called in his case-in-chief. (Petition, Doc. No. 157 at 44-52.) Although

Gumm did not present this part of his claim to the state supreme court,[12] Respondent

does not advance a procedural default defense. (Return of Writ, Doc. No. 163 at 44.)

Accordingly, this Court may address Gumm's claim *de novo*. *Howard v. Bouchard*, 405

F.3d 459, 467 (6th Cir. 2005).

The factual basis for Gumm's claim is as follows:

> Dr. [Henry] Leland[, a mental retardation expert,] was called
> as a defense witness at the guilt phase of Gumm's trial,
> where he testified that he had interviewed Gumm, reviewed

---

[12]Gumm advanced the claim in the state courts as one of prosecutorial misconduct, and it was addressed in the Ohio Supreme Court as such. (Appendix 2, Vol. 3 at 33, 38-43); *State v. Gumm*, 73 Ohio St. 3d 413, 426-27, 653 N.E.2d 253 (1995). Gumm asserts that claim in his fourth ground for relief, *infra*, and it will be addressed therein.

the transcripts of Gumm's statements to police, and reviewed a packet of information supplied to him by Gumm's counsel outlining tests and interviews undertaken and prepared by the Court Psychiatric Center and psychological reports generated while Gumm was a juvenile. In relying on this information and his own testing of Gumm, Dr. Leland concluded that Gumm demonstrated a mild to borderline level of mental retardation and that Gumm did not have the ability to accurately or consistently describe any series of events.

Thereafter, the prosecutor moved to strike the testimony of defense witness Dr. Henry Leland, unless the packet of materials prepared by the Court Psychiatric Center and relied on by Dr. Leland was admitted into evidence. . . .

In response to the prosecutor's question whether the packet of information helped him form the basis of his opinions on Gumm, Dr. Leland stated that the packet "presented the major basis, because when I was able to compare that information with my information, it became clear what the problem was."

*State v. Gumm*, 73 Ohio St. 3d 413, 426-27, 653 N.E.2d 253 (1995). Gumm argues that

"numerous damaging hearsay statements [contained in the Court Psychiatric Center's

report] . . . were highly prejudicial" to him. At trial, his counsel requested that the

statements be redacted from the report before it was admitted into evidence, but that

request was effectively denied. (Trial Tr. at 907-12.)

Except for the allegations that admission of the Court Psychiatric Center's report

denied Gumm "due process of law and a fair trial," and violated the Eighth Amendment

(Petition, Doc. No. 157 at 49, 52), Gumm does not cite any federal law indicating the

admission of the unredacted report was constitutionally improper. Instead, he argues

that a state evidentiary rule put him in the untenable position of having to choose

between his expert's testimony being stricken from the record, or damaging hearsay

statements being admitted into evidence. (Petition, Doc. No. 157 at 45-46.) When a

petitioner contends prejudicial hearsay evidence was admitted against him at his trial,

however, the core of the complaint is that the Sixth Amendment's Confrontation Clause

has been violated. As the Supreme Court has observed, the right to cross-examine

witnesses, which is the essence of the Confrontation Clause, are part and parcel of an

accused's right to due process of law:

> The right of an accused in a criminal trial to due process is,
> in essence, the right to a fair opportunity to defend against
> the State's accusations. The rights to confront and cross-
> examine witnesses . . . have long been recognized as essential
> to due process. . . .
>
> The right of cross-examination is more than a desirable rule
> of trial procedure. It is implicit in the constitutional right of
> confrontation, and helps assure the 'accuracy of the truth-
> determining process.' *Dutton v. Evans*, 400 U.S. 74, 89 (1970);
> *Bruton v. United States*, 391 U.S. 123, 135-137 (1968). It is,
> indeed, 'an essential and fundamental requirement for the
> kind of fair trial which is this country's constitutional goal.'
> *Pointer v. Texas*, 380 U.S. 400, 405 (1965). Of course, the right
> to confront and to cross-examine is not absolute and may, in
> appropriate cases, bow to accommodate other legitimate
> interests in the criminal trial process. E.g., *Mancusi v. Stubbs*,
> 408 U.S. 204 (1972). But its denial or significant diminution
> calls into question the ultimate "integrity of the fact-finding
> process" and requires that the competing interest be closely

examined. *Berger v. California*, 393 U.S. 314, 315 (1969).

*Chambers v. Mississippi*, 410 U.S. 284, 294-95 (1973) (parallel citations omitted). The

Confrontation Clause, however, does not bar all hearsay in criminal trials. *Maryland v.*

*Craig*, 497 U.S. 836, 847-48 (1990); *Ohio v. Roberts*, 448 U.S. 56, 63 (1980).

At the time of Gumm's trial, the governing law respecting Confrontation Clause

issues was set forth in *Roberts*, *supra*. There, the circumstances were somewhat different

from those in Gumm's case, as the hearsay evidence consisted of a transcript of an

unavailable witness' testimony at a preliminary hearing. *Roberts*, 448 U.S. at 58. A

transcript of that testimony was later introduced at trial to rebut an assertion made by the

defendant during his own testimony. *Id*. at 59. The Supreme Court identified two

separate restrictions imposed by the Confrontation Clause on the range of admissible

hearsay: (1) "the Sixth Amendment establishes a rule of necessity," which means that

"the prosecution must either produce, or demonstrate the unavailability of the declarant

whose statement it wishes to use against the defendant"; and (2) once the witness'

unavailability has been demonstrated, the out-of-court statements must possess "indicia

of reliability." *Id*. at 65-66. Because of the similar values intended to be protected by the

hearsay rules and the Confrontation Clause, reliability may be found where the evidence

falls within a "firmly rooted hearsay exception." *Id*. at 66. In other cases, the evidence

may be admitted if it possesses "particularized guarantees of trustworthiness." *Id*. After

noting the vigorous intellectual discussion that had been taking place respecting the Confrontation Clause prior to *Roberts*, the Court stated no commentator had demonstrated that the Court's prevailing analysis was in conflict with the Framers' intentions concerning the Confrontation Clause, and indicated its intention to stay the course. *Id*. at 66 n.9.

Twenty-four years later, and after Gumm's trial, the Court reversed course. In *Crawford v. Washington*, 541 U.S. 36, 42-68 (2004), the Court distinguished "testimonial" statements from "nontestimonial" statements, held that *Roberts* does not apply to "testimonial" statements, and held that the Confrontation Clause itself does not apply to "nontestimonial" statements. After *Crawford*, then, the threshold question in a Confrontation Clause analysis is whether the statements claimed to have violated the clause are "testimonial" in nature. *United States v. Cromer*, 389 F.3d 662, 672 (6th Cir. 2004).

*Crawford*, however, is relevant to Gumm's claim only if its holding is retroactively applicable. In *Whorton v. Bockting*, 549 U.S. 406, 421 (2007), the Court held that although *Crawford* announced a "new rule" of criminal procedure, it did not fall within the *Teague v. Lane*, 489 U.S. 288 (1989), exception for "watershed" rules that would make the new rule applicable retroactively. Therefore, *Roberts* still guides this Court's analysis of Gumm's claim that hearsay evidence was admitted at his trial in violation of his right to due process and a fair trial. Whether a state court decision is contrary to or an objectively

unreasonable application of clearly established federal law announced by the Supreme Court turns on what that Supreme Court law was as of the time the state court reached its decision.

Under *Roberts'* first prong, it must be determined whether the prosecution either produced or demonstrated the unavailability of the declarants whose statements were admitted at Gumm's trial. For Confrontation Clause purposes, "unavailability" requires that the prosecutorial authorities had to have made a good-faith effort to obtain the declarants' presence at trial. *Barber v. Page*, 390 U.S. 719, 724-25 (1968). *Accord California v. Green*, 399 U.S. 149, 161-62 (1970); *Berger v. California*, 393 U.S. 314, 314-15 (1969). In Gumm's case, the prosecutor made no attempt to demonstrate the unavailability of the declarants whose statements were included in the Court Psychiatric Center's report and supporting documents.

Having found that the prosecutors in Gumm's case failed to demonstrate that the declarants were unavailable to testify in court, there exists no need to address *Roberts'* second prong, but it cannot be satisfied either. The second prong requires the Court to consider whether the declarants' statements possess "indicia of reliability" necessary for their admission into evidence. *Roberts*, 448 U.S. at 65-66. A decade before *Roberts*, the Supreme Court had articulated four "indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though

there is no confrontation of the declarant." *Dutton v. Evans*, 400 U.S. 74, 89 (1970)

(plurality). The *Dutton* factors are as follows:

> (1) whether the hearsay statement contained an express
> assertion of past fact, (2) whether the declarant had personal
> knowledge of the fact asserted, (3) whether the possibility
> that the statement was based upon a faulty recollection is
> remote in the extreme, and (4) whether the circumstances
> surrounding the statement make it likely that the declarant
> fabricated the assertion of fact.

*Id*. at 88-89; *see also Anthony v. DeWitt*, 295 F.3d 554, 563-64 (6th Cir. 2002) (employing the

*Dutton* factors to determine the reliability of a declarant's out-of-court statements).

The hearsay statements contained in the Court Psychiatric Center's report and

supporting documents do not pass the four-part *Dutton* test for indicia of reliability.

Although the challenged statements are expressed as facts in the documents, they are

extremely light on details and for the most part temporally adrift.

In addition, most of the statements are double, triple, or even quadruple hearsay.

For instance, in her statement respecting her interview of Charles Bray, social worker

Marilyn Geeding states that "Charles recalls hearing a story from his wife of an incident

where Darryl [Gumm] threw a raccoon into a 5-gallon bucket of paint." (Doc. No. 170-3

at 9.) While it is unclear whether Charles' wife had any personal knowledge of the

incident then described, it is obvious that Charles and Geeding did not. Similarly,

Geeding notes that Bray related Gumm's having tried to persuade a relative to "suck

him," but that Bray did not know the date of the incident because it "was never reported to him, simply the behavior." *Id*. Thus, the conduct reported was not within the personal knowledge of either Geeding or Bray. Geeding's account of her interview with Betty Gumm, Petitioner's sister, suffers from similar weaknesses. Betty "had a report that Darryl had crawled into bed with some woman and her husband who lived in the apartment across the street from Betty." (Doc. No. 170-3 at 24.) "Having a report" that someone had done something is not the same as having personal knowledge of the act.

Many of the other hearsay statements leave open the question whether each declarant in the chain of communication had personal knowledge of the events described. Betty also described to Geeding an incident in which Gumm threw a dog into a space heater, killing it, and another in which Gumm was barred from a relative's house because he had stolen from the relative. *Id*. In neither statement does Betty Gumm give any indication that she personally witnessed the conduct described. It is certain that Geeding did not. The same is true of Betty Gumm's report that Gumm had tried to rape a friend of hers. *Id*. Both Charles Bray and Betty Gumm stated that Gumm was frequently cruel to animals. *Id*. at 9, 24. Bray reported that Gumm would kick dogs and had planned to kick a neighbor's dog to death before he was stopped, and Betty cited only the dog-in-the-space-heater incident as an example of Gumm's cruelty to animals. *Id*. at 9, 24. Neither of them indicated when such behavior might have occurred or whether they

were present to personally witness such behavior on Gumm's part. *Id*. Betty Gumm told Geeding that Gumm had once heated a spoon on the stove, then pressed it against a nephew's arm, which left a permanent scar on the boy. *Id*. at 24. While Betty may have had personal knowledge of the incident described, Geeding, who is the primary declarant, did not.

None of Bray's or Betty Gumm's statements contained in Geeding's reports are tethered to a specific or even an approximate day, month, or year. Consequently, it is impossible to determine whether the incidents described occurred a month ago, a year ago, a decade or even longer ago. This Court, therefore, cannot conclude that "the possibility that the statement[s were] . . . based upon a faulty recollection is remote in the extreme." *Dutton*, 400 U.S. at 88-89. There is, however, nothing in the circumstances surrounding the challenged statements to make it likely that the declarants fabricated the assertions of fact. *Id*.

The Court notes that the types of allegations contained in the statements described above are fraught with emotion and particularly inflammatory, given the offenses with which Gumm was charged. Their effect on the jurors could not have been innocuous, especially after they were argued by the prosecutor as fact in his closing argument. (Trial Tr. at 975-79.) In fact, it is highly likely that the challenged statements had a "substantial and injurious effect or influence in determining the jury's verdict," *Fry v. Pliler*, 551 U.S.

112, 116 (2007), *citing Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993), especially when those statements are considered in tandem with the effect of the "fucked a horse" testimony discussed above.

In conclusion, Gumm's right to due process of law was violated by the introduction of the "fucked a horse" testimony, and by the introduction of the highly prejudicial hearsay statements contained in the Court Psychiatric Center's report and supporting documents. Accordingly, the Magistrate Judge recommends that Gumm be granted habeas corpus relief on his third ground for relief.

**FOURTH GROUND FOR RELIEF**

In his fourth ground for relief, Gumm contends his trial was so infected with prejudicial prosecutorial misconduct that it constituted a denial of due process. (Petition, Doc. No. 157 at 52-57.) Respondent argues the claim is partially procedurally defaulted and meritless as well. (Return of Writ, Doc. No. 163 at 43-55.) Gumm does not argue the issue in his reply.

The Sixth Circuit has articulated the relevant standard for habeas claims of prosecutorial misconduct as follows:

> On habeas review, claims of prosecutorial misconduct are reviewed deferentially. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). To be cognizable, the misconduct must have "'so infected the trial with unfairness as to make the resulting

conviction a denial of due process.'" *Id*. (citation omitted). Even if the prosecutor's conduct was improper or even "universally condemned," *id*., we can provide relief only if the statements were so flagrant as to render the entire trial fundamentally unfair. Once we find that a statement is improper, four factors are considered in determining whether the impropriety if flagrant: (1) the likelihood that the remarks would mislead the jury or prejudice the accused, (2) whether the remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally presented to the jury, and (4) whether other evidence against the defendant was substantial. *See Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000). Under [the] AEDPA, this bar is heightened by the deference we give to the . . . [Ohio] Supreme Court's determination of . . . [Petitioner's] prosecutorial-misconduct claims. *See Macias v. Makowski*, 291 F.3d 447, 453-54 (6th Cir. 2002)("If this court were hearing the case on direct appeal, we might have concluded that the prosecutor's comments violated Macias's due process rights. But this case is before us on a petition for a writ of habeas corpus. So the relevant question is not whether the state court's decision was wrong, but whether it was an unreasonable application of clearly established federal law.").

*Bowling v. Parker*, 344 F.3d 487, 512-13 (6th Cir. 2003); *see also United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994)(summarizing existing Sixth Circuit precedent). In addition, an examination of alleged prosecutorial misconduct is performed in the context of the trial as a whole. *United States v. Beverly*, 369 F.3d 516, 543 (6th Cir. 2004), *citing United States v. Young*, 470 U.S. 1, 12 (1985) and *United States v. Francis*, 170 F.3d 546, 552 (6th Cir. 1999).

Gumm's claim of prosecutorial misconduct relies for the most part on the

prosecutor's introduction of the same evidence this Court concluded was unconstitutionally admitted as evidence in his third ground for relief, *supra*. In addition, he contends that the prosecutor's introduction of evidence of Gumm's drinking, sexual drive, and sexual habits, as well as the prosecutor's invitation to jurors to imagine Aaron Raines' terror and prayers for help compounded the misconduct. (Petition, Doc. No. 157 at 52-56.)

Respondent correctly acknowledges that the claim has been preserved insofar as Gumm claims the prosecutor's elicitation of the "other acts" evidence constituted prosecutorial misconduct. (Return of Writ, Doc. No. 163 at 53.) The remainder of Gumm's prosecutorial misconduct claim is, Respondent argues, procedurally defaulted. *Id*. Respondent's merits argument, however, focuses entirely on Gumm's claim that the prosecutor engaged in misconduct by inviting the jurors to imagine Aaron Raines' terror in the moments before his death. *Id*. at 54-55.

Gumm raised portions of the instant claim in the Ohio Supreme Court on direct appeal. Specifically, he raised the prosecutor's elicitation of the "fucked a horse" testimony, evidence of his sexual appetite, evidence of his drinking habit, and the hearsay statements contained in the Court Psychiatric Center's report and supporting documents as error. (Appendix 2, Vol. 3 at 72-82.) Gumm did not mention the prosecutor's speculation as to Aaron Raines' last thoughts during the penalty-phase closing argument

in Gumm's capital trial, so that portion of his claim is procedurally defaulted.[13]  As

Gumm does not argue his fourth ground for relief in his reply at all, he has not asserted

any excusing cause for or prejudice from the default.  Thus, Gumm's claim is preserved

only insofar as he challenges the prosecutor's elicitation of the other acts evidence.

When considering Gumm's claim of prosecutorial misconduct, the Ohio Supreme

Court found that Gumm's trial was fair and any error was harmless.  *State v. Gumm*, 73

Ohio St. 3d 413, 425-27, 653 N.E.2d 253 (1995).  As explained below, that court's

conclusion is contrary to federal law.

The prosecution's interest in a criminal trial "is not that it shall win a case, but that

justice shall be done."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  The prosecutor,

therefore, is first and foremost a servant of the law.  *Id*.  "[W]hile he may strike hard

blows [against his opponent], he is not at liberty to strike foul ones."  *Id*.  It is a

prosecutor's duty, therefore, to not only use every legitimate means to bring about a just

result, but to "refrain from improper methods calculated to produce a wrongful

conviction."  *Id*.  Nevertheless, in habeas corpus, "the touchstone of due process analysis

in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability

---

[13]The prosecutor did not argue the subject of Aaron's terror in the last minutes of his life until the penalty-phase closing argument in Gumm's trial.  (Trial Tr. at 1109-12.)  Consequently, those arguments could have had no effect on the jury in the guilt phase of Gumm's trial, the constitutionality of which is all that remains at issue in these habeas proceedings.  *See State v. Gumm*, 169 Ohio App.3d 650, 864 N.E.2d 133 (1st Dist. 2006), *appeal not allowed State v. Gumm*, 114 Ohio St. 3d 1410, 867 N.E.2d 844 (2007) (table) (finding Gumm mentally retarded and therefore ineligible for the death penalty).

of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982); *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006).

Taking the first inquiry in the test identified in *Bowling*, *supra*, the Court considers whether the prosecutor's elicitation of the other acts evidence was improper. *Bowling*, 344 F.3d at 512. As discussed above, there is no question but that the "fucked a horse" testimony and the hearsay contained in the Court Psychiatric Center's report and supporting documents infected Gumm's trial with unfairness and denied him the due process of law. (*See* Third Ground for Relief, *supra*.) Although the prosecutor's presentation of evidence of Gumm's sexual appetite and drinking habits may not support a finding of prosecutorial misconduct themselves, they are considered together with the other evidence Gumm claims was inappropriately brought out by the prosecutor.

The Sixth Circuit Court of Appeals has found improper comments by a prosecutor that appeared to have been made to inflame the passions of the jurors. *Slagle*, 457 F.3d at 518. This Court can think of few instances where evidence might be more likely to inflame the passions of jurors than statements that the defendant had "fucked a horse," killed a dog by burning it to death with a space heater, burned a child's arm with a heated spoon, and thrown a raccoon into a bucket of paint. Offering such inflammatory and irrelevant evidence at Gumm's trial, and emphasizing the evidence in the closing argument was therefore improper.

Having found the prosecutor's conduct in presenting the other acts evidence improper, the Court next considers the four *Bowling* factors to determine if the prosecutor's impropriety was flagrant. 344 F.3d 512-13. Although the improperly elicited evidence and the prosecutor's improper argument were relatively isolated, they were of a particularly prejudicial nature and certain to inflame the passions of the jurors. The most damaging and outrageous evidence, Thacker's testimony about Gumm and her horse, was offered right out of the gate, infecting Gumm's entire trial with unfairness. The evidence of Gumm's alleged cruelty to animals and children, and his alleged rape or attempted rapes of two women only solidified the unfairness generated by Thacker's testimony.

The prosecutors deliberately elicited the "fucked a horse" evidence and argued that evidence in their rebuttal argument in the guilt phase of the trial. A short time after Thacker was sworn in as the prosecution's first witness, prosecutor Thomas Longano began to question her about events that occurred in January 1992. (Trial Tr. at 476.) Thacker described Gumm's increasing consumption of alcohol and testified that she was afraid Gumm would hurt himself or someone else. *Id.* An objection was lodged by the defense on the ground that the events of January 1992 were irrelevant to Aaron's murder, which took place in May of that same year. *Id.* at 477. Longano, along with co-counsel Mark Piepmeier, explained to the court their purpose for that line of questioning as

follows:

> Court:      What are you trying to show here?  What are
>             you going to show?

> Longano:    His behavior began to change in 1992.  When
>             he drank, he became hateful; he became
>             spiteful.  This affected his personality, the way
>             he treated other people.  The fact that she
>             became so afraid of him, she wanted him out
>             of the house, it's all part of the background
>             leading up to the homicide.

> Piepmeier:  And in Hazard[, Kentucky,] his habit was to
>             get in fights with people.  There's other
>             witnesses who are going to say this.  And in his
>             statement he admits on the day in question he
>             had seven or eight beers.

(Trial Tr. at 477-78.)  The defense's objection was overruled, and Longano's examination

continued as follows, barely touching on Gumm's drinking, fights, and personality

changes:

> Longano:    Mrs. Thacker, I think we were at the point
>             where I asked you why you became afraid of
>             Junior and why you wanted him out of your
>             house.  Was there anything specific that
>             evening?[14]

> Thacker:    Junior's personality changed.  He talked crazy
>             talk and he – he acted strange to me and he
>             said things that made me afraid to be there
>             with him, just me and my daughter by myself.

---

[14]"Junior" refers to Gumm.  No date was mentioned in Thacker's previous testimony, so it is unclear
what night Longano was referring to when he asked about "that evening."

| | |
|---|---|
| Longano: | What did he say to you . . . that made you afraid? |
| Thacker: | Once he told us – we have a horse. Once he told us that the horse told him that he was mad at – that she was mad at him because he was mistreating him, and he was crying and he was serious that that horse had actually talked to him and told him that. and then once – |
| Longano: | Did he tell you why the horse was mad at him? |
| Thacker: | She said he wasn't taking care of him, that he was mistreating him and that the horse told him that he didn't love him anymore. |
| Longano: | Anything more specific than that? Do you remember what you told me? |
| Thacker: | Once he told me that him and Charles was working on the horse lot and they told us that him and Charles told him to do something and he didn't want to do it; he was after him about being drunk the night before and he was quarreling at him. And he came to the house and told me, "One of these days, I'm going to kill that gray-headed S[O]B," but he said the word. |
| Longano: | Did he tell you one time something he had done with the horse? . . . Is that difficult for you to tell us? |
| Thacker: | Yes. |
| Longano: | You're going to have to. |

(Trial Tr. at 478-80.) Gumm's defense counsel again objected, this time on the ground

that Longano was leading the witness.  *Id*. at 480.  The court overruled that objection as

well, and Longano's examination proceeded:

> Longano: Can you tell us what Junior told you he did with the horse?
>
> The Court: We're in a court of law, ma'am.  You can say exactly what he said.
>
> Thacker: I can't say that.  He told us that he did it to the horse and the horse got mad at him.
>
> Longano: He did it to the horse?
>
> Thacker: (Indicate yes.)
>
> Longano: Is that the word he used or did he use a different word?
>
> Thacker: He used the other word.
>
> Longano: You can use the other word.
>
> Thacker: I can say the letter to the other word.
>
> Longano: Can you spell it?
>
> Thacker: That's still cussing.  F – he said he fucked the horse.

(Trial Tr. at 480.)  Longano immediately moved on to other areas in his examination, and

did not question Thacker further on Gumm's drinking, fighting, or personality changes.

It does not escape this Court's notice that the prosecutors both responded to the

trial court's inquiry as to the purpose of their particular line of questioning immediately

prior to Longano's extrication of the "fucked a horse" testimony from Thacker without so much as a hint about what was to come.[15] Longano's prompting ("Do you remember what you told me?" and "Did he tell you one time something he had done with the horse?") unmistakably demonstrates that he knew what testimony he was after, and as soon as Thacker provided the damning testimony, Longano moved on to another topic. The startling disconnect between the reasons Longano and Piepmeier gave to the court for their questions to Thacker about the events of January 1992, and the actual testimony they extricated from Thacker about Gumm's relations with the horse leave no room for doubt about whether the "fucked a horse" evidence was deliberately presented to the jury.

Likewise, the hearsay evidence contained in the Court Psychiatric Center's report and supporting documents was deliberately presented to the jury. At the time Longano moved for the report to be entered into evidence, the prosecutors had the same packet of information from the Court Psychiatric Center that Dr. Leland had received prior to his testimony. (Trial Tr. at 882.) The trial court had already ruled that at least part of the damaging evidence was inadmissible. A defense objection interrupted testimony about Gumm's having burned a boy with a spoon, and the judge sustained the objection

---

[15]At the first evidentiary hearing in these proceedings, Longano testified that after the defense's objection, he told the court that the "fucked a horse" evidence was part of the background leading up to Aaron's murder (First Evid. Hrg. Tr. at 55), but that statement is belied by the trial transcript.

because it was irrelevant and went "too far." (Trial Tr. at 533.) Nevertheless, that same information and more, transformed into hearsay in the Court Psychiatric Center's report, was moved into evidence by the prosecutors after Dr. Leland's testimony, and argued as truth by the prosecution in its closing argument.

Although Ohio's evidentiary rules state that "the facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing," Ohio R. Evid. 703, the Ohio Supreme Court has interpreted the rule as an imperative, *State v. Jones*, 9 Ohio St. 3d 123, 459 N.E.2d 526 (1984) (syllabus) (holding that "[p]ursuant to Evid.R. 703, facts or data upon which an expert bases an opinion *must* be those perceived by him or admitted in evidence at the hearing," (emphasis added)). Thus, when an expert relies on facts or data he has not personally perceived, it stands to reason that such material must actually be admissible into evidence. After all, inadmissible hearsay evidence does not become admissible simply because it was relied upon by an expert. *State v. Robles*, 65 Ohio App. 3d 104, 110, 583 N.E.2d 318 (Ohio App. 6th Dist. 1989); *Gregory v. Thompson*, Nos. 57832, 57834, 1990 WL 203933 at *2 (Ohio App. 8th Dist. Dec. 13, 1990) (unreported). In other words, Ohio's rules governing the admission of hearsay evidence are not dispensed with merely because an expert relied on the hearsay in forming his or her opinion. That the hearsay was introduced contrary to the state's evidentiary rules is neither here nor there, except

to show that the prosecutors, who are presumed to know the rules of evidence, were aware that the evidence could not have been put before the jury in a more straightforward manner and deliberately introduced it via the Court Psychiatric Center's report and supporting documents.

Finally, the Court finds, as it did in its discussion of Gumm's third ground for relief, that the other evidence against Gumm, his own confession, was less than overwhelming given his mental retardation. Considering all the circumstances of the introduction of the "fucked a horse" testimony and the hearsay contained in the Court Psychiatric Center's report and supporting documents and the later emphasis on that evidence in their argument, the Court concludes that the prosecutors in Gumm's trial did engage in misconduct to the substantial prejudice of the defense. The state supreme court's conclusion that the prosecutors' conduct in introducing the challenged evidence and in arguing the truth of the hearsay evidence to the jury was permissible is objectively unreasonable when evaluated under the governing federal law as articulated by the United States Supreme Court. *State v. Gumm*, 73 Ohio St. 3d 413, 427, 653 N.E.2d 253 (1995).

Accordingly, for the reasons stated above, and to the extent Gumm has preserved his fourth ground for relief, his request for habeas corpus relief should be granted.

**FIFTH GROUND FOR RELIEF**

In his fifth ground for relief, Gumm contends his trial counsel provided ineffective assistance by failing to pursue other theories of defense, failing to conduct an adequate investigation, failing to object to prosecutorial misconduct and improper jury instructions, failing to request a continuance in the case, consenting to admission of the Court Psychiatric Center's file, and failing to move for a mistrial. (Petition, Doc. No. 157 at 57-66.) Respondent argues the claim is procedurally defaulted as well as meritless. (Return of Writ, Doc. No. 163 at 56-57.) Gumm does not contest Respondent's procedural defense, nor does he argue the merits of his claim in his reply.

The only ineffective assistance of trial counsel claim Gumm asserted in the state court of appeals concerned his trial counsel's failure to produce witnesses in support of his alibi defense, a claim not presented here.[16] (Appendix 2, Vol. 2 at 90.) On direct appeal to the Ohio Supreme Court, however, Gumm expanded his claim to include allegations that his counsel rendered ineffective assistance by failing to object to prosecutorial misconduct, consenting to the admission of the Court Psychiatric Center's file, and failing to move for a mistrial. (Appendix 2, Vol. 3 at 85-94.) The Ohio Supreme Court rejected Gumm's claim:

---

[16]As Gumm notes, appellate counsel also raised as error in the court of appeals trial counsel's deficient performance during the mitigation phase of his capital trial. (Petition, Doc. No. 157 at 61.) As he is no longer sentenced to death, however, that claim is irrelevant to his current habeas proceedings.

> Reversal of a conviction on the grounds of ineffective assistance requires that [D]efendant show, first, that counsel's performance was deficient, and second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687. However, each act of counsel with which Gumm finds fault was either not asserted as error in the court of appeals, and thus waived, or may be justified as a strategic decision. Nor had Gumm demonstrated prejudice, i.e., "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley* (1989), 42 Ohio St. 3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

*State v. Gumm*, 73 Ohio St. 3d 413, 428, 653 N.E.2d 253 (1995) (some parallel citations omitted).

None of the sub-claims advanced by Gumm in these habeas proceedings was presented to the state court of appeals, and only three were presented to the Ohio Supreme Court. As the supreme court observed, however, Gumm's failure to raise those three sub-claims in the court of appeals waived them. Although the Latin term itself was not mentioned, the procedural rule enforced by the state supreme court was one of *res judicata*, which provides that an alleged error must be brought to the state court's attention at the first possible opportunity, and that the failure to do so waives the claim in future proceedings. Ohio's doctrine of *res judicata* in criminal cases, enunciated in *State v. Perry*, 10 Ohio St. 2d 175, 226 N.E.2d 104 (1967)(paragraph seven of the syllabus), is an independent and adequate state procedural ground. *Mason v. Mitchell*, 320 F.3d 604, 628

(6th Cir. 2003), *citing Coleman v. Mitchell,* 268 F.3d 417, 427 (6th Cir. 2001), *Rust v. Zent,* 17 F.3d 155, 160-61 (6th Cir. 1994), and *Riggins v. McMackin,* 935 F. 2d 790 (6th Cir. 1991). Also, the Ohio courts have consistently enforced the rule. *State v. Cole*, 2 Ohio St. 3d 112, 114, 443 N.E.2d 169 (1982); *State v. Ishmail*, 67 Ohio St. 2d 16, 18, 423 N.E.2d 1068 (1981). Thus, for this Court to properly address the merits of Gumm's ineffective assistance of trial counsel claim, Gumm would have had to demonstrate cause and prejudice for the default of his claim, *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986), which he has not attempted to do. Furthermore, Gumm never presented the remaining four ineffective assistance of trial counsel sub-claims he advances here to the state courts, either on direct appeal or in his post-conviction proceedings. Those claims are therefore unexhausted, but any attempt to return to the state courts to litigate them under Ohio Rev. Code § 2953.23[17] would undoubtedly be futile. Thus, those claims, too, are procedurally defaulted with no showing by Gumm of cause for or prejudice from the default. Consequently, Gumm's fifth ground for relief is procedurally defaulted in its entirety and should be denied.

Even if that were not the case, however, Gumm's claim would fail. The law that would govern Gumm's ineffective assistance of counsel claims, had they been preserved, is embodied in *Strickland v. Washington*, 466 U.S. 668 (1984), which holds as follows:

---

[17]Ohio Rev. Code § 2953.23 provides for second or successive petitions for post-conviction relief in certain circumstances, none of which applies to Gumm's sub-claims herein.

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687.

In his first sub-claim, Gumm argues that his defense counsel provided ineffective assistance by throwing "all his [sic] eggs in one basket, suppression of the confession." (Petition, Doc. No. 157 at 58.) He contends that his attorneys should have instead put forth "extraordinary effort" and investigated the witnesses involved in the case. *Id*. When counsel's efforts to suppress Gumm's confession failed, Gumm claims they failed to pursue "other challenges" to Gumm's guilt. *Id*. Fundamentally, Gumm has presented no evidence that his attorneys failed to exert "extraordinary effort" in his defense. Gumm provides no information whatsoever as to what evidence would have been uncovered by counsel's exertion of "extraordinary effort," nor does he demonstrate what evidence an investigation into the witnesses in the case would have produced. Moreover, he does not even hint at what "other challenges" to his guilt were reasonably available

to pursue. Thus, Gumm has failed to state the facts supporting his sub-claim as required by Rule 2 of the Rules Governing § 2254 Cases, making it impossible for this Court to evaluate the claim.

The same is true of Gumm's second sub-claim. He argues that his counsel had a duty to investigate his case, and alleges that if counsel had done so, they would have uncovered "evidence that would have cast a reasonable doubt on the State's case," but nowhere does he state what evidence that might have been. (Petition, Doc. No. 157 at 58-59.) He goes only so far as to state that the Court Psychiatric Center's file could have provided counsel with "available witnesses," and does not name any witnesses who should have been but were not called to testify at trial. Instead of fulfilling the requirement of Rule 2 of the Rules Governing § 2254 Cases, he merely refers this Court to his state post-conviction relief petition without reference to any page or pages in that document to narrow the Court's search for support of his claim. (Petition Doc. No. 157 at 59.) It is not this Court's place, as a neutral body, to search the record for evidence of a habeas petitioner's claimed constitutional error. *Franklin v. Bradshaw*, No. 3:04-cv-187, 2009 WL 649581 at *31 (S.D. Ohio March 9, 2009).

Gumm also alleges his trial counsel failed to object to prosecutorial misconduct and the trial court's improper instructions to the jury. Although Gumm does not identify the prosecutorial misconduct to which he believes his counsel should have objected, the

Court assumes it is the same conduct that forms the basis of his fourth ground for relief, *supra*. As noted there, however, the "fucked a horse" testimony and the entire contents of the Court Psychiatric Center's file were admitted into evidence over defense counsel's explicit or implicit objections. (Trial Tr. at 477, 480, 882, 907-10.) Gumm does not identify other options available to defense counsel that might have been used to keep the damaging evidence from the jury.

As for the allegedly improper jury instructions, the Court again assumes Gumm refers to the same jury instructions he argues are unconstitutional in his ninth ground for relief, *infra*. Had Gumm preserved his claim, he would be required to demonstrate (1) that the jury instructions violated either the federal constitution or state law, (2) that the objection would have been sustained had it been lodged by defense counsel, and (3) prejudice from the complained-of jury instructions. Gumm has endeavored to show none of those requirements.

Gumm further faults his trial counsel for their failure to request a continuance, although he does not identify when in the course of Gumm's case that motion should have been made. (Petition, Doc. No. 157 at 60.) The Court assumes Gumm intends that his counsel should have moved for a continuance before his trial started since he claims "they were given insufficient time to prepare." *Id*. Gumm does not provide any example of how the outcome of his trial might have been different had his attorneys been given

more time to prepare.

Next, Gumm contends his counsel provided ineffective assistance by consenting to the admission of the Court Psychiatric Center's report and supporting documents. (Petition, Doc. No. 157 at 61.) As noted above, however, counsel stated their opposition to admission of the damaging hearsay evidence contained in the file. (Trial Tr. at 882, 907-10.)

Gumm further contends that his trial counsel were ineffective because they failed to move for a mistrial following admission of "prejudicial other act evidence," which the Court presumes is the same evidence discussed in Gumm's third ground for relief. (Petition, Doc. No. 157 at 61.) Gumm does not argue that the motion for mistrial would have had any likelihood of being sustained, nor does he demonstrate prejudice from counsel's failure to so move.

The Court observes that Gumm appears to argue several instances of counsel's deficient performance in the mitigation phase of his capital trial, as well. (Petition, Doc. No. 157 at 65.) Since his death sentence was vacated because of his mental retardation and he was resentenced to life imprisonment with parole eligibility after thirty years, any error that may have occurred in the penalty phase of his trial is irrelevant to his post-resentencing petition for a writ of habeas corpus.

To the extent Gumm raised the sub-claims contained in his fifth ground for relief

in the Ohio Supreme Court, they are procedurally defaulted because that court denied

them on an independent and adequate state procedural ground, and Gumm has offered

no excusing cause for or prejudice from the default. The remainder of Gumm's sub-

claims herein were never presented to the state courts, nor can they be litigated at this

late date, and are therefore procedurally defaulted as well. Accordingly, Gumm's fifth

ground for relief should be denied.


**SIXTH GROUND FOR RELIEF**

In his sixth ground for relief, Gumm contends he was deprived of the effective

assistance of his appellate counsel in his direct appeal in the state court. (Petition, Doc.

No. 157 at 66-73.) Respondent foregoes a procedural default defense, arguing instead

that the claim does not warrant habeas corpus relief. (Return of Writ, Doc. No. 163 at 63-

67.) Gumm does not argue his sixth ground for relief in his reply.

Gumm begins his claim with charges that his appellate counsel were not prepared

to represent a capital defendant because they lacked experience in capital litigation.

(Petition, Doc. No. 157 at 66-67.) Since Gumm's habeas case is no longer one that

involves the death penalty, however, that point is irrelevant. As attorneys licensed to

practice in Ohio, his counsel were fully qualified to represent Gumm in his direct appeal

in the state courts respecting matters having to do with the guilt phase of his trial.

Gumm also assails his appellate counsel for advancing several assignments of error that were either identical to or bore striking similarity to those they had set forth in another client's direct appeal from a capital conviction. *Id*. at 67. There is no federal constitutional requirement that appellate counsel compose anew each assignment of error in every appeal, even in death penalty cases.

Gumm contends his direct appeal was dismissed due to his appellate counsel's failure to file his appellate brief within the time allowed by Ohio law. (Petition, Doc. No. 157 at 67.) Gumm suffered no prejudice from counsel's alleged inattentiveness, however, because the court of appeals considered and rejected each of Gumm's claimed errors on direct appeal. *State v. Gumm*, Nos. C-920907, B-925608, 1994 WL 44411 (Ohio App. 1st Dist. Feb 16, 1994) (unreported).

As best the Court can tell from the remainder of Gumm's claim, he contends his appellate counsel were ineffective when they failed to raise as error on direct appeal the following proposed assignments of error:

1. Trial counsel's ineffectiveness in failing to make timely objections to prosecutorial misconduct including the knowing misstatement of the law, improper injection of other acts evidence, arguing facts not in evidence, and allowing Petitioner to be sentenced to death on the basis of an invalid aggravating circumstance.

2. Trial counsel's ineffectiveness in failing to move for a continuance for the purpose of investigating and

obtaining mitigation evidence.

3.       Trial counsel's ineffectiveness in failing to make appropriate objections to jury instruction errors.[18]

(Petition, Doc. No. 157 at 68-69, 72.)  Part of the first sub-claim and all of the second relate to the mitigation phase of Gumm's capital trial and are irrelevant since Gumm has been resentenced to life imprisonment.  The second phase of his capital trial could have had no effect on the first phase, and it is only the first phase that is now at issue in these habeas proceedings.  In addition, Gumm does not identify where in the record this Court might locate the misstatement of the law Gumm claims the prosecutor knowingly spoke at his trial, or where it might find the prosecutor's alleged argument of facts not in evidence.  As for Gumm's contention that his appellate counsel should have raised as error trial counsel's failure to object to prejudicial other acts evidence, as the Court observed in its discussion of Gumm's fifth ground for relief, *supra*, counsel did object to the damaging other acts evidence.  Consequently, there is no factual support for Gumm's claim to the contrary.  Thus, the only part of Gumm's claim left to consider is that his appellate counsel were ineffective for failing to raise as error on direct appeal trial counsel's ineffectiveness for their failure to object to erroneous jury instructions.

_____

[18]In his petition, Gumm states that "appellate counsel failed to make appropriate objections to jury instruction errors," (Doc. No. 157 at 72), but the Court believes Gumm meant to attribute the failure to object to trial counsel, and that he faults appellate counsel for not bringing trial counsel's failure to the attention of the court of appeals on direct appeal.

On direct appeal in the Ohio Supreme Court, Gumm did raise his appellate counsel's ineffectiveness, arguing that appellate counsel should have brought trial counsel's ineffectiveness to the attention of the court of appeals in Gumm's direct appeal. (Appendix 2, Vol. 3 at 88.) Gumm contended only that trial counsel's failure to object to improper argument by the prosecutor should have been raised as error by appellate counsel in Gumm's first appeal of right. *Id.* No mention was made of trial counsel's failure to object to the jury instructions. The supreme court rejected the claim, reasoning that the "failure to make objections does not constitute ineffective assistance of counsel *per se*, as that failure may be justified as a tactical decision." *State v. Gumm*, 73 Ohio St. 3d 413, 428, 653 N.E.2d 253 (1995).

In September 2003, Gumm expanded and raised the claim again when he filed an application to reopen his direct appeal in the court of appeals.[19] (Appendix 2, Vol. 16 at 6-8.) There, relevant to the current proceedings, Gumm alleges that his appellate counsel were ineffective for failing to raise as error on direct appeal trial counsel's ineffectiveness due to their failure to object to prosecutorial misconduct *and* object to erroneous jury instructions. *Id.* The court of appeals denied Gumm's application to reopen his direct appeal as untimely filed without a showing of cause for the delay. (Appendix 2, Vol. 16 at 204-5.) The Ohio Supreme Court affirmed on the same ground. (Appendix 2, Vol. 17

_____

[19]Gumm filed his application to reopen his direct appeal while his *Atkins* post-conviction proceedings were ongoing.

at 302.)

As indicated above, Gumm's claim that his appellate counsel were ineffective for failing to raise as error on direct appeal the ineffectiveness of trial counsel based upon their failure to object to unspecified jury instructions was first raised in his 2003 application to reopen his direct appeal. Both Ohio courts that considered Gumm's claim rejected it based upon the timeliness requirements in Ohio App. R. 26(B). Since that rule was "firmly established and regularly followed" by the time it was relied upon by the state courts in Gumm's case, *see Fautenberry v. Mitchell*, 515 F.3d 614, 640-41 (6th Cir. 2008), a credible argument could be made that Gumm has procedurally defaulted the claim. Respondent has not done so, however, which permits this Court to address Gumm's claim *de novo*.

Gumm does not specify in his petition which part or parts of the jury instructions he believes his trial counsel should have challenged. As it has before, the Court again assumes Gumm refers to the same jury instructions he argues are unconstitutional in his ninth ground for relief, *infra*. The underlying claim of improper jury instructions fails as discussed below, however, so there can have been no ineffective assistance of trial counsel for deciding not to object to them. It follows then that appellate counsel's performance cannot be faulted for failing to raise a fruitless claim on direct appeal. Accordingly, Gumm's claim of ineffective assistance of appellate counsel is unavailing.

To summarize, Gumm's ineffective assistance of appellate counsel advances several sub-claims that relate exclusively to the mitigation phase of his trial which is no longer at issue in these habeas corpus proceedings. In addition, he has not identified in the record where the factual bases for other alleged errors are demonstrated. One sub-claim's factual basis is specifically contradicted by the record. The single sub-claim left for this Court to evaluate is without merit. Consequently, Gumm's sixth ground for relief should be denied.

**SEVENTH GROUND FOR RELIEF**

In his seventh ground for relief, Gumm contends he was brought from Kentucky to Ohio without regard for his right to be free from removal without proper process under Article IV, Section 2 of the United States Constitution. (Petition, Doc. No. 157 at 74-76.) Respondent acknowledges the claim has been preserved for habeas corpus review, but argues the state court's decision respecting the claim was neither contrary to nor an unreasonable application of federal law. (Return of Writ, Doc. No. 68-69.) Gumm does not argue the issue in his reply.

Gumm presented his claim to the Ohio courts, which denied it reasoning as follows:

> Gumm contends that his conviction and death sentence
> should be deemed void based on what he contends was his

illegal arrest in Kentucky and transport to Ohio in the absence of proper extradition procedures. The record, however, supports the sole conclusion that Gumm voluntarily returned to Ohio with Cincinnati police officers. Assuming, *arguendo*, that Gumm was coerced, tricked, induced or deceived into returning to Ohio, such a circumstance would not necessarily invalidate a conviction. *Ker v. Illinois* (1886), 119 U.S. 436; *Frisbie v. Collins* (1952), 342 U.S. 519 . . . .

*State v. Gumm*, 73 Ohio St. 3d 413, 430, 653 N.E.2d 253 (1995) (parallel citations omitted).

For several reasons, Gumm's claim that his federal constitutional rights were violated by the police officers' transporting him back to Ohio fails. First, in his petition, Gumm characterizes his return as a seizure by the Cincinnati police. (Petition, Doc. No. 157 at 74.) No evidence in the record supports that characterization. As the Ohio Supreme Court found, Gumm voluntarily returned to Ohio with the police officers. Gumm presents no evidence to suggest that that finding was in any way unreasonable based upon the evidence presented to the state court. In addition, no evidence was presented in Gumm's two evidentiary hearings in these proceedings to support his claim that he was seized by the police or that his return to Ohio was anything other than voluntary. Accordingly, the Ohio Supreme Court's factual determination stands.

Second, Gumm argues that he was never told that he could be subjected to the death penalty for Aaron Raines' murder or that he could refuse to accompany the police officers back to Ohio. There is no constitutional provision that mandates providing an

individual acting voluntarily such information, and Gumm does not cite one.

Third, Gumm relies on Article IV, Section 2, of the United States Constitution in arguing that required procedures were ignored in obtaining Gumm's return to Ohio from Kentucky. (Petition, Doc. No. 157 at 75-76.) That provision, in relevant part, provides as follows:

> A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.

Leaving aside the fact that Gumm was not charged with any offense when he decided to return to Ohio, the United States Supreme Court has for more than a century consistently held that "forcible abduction is no sufficient reason why the party should not answer when brought within the jurisdiction of the court which has the right to try him for such an offence, and presents no valid objection to his trial in such court." *Ker v. Illinois*, 119 U.S. 436, 444 (1886.) Many years after *Ker*, the Court decided *Frisbie v. Collins*, 342 U.S. 519 (1952), where a defendant sought release from a Michigan state prison on the ground that his forcible seizure, handcuffing, beating, and transport from Illinois to Michigan violated the Due Process Clause of the Fourteenth Amendment. The Supreme Court reinforced *Ker* as follows:

> This Court has never departed from the rule announced in *Ker v. Illinois*, 119 U.S. 436, 444, that the power of a court to

> try a person for crime is not impaired by the fact that he had
> been brought within the court's jurisdiction by reason of a
> forcible abduction.  No persuasive reasons are now
> presented to justify overruling this line of cases.  They rest on
> the sound basis that due process of law is satisfied when one
> present in court is convicted of crime after having been fairly
> apprized of the charges against him and after a fair trial in
> accordance with constitutional procedural safeguards.  There
> is nothing in the  Constitution that requires a court to permit
> a guilty person rightfully convicted to escape justice because
> he was brought to trial against his will.

*Frisbie*, 342 U.S. at 522.  In *United States v. Crews*, 445 U.S. 463 (1980), the Supreme Court

again held that "[a]n illegal arrest, without more, has never been viewed as a bar to

subsequent prosecution, nor as a defense to a valid conviction."  445 U.S. at 474, *citing*

*Gerstein v. Pugh*, 420 U.S. 103, 119 (1975); *Frisbie*, 342 U.S. 519; *Ker*, 119 U.S. 436.  The Court

explained that the exclusionary rule delineates what proof may be offered against an

accused at trial by "closing the courtroom door to evidence secured by official

lawlessness."  *Crews*, 445 U.S. at 474.  Because a defendant himself is not suppressible

"fruit," illegality of his detention does not deprive the government of the opportunity to

present evidence wholly untainted by the alleged police misconduct.  *Id.*, *see also United*

*States v. Pelaez*, 930 F.2d 520, 525 (6th Cir. 1991)(observing that "[a] forcible abduction in

itself does not offend due process").

Surely, if one can be forcibly abducted in one state to stand trial in another without

violating the constitution, a police officer's failure to inform a suspect of the most severe

penalty he might face, even before he is charged, cannot offend due process. Nor can the mere fact that the officers did not prophylactically inform Gumm that he was under no obligation to accompany them back to Cincinnati constitute a due process violation. Thus, even if Gumm had been "seized" by police in the constitutional sense, habeas corpus relief would not be warranted.

As it is, this Court finds Gumm has failed to present clear and convincing evidence that the state court's decision rejecting his claim was based on an unreasonable determination of the facts, or contrary to or an unreasonable application of federal law. Instead, the Ohio Supreme Court's resolution of Gumm's claim is perfectly consistent with the facts as presented to that court and with federal law. As such, Gumm's seventh ground for relief should be denied.

**EIGHTH GROUND FOR RELIEF**

In his eighth ground for relief, Gumm claims that the introduction of gruesome and cumulative photographs at both phases of his trial violated his right to due process of law. (Petition, Doc. No. 157 at 77-78.) Specifically, Gumm contends an unknown number of photographs, including an enlarged photograph of Aaron Raines' face, a videotape of the crime scene with Aaron's body still in place, and Gumm's videotaped walk-through of the crime scene a month later were all more prejudicial than probative.

*Id.* Respondent states the claim is preserved for habeas corpus review, but meritless nonetheless. (Return of Writ, Doc. No. 163 at 70-72.) Gumm does not address the issue in his reply.

Gumm raised the instant claim on direct appeal to the Ohio Supreme Court as his sixth proposition of law, at least to the extent he claims the photographs and videotape of the crime scene are concerned. (Appendix 2, Vol. 3 at 66-68.) This Court observes that Gumm did not argue his videotaped walk-through of the crime scene was repetitive, cumulative, or gruesome. (Appendix 2, Vol. 3 at 66-68.) The state court, however, discusses that videotape along with the other material Gumm claims was unconstitutionally admitted against him at trial in its consideration of Gumm's claim. *State v. Gumm*, 73 Ohio St. 3d 413, 425, 653 N.E.2d 253 (1995). As Respondent advances no procedural default defense to any part of Gumm's claim, this Court will consider it as it has been presented, and as the Ohio Supreme Court decided it on direct appeal. That court determined that the challenged photographs and videotapes were neither repetitive nor cumulative, and that their probative value outweighed any prejudice to Gumm. *Id.*

As a general rule, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Roe v. Baker*,

316 F.3d 557, 567 (6th Cir. 2002), *citing Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994).

This Court first notes that no photographs have been transmitted to the Court as part of the first or second appendix filed in Gumm's case, so they are not a part of the record in these proceedings. Consequently, the Court is unable to determine whether the state supreme court's finding that they were probative rather than gruesome, cumulative, repetitive, or prejudicial was factually unreasonable or contrary to federal law.

As for the walk-through videotaped confession Gumm participated in after his return to Ohio, it is neither gruesome, repetitive, nor cumulative in any way. Setting aside for the time being the Court's earlier observations respecting the interplay between Gumm's mental retardation and his confessions, the videotaped confession is prejudicial in a way that all confessions are prejudicial, but not unduly so regarding the instant ground for relief.

The Court is therefore left to consider whether the admission of the videotape showing Aaron Raines' body at the crime scene "so perniciously affect[ed] the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Roe*, 316 F.3d at 567. Gumm does not argue that is so, nor does he provide any basis upon which this Court might conclude that the Ohio Supreme Court's decision respecting the videotape was contrary to or an unreasonable application of federal law as determined by the United States Supreme Court. In fact, aside from rote recitation of

the Sixth, Eighth, and Fourteenth Amendments, Gumm cites no law whatsoever to support his claim, let alone federal law. (Petition, Doc. No. 157 at 77-78.) The mere fact that a murder victim's body is present and observable on a videotape of the crime scene does not deny a defendant of his right to a fair trial, and Gumm makes no argument more convincing than that.

For all of the foregoing reasons, Gumm's eighth ground for relief should be denied.


**NINTH GROUND FOR RELIEF**

In his ninth and final ground for relief, Gumm alleges he was unconstitutionally prejudiced by improper jury instructions on witness credibility, the requirement that a verdict be unanimous, the element of purpose, and causation. (Petition, Doc. No. 157 at 79-83.) Respondent counters that the claim is both procedurally defaulted and meritless. (Return of Writ, Doc. No. 163 at 73-68.) Gumm does not argue either the procedural status of his claim or its merit in his reply.

As error that would be apparent in the trial record, Gumm would had to have raised the instant claim on direct appeal in the Ohio courts. In reviewing his direct appeal briefs in both the court of appeals and the supreme court, however, the Court finds that Gumm did not raise his claim in either brief. (Appendix 2, Vol. 2 at 54-145; Vol.

3 at 21-125.)  Nor did he raise the claim, even inappropriately, in his state petition for post-conviction relief.  (Appendix 2, Vol. 5 at 10-61.)  Thus, Gumm has procedurally defaulted his jury instruction claim.  As he offers no cause for the default and demonstrates no prejudice therefrom, his claim is defaulted without excuse, and his ninth ground for relief should be denied for that reason.

Even if he had preserved the claim for habeas corpus review, however, it would fail.  In *Estelle v. McGuire*, 502 U.S. 62, 72 (1991), the Supreme Court articulated the standard to be used by federal courts in habeas corpus cases as "whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process."  *See also Henderson v. Kibbe*, 431 U.S. 145, 152 (1977); *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973); *Allen V. Redman*, 858 F.2d 1194, 1200 (6th Cir. 1988).  It is not enough to merely show that the instruction was incorrect:  the burden the petitioner bears in challenging jury instructions in habeas corpus "is even greater than the showing required to establish plain error on appeal."  *Henderson*, 431 U.S. at 154.

Gumm first contends the trial court improperly instructed the jurors that the credibility of witnesses who are police officers should be "tested by exactly the same tests of believability as any other witness."  (Petition, Doc. No. 157 at 79.)  In addition, the trial court stated that such witnesses are not to be considered more credible simply because they are police officers.  *Id*.  Although it may very well be true that such an instruction

singles out a particular group of witnesses regarding credibility, and that such singling out may violate Ohio law, it is practically inconceivable that Gumm could have been prejudiced by the instruction. It was, instead, intended to protect Gumm from any juror's tendency to credit police officer testimony more than any other witness' testimony. Moreover, it is not the federal court's place in habeas corpus to correct errors of state law, *Estelle v. McGuire*, 502 U.S. 62, 67 (1991), and Gumm cites no federal law to support his sub-claim.

Next, Gumm challenges the instruction to the jury that, to find Gumm guilty of aggravated murder in the course of a kidnapping and/or rape, they must find that Gumm caused Aaron Raines' death while committing or attempting to commit a kidnapping and/or rape. (Petition, Doc. No. 157 at 80.) Gumm contends that instruction deprived him of a unanimous verdict because some jurors may have convicted him of aggravated murder in the course of a kidnapping, while others may have found him not guilty of that offense and guilty instead of aggravated murder in the course of a rape. *Id*. The United States Supreme Court has held, however, that the use of certain nonunanimous verdicts in state court criminal cases involving 12-person juries does not violate the defendant's right to due process. *Apodaca v. Oregon*, 406 U.S. 404, 406-12 (1972); *Johnson v. Louisiana*, 406 U.S. 356, 358-59 (1972). In addition, the Ohio Supreme Court has recognized that unanimous verdicts in criminal trials is required by court rule, not by the Sixth and

Fourteenth Amendments of the United States Constitution. *State v. Gardner*, 118 Ohio St. 3d 420, 426, 889 N.E.2d 995 (2008). Thus, the federal constitutional right to a unanimous jury verdict Gumm claims is a mere figment. The trial court's instruction, even if it had deprived Gumm of his right to a unanimous verdict, would be a matter of state law, not federal constitutional law, and would consequently be outside the reach of a federal court conducting habeas corpus review of his conviction.

Gumm also contends that a jury instruction stating "[a] person acts purposely when the gist of the offense is a prohibition against certain conduct of a certain nature . . .," was confusing, although he provides no further explanation of how that is so. (Petition, Doc. No. 157 at 81.) He cites only Ohio Jury Instructions and one state supreme court case in support of his claim. Even in the state case cited, however, the Ohio Supreme Court upheld a conviction against the jury instruction challenge, finding that "[i]n the context of all the instructions given the jury, the court provided adequate instructions on the element of specific intent to kill." *State v. Wilson*, 74 Ohio St. 3d 381, 393, 659 N.E.2d 292 (1996). As in *Wilson*, Gumm's jury was more fully instructed on the purpose element of the offenses charged than he suggests. (Trial Tr. at 1001-3.) Moreover, Gumm has failed to demonstrate how the instruction is contrary to or an unreasonable application of federal law as determined by the United States Supreme Court, 28 U.S.C. § 2254(d)(1), nor has he even hinted at any prejudice he suffered from

the alleged error.

Finally, Gumm contends the trial court's instruction on causation denied him a fair determination of his culpability for Aaron Raines' murder. (Petition, Doc. No. 157 at 81-82.) Gumm does not identify the federal law governing the claim, preferring instead to merely compare the jury instruction given to the one recommended in the Ohio Jury Instructions. There is a good reason for his failure to cite applicable federal law: there is none. A state trial court's failure to follow the format or precise wording of the suggested jury instructions as set out in the Ohio Jury Instructions is not a federal constitutional claim cognizable in habeas corpus.

Because Gumm procedurally defaulted his ninth ground for relief by failing to present it to any state court prior to these habeas corpus proceedings, and has offered no cause for the default or evidence of prejudice therefrom, his claim should be denied. Even if he had properly preserved the claim, however, it would fail on the merits.

## CONCLUSION

For the reasons given herein, the Magistrate Judge recommend that Gumm's first, second, fifth, sixth, seventh, eighth, and ninth grounds for relief be denied. Having found his third and fourth grounds for relief meritorious, it is further recommended that a conditional writ of habeas corpus be granted as to those claims, the condition being that

the State conduct a new trial of Petitioner within 180 days from the date of final judgment

in these proceedings.

September 28, 2009.

s/ **Michael R. Merz**
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).

J:\Death Penalty\Gumm v. Warden\Gumm Report & Recommendations as filed.wpd